# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA

| | |
|---|---|
| MARIO MENDIOLA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| VISION HOSPITALITY, LLC; I.T. | ) CIVIL ACTION NO. CV- 2:07 CV |
| MONTGOMERY, LLC, d/b/a) | 469-MEF |
| QUALITY INN & SUITES) | |
| CONFERENCE CENTER and J.T.) | |
| HOTELS, LLC, D/B/A QUALITY) | |
| INN & SUITES CONFERENCE) | |
| CENTER, | ) |
| | ) |
| Defendants. | ) |

## DEFENDANTS' SUPPLEMENTAL APPENDIX OF EVIDENCE IN SUPPORT OF RENEWED MOTION FOR SUMMARY JUDGMENT

COME NOW Defendants, Vision Hospitality, LLC, I.T. Montgomery, LLC and Rule 19 Defendant, J.T. Hotels, LLC, (hereinafter referred to as "Defendants"), and submit the following Evidence in Support of Defendants' Renewed Motion for Summary Judgment.

Exhibit Four[1]       Deposition of John Tampa

Exhibit Five        Deposition of Beverly Woods

Exhibit Six         Deposition of Timothy Banks

---

[1] Exhibits 1-3 are contained in Defendants' Appendix of Evidence filed on March 14, 2008.

Exhibit Seven        Deposition of Mario Mendiola

Respectfully submitted this 5th day of September, 2008.

/s/ Kyle T. Smith

Kyle T. Smith (ASB-6752-I72K)
J. Rushton  McClees (ASB-8805-C39J)
Attorneys for Defendants
VISION HOSPITALITY, LLC,
I.T. MONTGOMERY, LLC and J.T.
HOTELS, LLC

**OF COUNSEL:**
**SIROTE & PERMUTT, P.C.**
2311 Highland Avenue South
Post Office Box 55727
Birmingham, AL 35255-5727
Tel.:   (205) 930-5100
Fax:   (205) 930-5335

## CERTIFICATE OF SERVICE

I hereby certify that on the 5th day of September, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

D. Jason Britt, Esq.
Morris & McCannally, LLC
50 Wisteria Place
P.O. Box 490
Millbrook, AL 36054

David A. Bryant, Jr., Esq.
18 Augusta Pines Drive
Suite 200E
Spring, TX 77389

s/Kyle T. Smith
OF COUNSEL

# EXHIBIT "4"

# FREEDOM COURT REPORTING

**1**

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE MIDDLE DISTRICT OF ALABAMA

3

4    CIVIL ACTION NUMBER: CV-2:07 CV 469-MEF

5    MARIO MENDIOLA,

6        Plaintiff,

7        vs.

8    VISION HOSPITALITY, LLC,

9    and I.T. MONTGOMERY, LLC,

10   d/b/a QUALITY INN & SUITES

11   CONFERENCE CENTER

12       Defendants.

13

14

15

16

17       VIDEO DEPOSITION OF

18       JOHN TAMPA

19       MAY 15, 2008

20

21

22

23

**2**

1        S T I P U L A T I O N

2        IT IS STIPULATED AND AGREED by

3    and between the parties through their

4    respective counsel that the video

5    deposition of JOHN TAMPA may be taken

6    before Tanya D. Cornelius, Certified

7    Shorthand Reporter and Notary Public, at

8    the Law Offices of Sirote & Permutt, PC,

9    2311 Highland Avenue South, Birmingham,

10   Alabama 35205, on the 15th day of May,

11   2008.

12       IT IS FURTHER STIPULATED AND

13   AGREED that the signature to and the

14   reading of the deposition by the witness is

15   waived, the deposition to have the same

16   force and effect as if full compliance had

17   been had with all laws and rules of Court

18   relating to the taking of depositions.

19       IT IS FURTHER STIPULATED AND

20   AGREED that it shall not be necessary for

21   any objections to be made by counsel to any

22   questions, except as to form or leading

23   questions, and that counsel for the parties

**3**

1    may make objections and assign grounds at

2    the time of the trial, or at the time said

3    deposition is offered in evidence, or prior

4    thereto.

5        IT IS FURTHER STIPULATED AND

6    AGREED that notice of filing of the

7    deposition by the Commissioner is waived.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

**4**

1        I N D E X

2    EXAMINATION BY:          PAGE NUMBER:

3    Mr. Bryant          8

4

5        E X H I B I T S

6    PLAINTIFF'S EXHIBITS:      PAGE NUMBER:

7    1 - 4-27-05 Fax          37

8    2 - 12-6-05 Memo          46

9    3 - Copy of Check          52

10   4 - 12-12-05 Memo          58

11   5 - 12-14-05 Memo          72

12   6 - 12-12-05 Memo          77

13   7 - 12-14-05 Memo          81

14   8 - 12-19-05 Memo          88

15   9 - Charge of Discrimination    90

16   10 - EEOC Determination       96

17   11 - Letter from Unemployment

18       Compensation Agency      99

19   12 - Woods Affidavit        108

20   13 - Banks Affidavit        108

21

22

23

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

### 5

```
 1        A P P E A R A N C E S
 2
 3   FOR THE PLAINTIFF:
 4        DAVID A. BRYANT, Attorney at Law
 5        18 Augusta Pines Drive
 6        Suite 200 W
 7        Spring, Texas 77389
 8
 9        MORRIS & McANNALLY, LLC
10        BY Mr. D. Jason Britt
11        50 Wisteria Place
12        Millbrook, Alabama 36054
13
14   FOR THE DEFENDANT:
15        SIROTE & PERMUTT, PC
16        BY Mr. Kyle T. Smith
17        2311 Highland Avenue South
18        Birmingham, Alabama 35205
19
20   ALSO PRESENT:
21        Mr. Mario Mendiola
22        Mr. Phillip Brewer, Videographer
23
```

### 6

```
 1             I, Tanya D. Cornelius,
 2   Certified Shorthand Reporter and Notary
 3   Public, acting as Commissioner, certify
 4   that on this date, as provided by the
 5   Federal Rules of Civil Procedure, and the
 6   foregoing stipulation of counsel, there
 7   came before me at the Law Offices of Sirote
 8   & Permutt, PC, 2311 Highland Avenue South,
 9   Birmingham, Alabama 35205, beginning at
10   9:54 a.m., JOHN TAMPA, witness in the above
11   cause, for oral examination, whereupon the
12   following proceedings were had:
09:54:46 13
09:55:06 14             VIDEOGRAPHER: This begins
09:55:07 15   videotape number one in the deposition of
09:55:10 16   John Tampa in the matter of Mario Mendiola
09:55:15 17   vs. Vision Hospitality, LLC and IT
09:55:21 18   Montgomery, LLC, d/b/a Quality Inn & Suites
09:55:28 19   Conference Center, Case Number CV-2:07 CV
09:55:32 20   469-MEF, in the Court of the United States
09:55:37 21   District Court for the Middle District of
09:55:40 22   Alabama. We are on the record at 9:54 a.m.
09:55:44 23   on Thursday, May the 15th of 2008.
```

### 7

```
09:55:46  1             This deposition is taking place
09:55:48  2   at the office of Sirote & Permutt, PC. My
09:55:53  3   name is Phillip Brewer, representing
09:55:55  4   Freedom Court Reporting. Would counsel
09:55:59  5   please identify yourself and please state
09:56:00  6   whom you represent?
09:56:01  7             MR. BRYANT: David Bryant here
09:56:02  8   for the plaintiff, Mario Mendiola.
09:56:05  9             MR. BRITT: Jason Britt here for
09:56:06 10   the plaintiff, Mario Mendiola.
09:56:07 11             MR. SMITH: Kyle Smith is here
09:56:09 12   for the defendants, Vision Hospitality and
09:56:11 13   IT Montgomery.
         14             VIDEOGRAPHER: And will the
         15   reporter please swear in the witness?
         16
         17             JOHN TAMPA,
         18   being first duly sworn, was
         19   examined and testified as follows:
         20
         21             THE REPORTER: Will this be
09:56:21 22   usual stipulations?
09:56:21 23             MR. BRYANT: Federal rules. As
```

### 8

```
09:56:26  1   I understand the federal rules, all
09:56:28  2   objections except as to the form of the
09:56:31  3   question or the responsiveness of the
09:56:33  4   answer are reserved for the time of trial.
09:56:36  5             MR. SMITH: That's correct.
09:56:37  6   We'll agree to that.
09:56:39  7             MR. BRYANT: Thank you, sir.
09:56:39  8
09:56:39  9             EXAMINATION
09:56:41 10   BY MR. BRYANT:
09:56:41 11        Q.   What do you do for a living,
09:56:43 12   sir?
09:56:44 13        A.   I'm a developer.
09:56:45 14        Q.   What do you mean by that?
09:56:49 15        A.   Pretty much construction
09:56:54 16   development, working in construction,
09:56:58 17   develop most of commercial hotels property.
09:57:02 18        Q.   Hotels?
09:57:03 19        A.   Yes.
09:57:04 20        Q.   And how long has that been your
09:57:07 21   employment?
09:57:08 22        A.   Eight years.
09:57:10 23        Q.   Eight years?
```

### 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

9

| | | |
|---|---|---|
| 09:57:11 | 1 | A. Yes. |
| 09:57:12 | 2 | Q. Could you give us a little |
| 09:57:14 | 3 | background about yourself, sir, where |
| 09:57:16 | 4 | you're from, where you grew up, where you |
| 09:57:18 | 5 | went to school? |
| 09:57:20 | 6 | A. I grew up in Romania, went to |
| 09:57:23 | 7 | school in Romania. Came to the states in |
| 09:57:30 | 8 | '96 and worked as a laborer in |
| 09:57:37 | 9 | construction, and a few years later started |
| 09:57:42 | 10 | my own company. |
| 09:57:43 | 11 | Q. Okay. Who did you work for when |
| 09:57:46 | 12 | you came to the United States? What was |
| 09:57:50 | 13 | your first job? |
| 09:57:51 | 14 | A. I think the name of the company |
| 09:57:52 | 15 | is Eurocraft Company out of Atlanta, |
| 09:57:55 | 16 | Georgia. |
| 09:57:56 | 17 | Q. What do they do? |
| 09:57:58 | 18 | A. Exterior plaster and EIFS. |
| 09:58:02 | 19 | Q. Exterior plaster and what? |
| 09:58:05 | 20 | A. EIFS. |
| 09:58:07 | 21 | Q. What is that? |
| 09:58:08 | 22 | A. EIFS is exterior installation. |
| 09:58:10 | 23 | It's like a hard coat stucco. |

10

| | | |
|---|---|---|
| 09:58:14 | 1 | Q. Stucco? |
| 09:58:15 | 2 | A. Yes. |
| 09:58:16 | 3 | Q. Okay. Why did you leave that |
| 09:58:19 | 4 | employment, to start your own business? |
| 09:58:21 | 5 | A. That's correct. |
| 09:58:22 | 6 | Q. Okay. So that company that you |
| 09:58:24 | 7 | worked for, you went directly from that |
| 09:58:26 | 8 | company into your own business? |
| 09:58:28 | 9 | A. Yes. |
| 09:58:28 | 10 | Q. Okay. Have you ever been |
| 09:58:33 | 11 | involved in any development other than |
| 09:58:35 | 12 | hotels? |
| 09:58:37 | 13 | A. Some residential, but very |
| 09:58:40 | 14 | little, you know. |
| 09:58:43 | 15 | Q. What year did you start |
| 09:58:45 | 16 | developing hotels on your own? |
| 09:58:59 | 17 | A. 2004. |
| 09:58:59 | 18 | Q. Do you have a business partner? |
| 09:58:59 | 19 | A. Some of the projects I do. Some |
| 09:59:02 | 20 | of them not. |
| 09:59:03 | 21 | Q. Okay. Tell me what businesses |
| 09:59:09 | 22 | you have owned an interest in since the |
| 09:59:13 | 23 | time you became self-employed, so to speak. |

11

| | | |
|---|---|---|
| 09:59:18 | 1 | A. Tampa Enterprise. |
| 09:59:21 | 2 | Q. What is that? |
| 09:59:23 | 3 | A. That is a construction company. |
| 09:59:25 | 4 | Q. Is it an Inc.? |
| 09:59:28 | 5 | A. Yes. |
| 09:59:28 | 6 | Q. It's Tampa Enterprise, Inc.? |
| 09:59:31 | 7 | A. Uh-huh (positive response). |
| 09:59:31 | 8 | Q. Does that still exist? |
| 09:59:32 | 9 | A. Yes. |
| 09:59:33 | 10 | Q. All right. What else? |
| 09:59:36 | 11 | A. Vision Hospitality, Hospitality. |
| 09:59:45 | 12 | Q. Is that an Inc. or an LLC? |
| 09:59:47 | 13 | A. LLC. |
| 09:59:48 | 14 | Q. All right. What else? |
| 09:59:49 | 15 | A. Enterprise Hospitality, LLC. |
| 10:00:01 | 16 | Q. All right. |
| 10:00:01 | 17 | A. P&T Hospitality, LLC. |
| 10:00:01 | 18 | Q. What is it? |
| 10:00:03 | 19 | A. P&T |
| 10:00:05 | 20 | Q. P&T? |
| 10:00:07 | 21 | A. Yes. |
| 10:00:08 | 22 | Q. Hospitality? |
| 10:00:08 | 23 | A. Yes. |

12

| | | |
|---|---|---|
| 10:00:09 | 1 | Q. LLC? |
| 10:00:10 | 2 | A. Yes. |
| 10:00:10 | 3 | Q. What else? |
| 10:00:12 | 4 | A. Acent Hospitality. |
| 10:00:16 | 5 | Q. How do you spell that? |
| 10:00:17 | 6 | A. A-c-c-n-t. |
| 10:00:21 | 7 | Q. N-d? |
| 10:00:24 | 8 | A. T. |
| 10:00:26 | 9 | Q. T. Acent Hospitality? |
| 10:00:27 | 10 | A. LLC. |
| 10:00:27 | 11 | Q. What else? |
| 10:00:29 | 12 | A. Atmore Hospitality, LLC. |
| 10:00:32 | 13 | Atmore. |
| 10:00:32 | 14 | Q. Spell it, please. |
| 10:00:33 | 15 | A. A-t-m-o-r-e. |
| 10:00:44 | 16 | Q. Okay. What else? |
| 10:00:44 | 17 | A. JT Montgomery, what right now is |
| 10:00:44 | 18 | JT Hotels. |
| 10:00:46 | 19 | Q. JT Montgomery, LLC? |
| 10:00:49 | 20 | A. Yeah. |
| 10:00:49 | 21 | Q. And you say it's what, JT? |
| 10:00:52 | 22 | A. JT Hotels, you know. |
| 10:00:53 | 23 | Q. What does that mean? Is that a |

3 (Pages 9 to 12)

# FREEDOM COURT REPORTING

---

13

10:00:55 1   d/b/a?

10:00:57 2     A.  We transferred the interest from

10:00:59 3   JT Montgomery to JT Hotels, you know.

10:01:02 4     Q.  Is that an LLC?

10:01:03 5     A.  Yeah.

10:01:04 6     Q.  When did you do that?

10:01:06 7     A.  I believe -- I don't know

10:01:08 8   exactly the date, but I know that it was

10:01:11 9   transferred.

10:01:11 10     Q.  I need to know when.

10:01:13 11     A.  I don't know the date.

10:01:14 12     Q.  Was it this year?

10:01:16 13     A.  I don't recall.

10:01:17 14     Q.  Was it last year?

10:01:19 15     A.  The courthouse probably can help

10:01:21 16   you.

10:01:21 17     Q.  Well, I'm trying to find out

10:01:23 18   what you know. So if you don't know the

10:01:25 19   answer, you can say "I don't know."

10:01:27 20     A.  I already told you I don't

10:01:28 21   recall.

10:01:28 22     Q.  How about 2005? Was IT

10:01:30 23   Montgomery, LLC, had it already transferred

---

14

10:01:33 1   its interest to JT Hotels?

10:01:35 2     A.  I don't remember, sir.

10:01:36 3     Q.  And you don't remember if it

10:01:38 4   happened in 2006?

10:01:40 5     A.  I don't remember the date.

10:01:42 6     Q.  2007, same answer?

10:01:45 7     A.  Yes.

10:01:46 8     Q.  And what do you mean by

10:01:47 9   transferred its interest? Do you mean that

10:01:50 10   IT Montgomery, LLC has no assets now?

10:01:53 11     A.  That's correct.

10:01:55 12     Q.  Okay. What purpose did you

10:01:58 13   transfer those assets, sir?

10:02:01 14     A.  There was allegation regarding

10:02:03 15   the ownership of the LLC, and after the

10:02:09 16   settlement of that, we transferred

10:02:11 17   everything to JT Hotels, you know.

10:02:15 18     Q.  Is that pursuant to a settlement

10:02:17 19   agreement?

10:02:17 20     A.  That's correct.

10:02:27 21     Q.  Tell me about that. Was there a

10:02:27 22   lawsuit?

10:02:27 23     A.  Yes.

---

15

10:02:27 1     Q.  Who filed a lawsuit?

10:02:27 2     A.  There were several parties in

10:02:27 3   the lawsuit.

10:02:28 4     Q.  And who are they?

10:02:31 5     A.  One of my previous partner,

10:02:36 6   Tommy Haynes.

10:02:39 7     Q.  Tommy Haynes.

10:02:43 8     A.  Mike Malone, Triumph Assets

10:02:50 9   Management.

10:02:56 10     Q.  Anybody else?

10:02:57 11     A.  There were probably more,

10:02:59 12   several, twenty, thirty people involved,

10:03:02 13   part of the Triumph Assets Management, you

10:03:05 14   know.

10:03:05 15     Q.  Were you a defendant in that

10:03:08 16   lawsuit?

10:03:09 17     MR. SMITH:  Did they sue you?

10:03:11 18     A.  I'm sorry.

10:03:11 19     A.  Well, they sue me. I sue them.

10:03:14 20   It was one of those I don't know how you

10:03:16 21   really call that.

10:03:16 22     MR. SMITH:  My firm was involved

10:03:18 23   in that, but I wasn't, so I don't -- I

---

16

10:03:20 1   can't shed any light.

10:03:23 2     Q.  And was that here in Birmingham?

10:03:25 3     A.  No. It was in Georgia first.

10:03:29 4   After that, it was in Alabama, and after

10:03:33 5   that, it was transferred to Chattanooga,

10:03:36 6   Tennessee.

10:03:36 7     Q.  And is that lawsuit completed?

10:03:40 8   Is it over?

10:03:41 9     A.  Yes.

10:03:41 10     Q.  And when was that? When did it

10:03:45 11   end?

10:03:45 12     A.  I think it ended in '07

10:03:48 13   sometime. I'm not sure exactly.

10:03:49 14     Q.  Do you have any idea when that

10:03:51 15   suit was filed?

10:03:53 16     A.  No.

10:03:54 17     Q.  So it ended in --

10:03:56 18     A.  A year and a half or two year

10:03:58 19   probably before -- probably in '05 start.

10:04:02 20   I think sometime in '05 probably.

10:04:04 21     Q.  That's when it started?

10:04:05 22     A.  Yes.

10:04:07 23     Q.  Do you remember when in '07 that

---

4 (Pages 13 to 16)

# FREEDOM COURT REPORTING

| | 17 |
|---|---|
| 10:04:10 1 | the case was finished? |
| 10:04:12 2 | A. No. |
| 10:04:12 3 | Q. Did you sign a settlement |
| 10:04:14 4 | agreement? |
| 10:04:16 5 | A. I believe I did, yes. |
| 10:04:17 6 | Q. And do you recall whether the |
| 10:04:19 7 | assets that you transferred from IT |
| 10:04:23 8 | Montgomery to JT Hotels was done after you |
| 10:04:26 9 | signed the settlement agreement? |
| 10:04:28 10 | A. Yes. |
| 10:04:43 11 | Q. Okay. Let me go back through |
| 10:04:45 12 | the entities again that you have given us. |
| 10:04:48 13 | Tampa Enterprise, Inc., does that still |
| 10:04:51 14 | exist? |
| 10:04:51 15 | A. Yes. |
| 10:04:51 16 | Q. Vision Hospitality, LLC, does |
| 10:04:53 17 | that still exist? |
| 10:04:54 18 | A. Yes. |
| 10:04:55 19 | Q. Enterprise Hospitality, does |
| 10:04:57 20 | that still exist? |
| 10:04:57 21 | A. Yes. |
| 10:04:57 22 | Q. P&T Hospitality? |
| 10:05:00 23 | A. Yes. |

| | 18 |
|---|---|
| 10:05:00 1 | Q. Acent Hospitality? |
| 10:05:03 2 | A. Yes. |
| 10:05:03 3 | Q. Atmore Hospitality? |
| 10:05:05 4 | A. Yes. |
| 10:05:06 5 | Q. What does Tampa Enterprise do? |
| 10:05:08 6 | A. It's a construction company. |
| 10:05:10 7 | Q. Does it own assets, real estate, |
| 10:05:14 8 | anything? |
| 10:05:14 9 | A. No. |
| 10:05:15 10 | Q. Vision Hospitality, is that -- |
| 10:05:17 11 | tell me what that company does. |
| 10:05:20 12 | A. That company is holding the deed |
| 10:05:23 13 | for one of the hotels. |
| 10:05:26 14 | Q. It's a holding company? |
| 10:05:27 15 | A. No. It's holding the deed. |
| 10:05:29 16 | It's the LLC who owns one of the real |
| 10:05:34 17 | estate. |
| 10:05:34 18 | Q. I didn't understand what you |
| 10:05:35 19 | just said. I apologize. It owns what? |
| 10:05:38 20 | A. Each hotel have its own LLC, you |
| 10:05:41 21 | know. |
| 10:05:41 22 | Q. Uh-huh (positive response). And |
| 10:05:43 23 | Vision Hospitality holds the deed for which |

| | 19 |
|---|---|
| 10:05:45 1 | hotel? |
| 10:05:56 2 | A. A Hampton Inn. |
| 10:05:56 3 | Q. What does -- does Vision |
| 10:05:56 4 | Hospitality do anything else? |
| 10:05:56 5 | A. We also keeping the name as, |
| 10:05:56 6 | right now we answer as Vision Hospitality, |
| 10:06:00 7 | main office phone number. |
| 10:06:01 8 | Q. Does the company do anything |
| 10:06:03 9 | else besides -- |
| 10:06:04 10 | A. No, no. |
| 10:06:05 11 | Q. Does it operate a hotel? |
| 10:06:07 12 | A. Well, it's operating its own |
| 10:06:10 13 | hotel. |
| 10:06:10 14 | Q. That's what I'm asking you. |
| 10:06:12 15 | Does Vision Hospitality operate a hotel? |
| 10:06:14 16 | A. Hampton Inn. |
| 10:06:16 17 | Q. So it doesn't just hold the |
| 10:06:17 18 | deed, it operates the hotel? |
| 10:06:19 19 | A. Well, the hotel is operating by |
| 10:06:21 20 | itself, you know. The employees are |
| 10:06:23 21 | working for Vision Hospitality. |
| 10:06:25 22 | Q. Okay. What about Enterprise |
| 10:06:27 23 | Hospitality? What does that company do? |

| | 20 |
|---|---|
| 10:06:29 1 | A. Same thing. |
| 10:06:31 2 | Q. Does it run the Hampton Inn? |
| 10:06:33 3 | A. Yeah, a different Hampton Inn. |
| 10:06:37 4 | Q. All right. Does Enterprise |
| 10:06:39 5 | Hospitality do anything other than run the |
| 10:06:41 6 | Hampton Inn? |
| 10:06:42 7 | A. Same thing, operates its own -- |
| 10:06:46 8 | under the entity, we operate the hotel. |
| 10:06:48 9 | Q. What about P&T Hospitality? |
| 10:06:51 10 | A. Same thing. |
| 10:06:52 11 | Q. What does it operate? |
| 10:06:55 12 | A. Hampton Inn and Suites. |
| 10:07:01 13 | Q. Acent Hospitality? |
| 10:07:03 14 | A. The same, just Hilton Garden |
| 10:07:09 15 | Inn. |
| 10:07:09 16 | Q. Atmore? |
| 10:07:09 17 | A. Comfort Suites. |
| 10:07:18 18 | Q. And I guess IT Montgomery is now |
| 10:07:20 19 | JT Hotels? |
| 10:07:22 20 | A. Yes. It is Quality Inn and |
| 10:07:25 21 | Suites and Super 8. |
| 10:07:27 22 | Q. Quality Inn and Suites. And |
| 10:07:31 23 | that is in Montgomery? |

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

| | 21 |
|---|---|
| 10:07:32 1 | A. Yes. |
| 10:07:33 2 | Q. That is the location that Mario |
| 10:07:36 3 | Mendiola was employed? |
| 10:07:38 4 | A. That's correct. |
| 10:07:41 5 | Q. Vision Hospitality, LLC, it |
| 10:07:44 6 | operates the Hampton Inn where? |
| 10:07:46 7 | A. In Hope Hull, Alabama, Hope, |
| 10:07:52 8 | H-o-p-e, Hull, H-u-l-l. |
| 10:07:56 9 | Q. Hope Hull, Alabama. What about |
| 10:07:58 10 | Enterprise Hospitality, which Hampton Inn |
| 10:08:01 11 | does it operate? |
| 10:08:02 12 | A. In Enterprise, Alabama. |
| 10:08:04 13 | Q. Enterprise. And what about P&T, |
| 10:08:07 14 | what Hampton does it operate, what |
| 10:08:09 15 | location? |
| 10:08:09 16 | A. Hampton Inn, downtown |
| 10:08:12 17 | Montgomery. |
| 10:08:14 18 | Q. Hilton Garden? |
| 10:08:17 19 | A. Maryville, Indiana. |
| 10:08:19 20 | Q. All right. And the Conference |
| 10:08:26 21 | -- I've got Atmore. What was the one you |
| 10:08:28 22 | said Atmore runs? |
| 10:08:31 23 | A. Comfort Suites. |

| | 22 |
|---|---|
| 10:08:32 1 | Q. Comfort Suites. I can't even |
| 10:08:34 2 | read my own writing. Comfort Suites, where |
| 10:08:36 3 | is that located? |
| 10:08:37 4 | A. Atmore, Alabama. |
| 10:08:41 5 | Q. And each of these entities, each |
| 10:08:43 6 | of these hotels that are operated by these |
| 10:08:47 7 | various companies, who owns the various |
| 10:08:53 8 | companies? For example, who owns Tampa |
| 10:08:56 9 | Enterprise? |
| 10:08:56 10 | A. I do. |
| 10:08:56 11 | Q. Are you a hundred percent owner? |
| 10:08:58 12 | A. Yes. |
| 10:08:59 13 | Q. What about Vision Hospitality? |
| 10:09:01 14 | A. I do. |
| 10:09:02 15 | Q. Okay. Enterprise Hospitality? |
| 10:09:07 16 | A. I own fifty percent, and my |
| 10:09:17 17 | partner owns fifty percent. |
| 10:09:17 18 | Q. Who is your partner? |
| 10:09:17 19 | A. Nash Patel. |
| 10:09:17 20 | Q. How do you spell that? |
| 10:09:17 21 | A. N-a-s-h, Patel, P-a-t-e-l. |
| 10:09:21 22 | Q. Where is he located? |
| 10:09:22 23 | A. Indiana operation, Indiana. |

| | 23 |
|---|---|
| 10:09:26 1 | Q. Indiana? |
| 10:09:26 2 | A. Yeah. |
| 10:09:26 3 | Q. What about P&T Hospital? |
| 10:09:29 4 | A. Same as Enterprise Hospitality. |
| 10:09:32 5 | Q. It's owned fifty percent by you |
| 10:09:34 6 | and fifty percent by Mr. Patel? |
| 10:09:36 7 | A. Yes. |
| 10:09:36 8 | Q. Acent Hospitality, who owns |
| 10:09:39 9 | that? |
| 10:09:39 10 | A. Me, Nash, and also a third |
| 10:09:41 11 | party, Bob Patel. |
| 10:09:43 12 | Q. Is that any relation to Nash |
| 10:09:45 13 | Patel? |
| 10:09:46 14 | A. It's his brother-in-law. |
| 10:09:50 15 | Q. All right. And are you equal |
| 10:09:52 16 | partners in that? |
| 10:09:53 17 | A. Yeah. |
| 10:09:54 18 | Q. A third, a third, a third? |
| 10:09:56 19 | A. Yes. |
| 10:09:58 20 | Q. What about Atmore? |
| 10:10:00 21 | A. Me and Nash, fifty/fifty. |
| 10:10:07 22 | Q. Okay. And then JT Hotels? |
| 10:10:11 23 | A. Myself, a hundred percent. |

| | 24 |
|---|---|
| 10:10:13 1 | Q. Has that always been the case? |
| 10:10:16 2 | A. After the settlement, yes. |
| 10:10:18 3 | Q. What about before the |
| 10:10:19 4 | settlement? |
| 10:10:20 5 | A. Well, before the settlement, |
| 10:10:22 6 | there were a lot of hands on the property, |
| 10:10:26 7 | you know. From the first time I purchased |
| 10:10:29 8 | the property, it was a partnership. After |
| 10:10:32 9 | that, I took it, there was some dispute, |
| 10:10:37 10 | and we settled, you know. |
| 10:10:49 11 | Q. All right. In terms of |
| 10:10:54 12 | operating these hotels, is it you, John |
| 10:10:59 13 | Tampa, that decides how to operate the |
| 10:11:03 14 | hotel? Are you in charge of essentially |
| 10:11:05 15 | deciding what policy will be and what |
| 10:11:08 16 | procedure will be? |
| 10:11:09 17 | A. Most of them. I'm not sure if I |
| 10:11:12 18 | can cover sometime everything, but that's |
| 10:11:15 19 | what we're trying to do, yes. |
| 10:11:17 20 | Q. Everyone answers to you, |
| 10:11:19 21 | correct, all the employees of each of these |
| 10:11:21 22 | entities answers directly to you? |
| 10:11:23 23 | A. Yes. Not directly to me, no. |

6 (Pages 21 to 24)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

<table>
<tr><td colspan="2">25</td></tr>
</table>

| | |
|---|---|
| 10:11:25 1 | Q. There may be a manager in |
| 10:11:27 2 | between? |
| 10:11:27 3 | A. Manager and also the person |
| 10:11:31 4 | running the office, sometime they report. |
| 10:11:35 5 | Q. So you would be their boss? |
| 10:11:37 6 | A. Yes. |
| 10:11:37 7 | Q. Who's your boss? |
| 10:11:38 8 | A. I don't have no boss. |
| 10:11:40 9 | Q. You don't have a boss? |
| 10:11:42 10 | A. (Witness shakes head.) |
| 10:11:43 11 | Q. All right. So it's fair to say, |
| 10:11:45 12 | then, you make all decisions, all |
| 10:11:47 13 | significant decisions with respect to |
| 10:11:50 14 | operating these entities; is that true? |
| 10:11:53 15 | A. I cannot tell you I'm making a |
| 10:11:55 16 | hundred percent decision. Probably |
| 10:11:57 17 | sometime managers are making decision and |
| 10:12:00 18 | I'll follow up later. You know, I'm |
| 10:12:01 19 | finding out they made the decision. |
| 10:12:04 20 | However, I cannot tell you I'm making all |
| 10:12:07 21 | the decisions, because I cannot. |
| 10:12:12 22 | Q. Have -- do you operate a Super |
| 10:12:18 23 | 8? |

<table>
<tr><td colspan="2">26</td></tr>
</table>

| | |
|---|---|
| 10:12:18 1 | A. Myself personal? |
| 10:12:21 2 | Q. Yes, sir. |
| 10:12:21 3 | A. No, I have a manager. |
| 10:12:23 4 | Q. Well, you own a Super 8? |
| 10:12:26 5 | A. Yes. |
| 10:12:28 6 | Q. And is that a different entity |
| 10:12:31 7 | than what you've already told me? |
| 10:12:33 8 | A. No. The Super 8 is under JT -- |
| 10:12:37 9 | JT Hotels I mentioned to you before. |
| 10:12:39 10 | Q. Did you acquire that Super 8 |
| 10:12:40 11 | recently? |
| 10:12:41 12 | A. No. |
| 10:12:42 13 | Q. When did you first acquire the |
| 10:12:45 14 | Super 8? |
| 10:12:47 15 | A. The building for the Super 8 was |
| 10:12:50 16 | part of the building name of Governor's |
| 10:12:58 17 | House, what actually was the building where |
| 10:13:01 18 | Quality Inn & Suite, and I split that |
| 10:13:05 19 | building in two, did two hotels out of it. |
| 10:13:07 20 | Q. But operated by JT Hotels now? |
| 10:13:09 21 | A. That's correct. |
| 10:13:10 22 | Q. Previously operated by IT |
| 10:13:11 23 | Montgomery? |

<table>
<tr><td colspan="2">27</td></tr>
</table>

| | |
|---|---|
| 10:13:12 1 | A. That's correct. |
| 10:13:12 2 | Q. And when did you open the Super |
| 10:13:20 3 | 8? |
| 10:13:20 4 | A. I believe '05 or '06, I opened |
| 10:13:23 5 | that. |
| 10:13:32 6 | Q. Did you ever have -- |
| 10:13:32 7 | A. '06. |
| 10:13:32 8 | Q. I'm sorry. '06? |
| 10:13:32 9 | A. Probably '06, January. I know |
| 10:13:33 10 | it was January. I think '06, if I'm not |
| 10:13:36 11 | mistaken. I cannot recall. Either '05 or |
| 10:13:40 12 | '06, sometime in January. |
| 10:13:51 13 | Q. Have you ever allowed, say, IT |
| 10:13:52 14 | Montgomery to use or borrow employees from |
| 10:14:01 15 | any of the other entities to do work for |
| 10:14:04 16 | you at either the Super 8 or the Quality |
| 10:14:11 17 | Inn? |
| 10:14:11 18 | A. No. Pretty much, they are not |
| 10:14:13 19 | allowed to use employees from one property |
| 10:14:18 20 | to another, you know. That's my policy. |
| 10:14:21 21 | Q. Has that ever happened? |
| 10:14:23 22 | A. I'm not sure. |
| 10:14:25 23 | Q. So you're saying you don't mix |

<table>
<tr><td colspan="2">28</td></tr>
</table>

| | |
|---|---|
| 10:14:27 1 | your employees between one entity and |
| 10:14:29 2 | another? |
| 10:14:30 3 | A. No, we don't. |
| 10:14:31 4 | Q. So you don't call someone over |
| 10:14:33 5 | at Acent down at the Hilton, or whatever, |
| 10:14:35 6 | and ask them to come over to fill in for |
| 10:14:38 7 | someone at the Super 8 or at the Quality |
| 10:14:41 8 | Inn? |
| 10:14:41 9 | A. I do not, no. The policy is to |
| 10:14:45 10 | not use -- to not mix employees. |
| 10:14:47 11 | Q. How many employees, back in |
| 10:14:49 12 | 2005, did IT Montgomery have? |
| 10:14:58 13 | A. I don't know exactly. I don't |
| 10:15:01 14 | know at this time. Thirty, thirty-five, |
| 10:15:02 15 | forty. I'm not sure. |
| 10:15:04 16 | Q. Okay. More than twenty-five? |
| 10:15:08 17 | A. I'm not sure, because some of |
| 10:15:10 18 | them are part-time. I don't know what we |
| 10:15:12 19 | got right now. |
| 10:15:13 20 | Q. Well, part-time, full-time, |
| 10:15:15 21 | everybody? |
| 10:15:16 22 | A. It can be -- I'm not sure. The |
| 10:15:18 23 | manager probably can answer that question. |

7 (Pages 25 to 28)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

29

| | | |
|---|---|---|
| 10:15:20 | 1 | Q. Who is the manager? |
| 10:15:21 | 2 | A. Beverly Woods. |
| 10:15:24 | 3 | Q. Beverly Woods. Okay. Sir, have |
| 10:15:28 | 4 | you ever been arrested? |
| 10:15:29 | 5 | A. Yes. |
| 10:15:30 | 6 | Q. For what? |
| 10:15:33 | 7 | A. Speeding. |
| 10:15:34 | 8 | Q. Anything else? |
| 10:15:35 | 9 | A. No. |
| 10:15:36 | 10 | Q. You got arrested for speeding? |
| 10:15:38 | 11 | A. Yep. |
| 10:15:38 | 12 | Q. Were you going real fast? |
| 10:15:40 | 13 | A. Yeah. |
| 10:15:41 | 14 | Q. Okay. Have you ever been |
| 10:15:44 | 15 | convicted of any crime? |
| 10:15:45 | 16 | A. No. |
| 10:15:47 | 17 | Q. Are you a United States citizen? |
| 10:15:49 | 18 | A. Yes. |
| 10:15:49 | 19 | Q. And when did you obtain your |
| 10:15:52 | 20 | citizenship? |
| 10:15:54 | 21 | A. In 2005. |
| 10:15:55 | 22 | Q. 2005? |
| 10:15:57 | 23 | A. I think. |

30

| | | |
|---|---|---|
| 10:15:57 | 1 | Q. Do you know your driver's |
| 10:15:59 | 2 | license number off the top of your head? |
| 10:16:01 | 3 | A. No. |
| 10:16:01 | 4 | Q. Do you have it with you? |
| 10:16:02 | 5 | A. Yeah. |
| 10:16:02 | 6 | Q. Could you tell me what the |
| 10:16:11 | 7 | number is, please? |
| 10:16:12 | 8 | A. |
| 10:16:19 | 9 | Q. Okay. You live in Georgia? |
| 10:16:25 | 10 | A. Yes. |
| 10:16:25 | 11 | Q. What's your home address? |
| 10:16:27 | 12 | A. |
| 10:16:32 | 13 | Q. |
| 10:16:35 | 14 | A. Buford -- |
| 10:16:39 | 15 | Q. Buford with a -- |
| 10:16:39 | 16 | A. Georgia. |
| 10:16:39 | 17 | Q. -- Buford with a T, Buford -- |
| 10:16:44 | 18 | A. Buford with a -- |
| 10:16:44 | 19 | Q. -- with a D? |
| 10:16:44 | 20 | A. -- D. |
| 10:16:46 | 21 | Q. Buford, Georgia? |
| 10:16:47 | 22 | A. 30509. |
| 10:16:50 | 23 | Q. 509. What other states have you |

31

| | | |
|---|---|---|
| 10:16:53 | 1 | lived in besides Georgia? |
| 10:16:56 | 2 | A. Only Georgia. |
| 10:16:58 | 3 | Q. So when you moved from Romania |
| 10:17:02 | 4 | back in what, '96, you said? |
| 10:17:04 | 5 | A. Yes. |
| 10:17:04 | 6 | Q. You moved directly to Georgia? |
| 10:17:07 | 7 | A. Yes. |
| 10:17:08 | 8 | Q. Okay. Have you lived in any |
| 10:17:09 | 9 | other countries besides Romania and the |
| 10:17:13 | 10 | United States? |
| 10:17:13 | 11 | A. No. |
| 10:17:13 | 12 | Q. Are you married? |
| 10:17:14 | 13 | A. No. |
| 10:17:15 | 14 | Q. Have you ever been married? |
| 10:17:16 | 15 | A. Yes. |
| 10:17:17 | 16 | Q. When was that? |
| 10:17:27 | 17 | A. '97. |
| 10:17:27 | 18 | Q. And did you divorce? |
| 10:17:27 | 19 | A. Yes. |
| 10:17:27 | 20 | Q. What was your wife's name? |
| 10:17:29 | 21 | A. I'm sorry? |
| 10:17:30 | 22 | Q. Your wife's name, your ex-wife, |
| 10:17:32 | 23 | what's her name? |

32

| | | |
|---|---|---|
| 10:17:33 | 1 | A. Alina. |
| 10:17:33 | 2 | Q. Alina? How do you spell it? |
| 10:17:34 | 3 | A. A-l-i-n-a. |
| 10:17:38 | 4 | Q. And is she a United States |
| 10:17:40 | 5 | citizen? |
| 10:17:40 | 6 | A. Yes. |
| 10:17:40 | 7 | Q. Is she from Georgia? |
| 10:17:43 | 8 | A. I think originally she's from |
| 10:17:45 | 9 | Romania. |
| 10:17:46 | 10 | Q. And when did you all divorce, |
| 10:17:50 | 11 | '97 you said? |
| 10:17:50 | 12 | A. I'm sorry? |
| 10:17:51 | 13 | Q. You divorced in '97? |
| 10:17:52 | 14 | A. No. I got married in '97. |
| 10:17:54 | 15 | Q. Oh, I'm sorry. And you |
| 10:17:56 | 16 | divorced? |
| 10:17:57 | 17 | A. Divorced in '05. |
| 10:17:59 | 18 | Q. In '05. And that was there in |
| 10:18:02 | 19 | Buford? Your divorce action was filed in |
| 10:18:08 | 20 | Buford or some place else? |
| 10:18:11 | 21 | A. Same thing, Gwinnett County, |
| 10:18:14 | 22 | same county. I believe the courthouse in |
| 10:18:18 | 23 | different city, Lawrenceville. |

8 (Pages 29 to 32)

# FREEDOM COURT REPORTING

33

10:18:19 1    Q.   Same county.  But you're not
10:18:21 2   married now?
10:18:22 3    A.   No.
10:18:22 4    Q.   Sir, have you ever -- have you
10:18:34 5   ever suffered from a serious illness?  And
10:18:37 6   what I mean by that is one that might be
10:18:40 7   fatal?
10:18:42 8    A.   What do you mean fatal?
10:18:43 9    Q.   Like it could kill you?
10:18:48 10    A.   Not me, but my family did.
10:18:50 11    Q.   Who?
10:18:51 12    A.   My mom.
10:18:52 13    Q.   Your mom?
10:18:53 14    A.   Uh-huh (positive response).
10:18:53 15    Q.   If you don't mind me asking,
10:18:56 16   what illness did she suffer from?
10:18:59 17    A.   I don't know exactly in English
10:19:02 18   how to say, but it's inside the intestine.
10:19:06 19   It's like a cancer.
10:19:07 20    Q.   It was cancer?
10:19:08 21    A.   Something.  I'm not sure
10:19:10 22   exactly, similar to that.
10:19:20 23    Q.   Let me ask you about Mr.

34

10:19:28 1   Mendiola.  When did you first speak with
10:19:32 2   Mr. Mendiola about working for your hotel?
10:19:38 3    A.   I don't recall the date exactly.
10:19:43 4   I know I meet him in San Antonio.
10:19:47 5    Q.   You met him in San Antonio?
10:19:49 6    A.   Yes.
10:19:49 7    Q.   Why is that?
10:19:50 8    A.   I was doing a project over
10:19:52 9   there, construction.  I'm not sure.  It's
10:19:58 10   close to the airport, a couple of miles
10:20:03 11   from the airport.  What is that, 280 or --
10:20:03 12    Q.   281?
10:20:03 13    A.   Yeah, 281, you know.  Right now
10:20:09 14   the hotel is Hilton Garden Inn.
10:20:11 15    Q.   You were doing construction at
10:20:13 16   the hotel?
10:20:13 17    A.   Yes.
10:20:14 18    Q.   And was Mr. Mendiola working at
10:20:18 19   the hotel?
10:20:18 20    A.   Yes.
10:20:28 21    Q.   And do you remember when that
10:20:28 22   was?
10:20:28 23    A.   I don't recall the date exactly,

35

10:20:30 1   you know.
10:20:32 2    Q.   You were doing construction, and
10:20:34 3   at some point, I guess, you and Mr.
10:20:36 4   Mendiola talked about him working for you?
10:20:39 5    A.   One of the afternoon, pretty
10:20:43 6   much, we were still working construction.
10:20:44 7   Most of the people left.  I meet with him.
10:20:47 8   I saw him in the parking lot, and I asked
10:20:51 9   him what's going on, and he was pretty sad,
10:20:55 10   you know, and I asked him what's wrong.  He
10:20:57 11   said, well, you know, they brought another
10:20:59 12   lady to replace me.  I believe prior to
10:21:04 13   that was the GM for the property, what was
10:21:08 14   a Clarion Hotel, and the owners brought a
10:21:13 15   new GM, you know, for the property to
10:21:17 16   become Hilton Garden Inn.
10:21:20 17    Q.   And do you remember when you
10:21:23 18   first discussed him actually working for
10:21:25 19   you?
10:21:25 20    A.   At that time, you know, I spoke
10:21:27 21   with him, and I said, what's going on?
10:21:29 22   What are you going to do?  He said, well, I
10:21:32 23   don't know.  They de-promote (sic) me to a

36

10:21:36 1   very low property, Econo Lodge, and I don't
10:21:38 2   know what I'm going to do.  And at that
10:21:40 3   time, I mentioned to him, hey, I have a
10:21:43 4   property in Montgomery, Alabama.  If it's
10:21:46 5   something that's going to interest you, you
10:21:48 6   can go ahead and fly, you can see what's
10:21:50 7   going on, and let me know if it's something
10:21:53 8   you want to do.
10:21:53 9    Q.   Okay.  And at some point, I
10:21:55 10   guess, you all agreed that he would come to
10:21:59 11   work for you?
10:21:59 12    A.   Yes.
10:22:00 13    Q.   Did you draft any documents
10:22:01 14   relating to an employment offer from Mr.
10:22:08 15   Mendiola?
10:22:09 16    A.   I think there was something
10:22:11 17   draft, yes.
10:22:13 18    Q.   Let me see if I can find it.
10:22:17 19   Did you draft something or did Mr. Mendiola
10:22:20 20   draft something?
10:22:21 21    A.   No, I think my office did
10:22:22 22   probably type it.
10:22:26 23    Q.   I'll go ahead and mark Exhibit

9 (Pages 33 to 36)

# FREEDOM COURT REPORTING

---

**37**

10:22:29 1    i, then, and ask if you can identify this?

10:22:30 2    It's a document dated April 27th of '05.

10:22:30 3

10:22:30 4        (Whereupon, Plaintiff's Exhibit 1 was

10:22:30 5        marked for identification and same

10:22:30 6        is attached hereto.)

10:22:36 7

10:22:56 8    A.  Yes, something like this.

10:22:58 9    Q.  Okay.  Well, is this the

10:23:01 10   document or is it something like that?

10:23:03 11   A.  I don't -- I think this is it,

10:23:06 12   you know, but I cannot tell you exactly.

10:23:09 13   Q.  Is that your signature at the

10:23:10 14   bottom?

10:23:11 15   A.  It look my signature, yes.

10:23:12 16   Q.  So you're not denying that you

10:23:14 17   signed this document?

10:23:16 18   A.  It look my signature, yes.

10:23:18 19   Q.  And in this document, you

10:23:22 20   indicate that Mr. Mendiola would earn a

10:23:30 21   certain type of salary?

10:23:30 22   A.  Yes.

10:23:30 23   Q.  A certain level of salary,

---

**38**

10:23:30 1    right?  Is that correct?

10:23:30 2    A.  Yes.

10:23:30 3    Q.  And that you would also provide

10:23:32 4    a job in the hotel for Roxanna Luker; is

10:23:35 5    that correct?

10:23:35 6    A.  Yes.

10:23:36 7    Q.  And who did you understand

10:23:37 8    Roxanna Luker to be?

10:23:39 9    A.  Roxanna, my understanding, was

10:23:42 10   his girlfriend.

10:23:43 11   Q.  Okay.  You also agreed to pay

10:23:52 12   some expenses for him, some moving

10:23:56 13   expenses, I think?

10:23:56 14   A.  Yes.

10:23:57 15   Q.  Because he was coming from San

10:23:58 16   Antonio?

10:23:58 17   A.  That's correct.

10:23:59 18   Q.  And he would be provided a

10:24:01 19   bedroom and living room area?

10:24:03 20   A.  Yes.

10:24:04 21   Q.  That would be on-site?

10:24:05 22   A.  Yes.

10:24:07 23   Q.  That's not a hotel room, is it?

---

**39**

10:24:12 1    A.  The room was in the hotel, but

10:24:14 2    was not a room hotel.  It was apartment.

10:24:18 3    Q.  It was a separate -- it's not

10:24:19 4    something you rent out to customers?

10:24:20 5    A.  No, no.

10:24:21 6    Q.  And then a place for his dog in

10:24:23 7    the back.  All right.  Do you see here

10:24:32 8    where it says, "I would like to give my

10:24:33 9    resignation notice today"?  Did you read

10:24:36 10   that at the bottom?  You can see it if you

10:24:44 11   want.

10:24:44 12   A.  Yes, I see it.

10:24:45 13   Q.  Okay.  Do you know whether he

10:24:47 14   sent a letter to his former boss?  Do you

10:24:49 15   have any idea?

10:24:50 16   A.  I don't know.

10:24:52 17   Q.  Was it your understanding from

10:24:54 18   your discussions with Mr. Mendiola that he

10:24:58 19   would have this job so long as he did his

10:25:01 20   job properly?

10:25:04 21   A.  Yes.

10:25:05 22   Q.  So assuming he did his job

10:25:09 23   properly, he should continue to have that

---

**40**

10:25:10 1    job?

10:25:11 2    A.  That's correct.

10:25:12 3    Q.  Okay.  And would you agree, sir,

10:25:14 4    then, that you would not terminate Mr.

10:25:16 5    Mendiola except for good cause?

10:25:22 6    A.  Mr. Mario Mendiola never was

10:25:25 7    terminated.

10:25:25 8    Q.  I'm not asking you that

10:25:27 9    question, sir.  I'm saying, assume with me

10:25:29 10   that Mr. Mendiola did his job properly.

10:25:31 11   You're telling us that you agreed he would

10:25:33 12   only be terminated for good cause?  If he

10:25:36 13   was terminated, you --

10:25:38 14       MR. SMITH:  Object to the form.

10:25:41 15   A.  I don't know how the -- I don't

10:25:45 16   understand good the question.

10:25:59 17   Q.  Well, what you've told me so far

10:25:59 18   sounds like, and you correct me if I'm

10:26:00 19   wrong, sounds like you told Mr. Mendiola or

10:26:03 20   your agreement was that as long as he did

10:26:04 21   his job properly, you wouldn't fire him; is

10:26:10 22   that true?

10:26:10 23   A.  My intention, as a employer, is

---

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

41

| | |
|---|---|
| 10:26:13 1 | when you hire a person is not to fire them, |
| 10:26:17 2 | that's for sure, anyone, not only Mario |
| 10:26:20 3 | Mendiola. It is not intention to hire |
| 10:26:24 4 | people to fire people. That's costing the |
| 10:26:26 5 | company money to hire or fire and relocate |
| 10:26:30 6 | and all this. The intention is to hire |
| 10:26:35 7 | person to do the job. |
| 10:26:35 8 | Q. I'm just talking about Mr. |
| 10:26:37 9 | Mendiola, because you don't have -- correct |
| 10:26:41 10 | me if I'm wrong. You don't have a written |
| 10:26:41 11 | document relating to an employment offer |
| 10:26:44 12 | for, say, the cleaning staff, do you, a |
| 10:26:49 13 | document like this? |
| 10:26:50 14 | A. Well, there is -- we have a |
| 10:26:53 15 | paper, you know, to fill it out for the |
| 10:26:57 16 | hourly rates on the properties, you know. |
| 10:27:01 17 | Q. Well, but your cleaning staff |
| 10:27:02 18 | doesn't get a letter that says, salary |
| 10:27:04 19 | forty-two thousand dollars, provide a job |
| 10:27:06 20 | for Roxanna, send me a check for twenty -- |
| 10:27:09 21 | two hundred and seventy-five dollars, et |
| 10:27:11 22 | cetera, correct? |
| 10:27:11 23 | A. Correct. |

42

| | |
|---|---|
| 10:27:12 1 | Q. So Mr. Mendiola has a special |
| 10:27:14 2 | document that says what his -- what the |
| 10:27:18 3 | terms of his employment would be? |
| 10:27:20 4 | MR. SMITH: Object to the form |
| 10:27:21 5 | special document. |
| 10:27:22 6 | MR. BRYANT: What was that last |
| 10:27:24 7 | part? |
| 10:27:25 8 | MR. SMITH: The terminology, |
| 10:27:26 9 | special document. |
| 10:27:27 10 | MR. BRYANT: Oh, I'm sorry. |
| 10:27:28 11 | A. I believe the document, the |
| 10:27:30 12 | paper reflect, you know, his |
| 10:27:33 13 | responsibility. |
| 10:27:33 14 | Q. And how much he would be paid? |
| 10:27:35 15 | A. That's right. |
| 10:27:36 16 | Q. And what you've told us already |
| 10:27:38 17 | is that, essentially, you wouldn't haul off |
| 10:27:41 18 | and fire Mr. Mendiola just for anything? |
| 10:27:43 19 | A. I did not say Mr. Mendiola. |
| 10:27:46 20 | Anyone. |
| 10:27:46 21 | Q. I'm just asking about Mr. |
| 10:27:48 22 | Mendiola. |
| 10:27:48 23 | A. Okay. |

43

| | |
|---|---|
| 10:27:49 1 | Q. You agreed, did you not, that |
| 10:27:52 2 | you would allow him to keep his job as long |
| 10:27:54 3 | as he did it properly? |
| 10:27:55 4 | A. That's right. |
| 10:27:56 5 | Q. All right. Now, that's Exhibit |
| 10:28:03 6 | 1. Sir, it's my understanding that you're |
| 10:28:06 7 | going to tell the jury in this case that |
| 10:28:09 8 | Mr. Mendiola, after being diagnosed or |
| 10:28:12 9 | possibly diagnosed with leukemia, resigned |
| 10:28:15 10 | from his employment? Is that your |
| 10:28:17 11 | position? |
| 10:28:18 12 | MR. SMITH: Object to the form. |
| 10:28:19 13 | A. Can you rephrase? |
| 10:28:20 14 | Q. Is it your position, sir, that |
| 10:28:22 15 | Mr. Mendiola resigned from his employment? |
| 10:28:25 16 | A. That's correct. |
| 10:28:25 17 | Q. And it's your testimony, sir, |
| 10:28:28 18 | that he did that after he learned he might |
| 10:28:30 19 | have leukemia? |
| 10:28:32 20 | A. After he learned he have health |
| 10:28:36 21 | issues. |
| 10:28:36 22 | Q. Health issues? |
| 10:28:37 23 | A. Yes. |

44

| | |
|---|---|
| 10:28:38 1 | Q. Did you find that strange? |
| 10:28:43 2 | A. I don't know. It was too much |
| 10:28:45 3 | confusion. He never told me exactly. I |
| 10:28:49 4 | don't think, sir, he never knew what he |
| 10:28:51 5 | got. He just said health problems, you |
| 10:28:53 6 | know. |
| 10:28:53 7 | Q. So you're telling the jury that |
| 10:28:55 8 | Mr. Mendiola threw his hands up and said, |
| 10:28:58 9 | I'm sick, I quit? |
| 10:29:00 10 | MR. SMITH: Object to the form. |
| 10:29:01 11 | A. No, no. Mr. Mendiola came to me |
| 10:29:03 12 | -- actually, he called me and said he got a |
| 10:29:06 13 | -- I don't know all the word -- issue is |
| 10:29:09 14 | good. But he told me, hey, I have a |
| 10:29:11 15 | problem or issue with health. I think I've |
| 10:29:13 16 | got to go back to Texas. |
| 10:29:15 17 | Q. Did he say, I resign? |
| 10:29:16 18 | A. He tell me, I've got to go back |
| 10:29:18 19 | to Texas. I cannot manage the property no |
| 10:29:20 20 | more. And my understanding was, I'm going |
| 10:29:37 21 | to leave in condition from the company due |
| 10:29:37 22 | to my health issue. |
| 10:29:37 23 | Q. Did Mr. Mendiola tell you that |

11 (Pages 41 to 44)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

**45**

10:29:37 1 he might have to go to Texas for treatment?
10:29:38 2     A. He told me he got to go over
10:29:41 3 there to be with his family.
10:29:43 4     Q. Did you wonder where he would
10:29:49 5 earn income?
10:29:51 6     A. What do you mean?
10:29:55 7     Q. Do you think that someone who
10:29:56 8 has leukemia might need some money?
10:29:59 9     A. I don't know if Mr. Mendiola
10:30:01 10 have leukemia. I did not know. Nobody
10:30:05 11 know.
10:30:05 12     Q. Do you know now?
10:30:06 13     A. No.
10:30:06 14     Q. You don't know now?
10:30:08 15     A. No.
10:30:11 16     Q. Did you wonder where Mr.
10:30:13 17 Mendiola would live?
10:30:16 18     A. Oh, he told me he was going to
10:30:18 19 his family.
10:30:20 20     Q. Did Mr. Mendiola have insurance
10:30:23 21 as part of his employee benefits?
10:30:25 22     A. No.
10:30:29 23     Q. Sir, did you feel Mr. Mendiola's

**46**

10:30:34 1 illness affected his job performance?
10:30:40 2     A. In the last few weeks, yes. I'm
10:30:44 3 not sure if he -- the illness affected or
10:30:48 4 -- him or -- because the last few weeks he
10:30:52 5 was on the properties, after he find out he
10:30:54 6 got a issue with his blood sugar, he was
10:30:58 7 not too much on the property. Most of the
10:31:01 8 time he ran around checking doctor. He was
10:31:04 9 just not at work.
10:31:06 10     Q. And that was a problem for you,
10:31:08 11 wasn't it?
10:31:11 12     A. Not really, no.
10:31:13 13     Q. Really?
14
15     (Whereupon, Plaintiff's Exhibit 2 was
16     marked for identification and same
17     is attached hereto.)
18
10:31:16 19     Q. I'll show you Exhibit 2. Tell
10:31:20 20 me if you recognize that document. Do you
10:31:36 21 want to see it?
10:31:37 22     MR. SMITH: Have you got a copy
10:31:40 23 of that?

**47**

10:31:54 1     MR. BRYANT: It's right on top.
10:31:55 2     Q. Do you remember that document?
10:31:57 3     A. It looks familiar.
10:31:57 4     Q. It says to Mario Mendiola from
10:32:01 5 John Tampa, December 6th of '05, and it
10:32:05 6 says at the bottom John Tampa. Is that
10:32:08 7 true?
10:32:09 8     A. Look, we have so many memos, so
10:32:13 9 many I cannot recall everything what
10:32:15 10 happened two years ago or exactly wording,
10:32:18 11 you know.
10:32:21 12     Q. So you draft a lot of memos?
10:32:23 13     A. Well, we send memo. We send
10:32:27 14 e-mails, you know.
10:32:29 15     Q. Are you saying you didn't draft
10:32:31 16 this memo, sir?
10:32:32 17     A. I did not say that. You just
10:32:34 18 asked me if it's a hundred percent exactly.
10:32:37 19 I don't know.
10:32:37 20     Q. Do you remember when Mr.
10:32:39 21 Mendiola first spoke with you about whether
10:32:42 22 he had leukemia or not?
10:32:46 23     A. You asking me as a date or --

**48**

10:32:50 1     Q. Whatever you can tell me.
10:32:51 2     A. I don't recall the date.
10:32:53 3     Q. Have you told someone in the
10:32:55 4 past that it was late November or early
10:32:58 5 December?
10:33:02 6     A. I don't recall.
10:33:03 7     Q. Because this memo here that has
10:33:06 8 your name at the bottom and the top, dated
10:33:09 9 December the 6th, at the very bottom says:
10:33:13 10 "I understand you are sick, but the
10:33:14 11 business has to go forward," exclamation.
10:33:19 12 Did you write that?
10:33:20 13     A. I don't recall.
10:33:29 14     Q. Well, you're making complaints
10:33:30 15 in this memo, aren't you, sir?
10:33:30 16     MR. SMITH: Object to the form.
10:33:30 17     Q. All right. Take a look at it
10:33:30 18 and tell me if you're complaining about
10:33:30 19 something.
10:33:32 20     A. First of all, as I mentioned, I
10:33:37 21 don't recall exactly the specific, this
10:33:39 22 paper. Second thing, I'm not making
10:33:42 23 complaint. I'm addressing issues.

12  (Pages 45 to 48)

# FREEDOM COURT REPORTING

49

10:33:46 1    Q.   Well, okay. It says: "I should
10:33:57 2    not have to make a trip to the property to
10:33:57 3    point out problem areas. I am really
10:33:59 4    aggravated with this." That's what you
10:34:02 5    say, and you're saying that's not a
10:34:05 6    complaint?
10:34:05 7    A.   I believe for any owner business
10:34:10 8    to have employees and go on his property
10:34:14 9    and see trash all around, there is a issue
10:34:17 10    you've got to be addressed by anyone, you
10:34:20 11    know. Anyone going to have a problem with
10:34:22 12    that.
10:34:22 13    Q.   And were you concerned at that
10:34:23 14    point that this might continue with Mr.
10:34:25 15    Mendiola, this having trash on the
10:34:28 16    property, et cetera?
10:34:30 17    A.   This kind of issue there
10:34:32 18    constantly, not on that property,
10:34:34 19    everywhere. It's normal. It's a generic
10:34:38 20    thing. Hotel business is a daily business.
10:34:42 21    You renting rooms. You cleaning rooms.
10:34:45 22    You're getting trash daily. There's always
10:34:47 23    something, you know. This kind of stuff

50

10:34:50 1    are general for not just that property.
10:34:52 2    Everywhere, you know. Any company sending
10:34:55 3    this kind of memo.
10:34:57 4    Q.   What does Mr. Mendiola being
10:34:59 5    sick have to do with anything?
10:35:01 6    MR. SMITH: Object to the form.
10:35:03 7    A.   Have anything -- we did not know
10:35:07 8    what his sickness is. Second thing is, I
10:35:13 9    believe a person can see if a -- trash was
10:35:15 10    not a physical work. If you see trash on
10:35:18 11    the floor, Mr. Mendiola, as a GM, can
10:35:23 12    appoint, and he have people working under
10:35:27 13    him, make sure the cleaning was done.
10:35:29 14    Q.   Did you ever discipline Mr.
10:35:31 15    Mendiola?
10:35:33 16    A.   Discipline as what?
10:35:35 17    Q.   Dock his pay or --
10:35:39 18    A.   No.
10:35:40 19    Q.   Because of bad performance?
10:35:45 20    A.   No. At that time there was just
10:35:47 21    way too much. He did not feel good. You
10:35:51 22    cannot do that to people, you know, in this
10:35:54 23    kind of situation.

51

10:35:56 1    Q.   Why not?
10:35:57 2    A.   You just cannot, you know.
10:35:59 3    Q.   Why?
10:35:59 4    A.   Because they need money to live,
10:36:02 5    too, you know.
10:36:04 6    Q.   Have you ever been fired from a
10:36:06 7    job?
10:36:06 8    A.   No. But --
10:36:15 9    Q.   Do you believe illness should be
10:36:16 10    a grounds for termination?
10:36:20 11    A.   It's a complex question. I
10:36:24 12    don't know if you're talking about in this
10:36:26 13    matter or overall, you know. I cannot
10:36:29 14    speak for other people, you know.
10:36:34 15    Q.   Would you agree that terminating
10:36:36 16    an employee because of an illness would be
10:36:38 17    improper?
10:36:40 18    A.   That's correct.
10:36:42 19    Q.   And how do you know that, sir?
10:36:51 20    A.   Well, you know, I don't believe
10:36:51 21    you should go and terminate -- if a
10:36:51 22    employee have a problem, to go and
10:36:51 23    terminate him, you know. My philosophy, my

52

10:36:54 1    view is employee is part of the team. As a
10:37:00 2    general manager, as the owner, he's
10:37:02 3    representing that property. And I believe
10:37:06 4    in a teamwork to work together with the
10:37:08 5    employees, and this is what I'm doing with
10:37:10 6    all of them.
10:37:13 7    Q.   Were you upset with Mr.
10:37:19 8    Mendiola?
10:37:20 9    A.   No.
10:37:21 10    Q.   Okay. So what reason would you
10:37:26 11    have for stopping payment on his last
10:37:28 12    paycheck?
10:37:32 13    A.   I'm not sure if we stopped
10:37:35 14    payment on his check, first of all. I
10:37:38 15    don't recall that, what's going on with
10:37:40 16    that.
10:37:40 17
10:37:40 18    (Whereupon, Plaintiff's Exhibit 3 was
10:37:40 19    marked for identification and same
10:37:40 20    is attached hereto.)
10:37:48 21
10:37:48 22    Q.   Here is Exhibit 3. See if you
10:37:48 23    recognize that. Do you recognize that?

13  (Pages 49 to 52)

# FREEDOM COURT REPORTING

53

| | | |
|---|---|---|
| 10:38:02 | 1 | A. Yeah, it look like one of the |
| 10:38:04 | 2 | check from the property. |
| 10:38:05 | 3 | Q. One of the checks from the |
| 10:38:06 | 4 | property. Do you know what the date is? |
| 10:38:08 | 5 | A. December 20th. |
| 10:38:09 | 6 | Q. And that's Exhibit 3. Is that |
| 10:38:11 | 7 | one of your checks? |
| 10:38:12 | 8 | A. One of my company checks, yes. |
| 10:38:14 | 9 | Q. And is that your signature stamp |
| 10:38:16 | 10 | at the bottom? |
| 10:38:17 | 11 | A. Yeah. |
| 10:38:18 | 12 | Q. And you see where it says stop |
| 10:38:20 | 13 | payment? |
| 10:38:20 | 14 | A. Yes. |
| 10:38:21 | 15 | Q. Why is that? |
| 10:38:23 | 16 | A. I can check on it. I think Mr. |
| 10:38:26 | 17 | Mendiola, he took a lot of petty cash out |
| 10:38:29 | 18 | of the properties. That was the reason the |
| 10:38:32 | 19 | check was stopped. |
| 10:38:33 | 20 | Q. When did you discover that? |
| 10:38:34 | 21 | A. After he left. |
| 10:38:36 | 22 | Q. So Mr. Banks, who is going to |
| 10:38:39 | 23 | testify today -- |

54

| | | |
|---|---|---|
| 10:38:39 | 1 | A. Yes. |
| 10:38:40 | 2 | Q. -- will be able to confirm that? |
| 10:38:42 | 3 | MR. SMITH: Object to the form. |
| 10:38:44 | 4 | A. I think the office can confirm |
| 10:38:45 | 5 | that. |
| 10:38:48 | 6 | Q. All right. Well, we'll talk |
| 10:38:50 | 7 | to -- |
| 10:38:50 | 8 | A. Mr. Mendiola was in charge of |
| 10:38:52 | 9 | the petty cash. As the GM, you get the |
| 10:38:55 | 10 | petty cash. You send it to the office for |
| 10:38:57 | 11 | reimbursement with the receipts, and I |
| 10:39:00 | 12 | believe that was the issue. |
| 10:39:01 | 13 | Q. When did you determine that? |
| 10:39:03 | 14 | A. After he left, after we tried to |
| 10:39:05 | 15 | figure out what's happening in the |
| 10:39:07 | 16 | property. |
| 10:39:07 | 17 | Q. How long after he left? |
| 10:39:09 | 18 | A. I don't recall exactly. |
| 10:39:11 | 19 | Q. All right. Was it a week? Was |
| 10:39:21 | 20 | it a month? |
| 10:39:24 | 21 | A. Probably days or a week, |
| 10:39:26 | 22 | probably. I'm not sure it was a month. |
| 10:39:36 | 23 | I'm not sure. |

55

| | | |
|---|---|---|
| 10:39:38 | 1 | Q. Did you ever call Mr. Mendiola |
| 10:39:39 | 2 | to ask him about this petty cash? |
| 10:39:42 | 3 | A. I think the office did, yes. |
| 10:39:44 | 4 | Q. Well, I want to know if you did. |
| 10:39:48 | 5 | A. I don't recall. |
| 10:39:50 | 6 | Q. Okay. And what do you mean the |
| 10:39:54 | 7 | office called? |
| 10:39:56 | 8 | A. I think if the office -- you |
| 10:39:59 | 9 | know, my office is sending the check |
| 10:40:02 | 10 | reimbursement and everything. It's not |
| 10:40:05 | 11 | coming to me every time, you know. And I |
| 10:40:08 | 12 | believe if there was a discrepancy, |
| 10:40:10 | 13 | definitely they call Mario and see what's |
| 10:40:12 | 14 | going on. |
| 10:40:12 | 15 | Q. And you're talking about Brenda |
| 10:40:22 | 16 | Gwin? |
| 10:40:22 | 17 | A. Yes. |
| 10:40:22 | 18 | Q. Is Brenda Gwin still with your |
| 10:40:22 | 19 | company? |
| 10:40:22 | 20 | A. Yes. |
| 10:40:22 | 21 | Q. Who is she? |
| 10:40:22 | 22 | A. She's my assistant. |
| 10:40:22 | 23 | Q. She's your assistant? |

56

| | | |
|---|---|---|
| 10:40:24 | 1 | A. Yeah. |
| 10:40:24 | 2 | Q. How long has she been with your |
| 10:40:26 | 3 | company? |
| 10:40:36 | 4 | A. Three year and a half, four |
| 10:40:36 | 5 | years. |
| 10:40:36 | 6 | Q. Which company does she work for? |
| 10:40:36 | 7 | A. She's working for the property |
| 10:40:38 | 8 | in Dalton, Georgia. |
| 10:40:41 | 9 | Q. Yeah, I understand that. But |
| 10:40:43 | 10 | what I'm asking you is: These entities we |
| 10:40:45 | 11 | talked about in the beginning? |
| 10:40:46 | 12 | A. Yes. |
| 10:40:46 | 13 | Q. Which entities does she work |
| 10:40:48 | 14 | for? |
| 10:40:48 | 15 | A. Vision Hospitality in Georgia. |
| 10:40:50 | 16 | Q. Vision Hospitality? |
| 10:40:52 | 17 | A. At this time. |
| 10:40:53 | 18 | Q. Okay. What did she -- what |
| 10:40:55 | 19 | company did she work for back in 2005? |
| 10:40:57 | 20 | A. IT Dalton. |
| 10:40:59 | 21 | Q. IT Dalton? |
| 10:41:00 | 22 | A. Yes. |
| 10:41:01 | 23 | Q. Is that a different company than |

14 (Pages 53 to 56)

# FREEDOM COURT REPORTING

57

10:41:03 1 JT Montgomery?

10:41:04 2     A.  Yes.

10:41:04 3     Q.  Because I asked you about all

10:41:06 4 the companies that you have had an interest

10:41:07 5 in, and that wasn't one of the ones you

10:41:11 6 told me about.

10:41:12 7     A.  I left out the one that you

10:41:15 8 asked me.

10:41:16 9     Q.  Dalton?

10:41:17 10     A.  Yes.

10:41:17 11     Q.  Is that an Inc. or LLC?

10:41:20 12     A.  LLC, I believe it was.

10:41:21 13     Q.  Is there any other company that

10:41:23 14 you had an interest in that you haven't

10:41:24 15 told me about?

10:41:25 16     A.  I'm not sure. I've got to check

10:41:27 17 it out.

10:41:28 18     Q.  All right. Does Brenda Gwin

10:41:30 19 work for anyone else, any other companies

10:41:32 20 that are on this list, Tampa Enterprise,

10:41:34 21 Vision Hospitality, Enterprise, P&T, Acent,

10:41:39 22 Atmore, JT or JT?

10:41:41 23     A.  At this time or prior?

58

10:41:43 1     Q.  At any time.

10:41:45 2     A.  Prior, years ago, not all the

10:41:50 3 properties were formed, you know.

10:41:52 4     Q.  Before the properties were

10:41:54 5 formed?

10:41:54 6     A.  The LLC, the companies were not

10:41:56 7 formed. Most of these projects are new

10:42:00 8 projects.

10:42:02 9     Q.  All these companies that you

10:42:04 10 listed for us before, are they Georgia

10:42:06 11 companies?

10:42:08 12     A.  No, Alabama.

10:42:09 13     Q.  Alabama companies?

10:42:10 14     A.  Alabama, and one is Indiana.

10:42:12 15     Q.  Okay. All right. I'll mark

10:42:27 16 Exhibit 4 now and ask you to identify that

10:42:27 17 document.

10:42:27 18

10:42:27 19     (Whereupon, Plaintiff's Exhibit 4 was

10:42:27 20     marked for identification and same

10:42:27 21     is attached hereto.)

10:42:29 22

10:42:29 23     MR. SMITH:  Is that it right

59

10:42:31 1 there (indicating)?

10:42:33 2     MR. BRYANT:  Yes. Do you want

10:42:35 3 this?

10:42:35 4     MR. SMITH:  Yes.

10:42:37 5     A.  (Witness reviews document.)

10:42:53 6     Q.  Do you know what this document

10:42:55 7 is?

10:42:56 8     A.  A piece of paper.

10:43:09 9     Q.  What does this piece of paper

10:43:09 10 do? What does it say?

10:43:10 11     MR. SMITH:  I object to the

10:43:12 12 extent it speaks for itself.

10:43:14 13     Q.  Give me -- you're right.

10:43:16 14     A.  I believe it's a memo.

10:43:17 15     Q.  It's a memo from you, a memo

10:43:20 16 from you to Mario Mendiola, dated December

10:43:24 17 the 12th of '05; is that true?

10:43:26 18     A.  It look like, yes.

10:43:27 19     Q.  Did you read through this memo

10:43:30 20 just a second ago?

10:43:31 21     A.  Yes.

10:43:31 22     Q.  Did you type this memo yourself?

10:43:33 23     A.  No.

60

10:43:43 1     Q.  Who typed it?

10:43:43 2     A.  Probably Brenda did.

10:43:43 3     Q.  Brenda Gwin?

10:43:43 4     A.  Yes.

10:43:43 5     Q.  Was Brenda Gwin present when you

10:43:43 6 spoke with Mr. Mendiola the very first time

10:43:45 7 about his illness or potential illness?

10:43:51 8     A.  I'm not sure the first time, but

10:43:56 9 I definitely know Brenda did have

10:43:59 10 conversation. She's the one probably had

10:44:02 11 more conversation with Mario than me.

10:44:03 12     Q.  Well, sir, then why isn't she

10:44:06 13 listed as a person with knowledge of

10:44:08 14 relevant facts in your lawsuit?

10:44:09 15     MR. SMITH:  My guess is he

10:44:11 16 doesn't know who's a person listed since

10:44:11 17 his lawyer prepared that documentation.

10:44:14 18     MR. BRYANT:  Well, I'm assuming

10:44:15 19 he helped you with it, but fair enough.

10:44:20 20     Q.  Do you think Brenda Gwin knows

10:44:23 21 more about the allegations in our lawsuit

10:44:25 22 than you do?

10:44:25 23     A.  No, but the question was if she

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

| | 61 |
|---|---|
| 10:44:28 1 | did know about my first conversation with |
| 10:44:31 2 | Mario Mendiola, and I told you probably |
| 10:44:36 3 | she's the one who spoke with him on daily |
| 10:44:39 4 | basis, because she's the one who was |
| 10:44:40 5 | cutting the check for him and -- you know. |
| 10:44:43 6 | Q. It says "per our conversation," |
| 10:44:45 7 | and that's referring to you, your |
| 10:44:47 8 | conversation? |
| 10:44:47 9 | A. Okay. |
| 10:44:49 10 | Q. Okay. So are you telling us you |
| 10:44:51 11 | didn't draft this document, right? |
| 10:44:53 12 | MR. SMITH: He said he didn't |
| 10:44:54 13 | type it. He didn't say he didn't draft it. |
| 10:44:58 14 | That's not the same thing. |
| 10:44:59 15 | Q. Well, let's clarify. I'm not |
| 10:45:00 16 | trying to trick you. I'm just trying to |
| 10:45:02 17 | find out if you really wrote these words or |
| 10:45:04 18 | you dictated them or whatever. |
| 10:45:06 19 | A. They were -- let's put it that |
| 10:45:08 20 | way. The memo was typed by Brenda, but I |
| 10:45:11 21 | was the one who told her to type. |
| 10:45:13 22 | Q. Did you tell her every word? |
| 10:45:15 23 | A. Probably. |

| | 62 |
|---|---|
| 10:45:18 1 | Q. Anyway, it says that -- and this |
| 10:45:22 2 | is the 12th of December, basically saying |
| 10:45:25 3 | that you understand they are making plans |
| 10:45:27 4 | to leave, right, that Mr. Mendiola and |
| 10:45:30 5 | Roxanna are making plans to leave and that |
| 10:45:34 6 | you've located someone for the GM position |
| 10:45:36 7 | who wants to start on the 20th? |
| 10:45:37 8 | A. Prior to this memo, me and |
| 10:45:41 9 | Mario, we did have conversation. I think I |
| 10:45:49 10 | believe the first conversation we had over |
| 10:45:50 11 | the phone and after that we did have |
| 10:45:52 12 | several discussion in the property. I was |
| 10:45:54 13 | going to Montgomery after he told me in the |
| 10:45:58 14 | first conversation we have -- I believe |
| 10:46:01 15 | he's the one who called me and told me he |
| 10:46:04 16 | got the health issue, and he need some |
| 10:46:10 17 | time. He cannot -- you know, if I'm going |
| 10:46:12 18 | to allow him to go to the doctors and all |
| 10:46:17 19 | this, and I told him it's okay, you know. |
| 10:46:19 20 | Q. It was okay for him to go to the |
| 10:46:21 21 | doctor, right? |
| 10:46:22 22 | A. Well, you know, if you got a |
| 10:46:23 23 | issue, you got to go, you know. |

| | 63 |
|---|---|
| 10:46:33 1 | Q. So you wouldn't have told him |
| 10:46:33 2 | that he couldn't take off a little time to |
| 10:46:33 3 | go to the doctor, right? |
| 10:46:33 4 | A. No, no. He was allowed to do |
| 10:46:33 5 | so. |
| 10:46:33 6 | Q. So he could have done that? |
| 10:46:34 7 | A. He did that for weeks. |
| 10:46:36 8 | Q. For what? |
| 10:46:37 9 | A. For weeks. |
| 10:46:38 10 | Q. For weeks? |
| 10:46:39 11 | A. Yes, sir. |
| 10:46:40 12 | Q. Okay. So you're saying Mario |
| 10:46:43 13 | Mendiola was not on your property for |
| 10:46:45 14 | weeks? |
| 10:46:45 15 | A. Well, he was in the property, |
| 10:46:47 16 | staying in the property, but during the |
| 10:46:50 17 | day, he was out like half a day or a full |
| 10:46:53 18 | day or checking stuff. He was not working |
| 10:46:57 19 | hundred percent for the property, no. |
| 10:46:59 20 | Q. Was this before December the |
| 10:47:03 21 | 12th? |
| 10:47:03 22 | A. After. |
| 10:47:04 23 | Q. After? |

| | 64 |
|---|---|
| 10:47:05 1 | A. Yes. |
| 10:47:06 2 | Q. Okay. |
| 10:47:08 3 | A. Probably a little bit of, |
| 10:47:10 4 | because my conversation with him was prior |
| 10:47:13 5 | to my letter to him. It doesn't mean it |
| 10:47:17 6 | was prior to and after, you know. It was a |
| 10:47:19 7 | combination. |
| 10:47:20 8 | Q. All right. It says, I have |
| 10:47:21 9 | located -- |
| 10:47:22 10 | A. The letter was between. |
| 10:47:23 11 | Q. I'm sorry. Don't let me do |
| 10:47:25 12 | that. I'm sorry. |
| 10:47:25 13 | A. No, not a problem. |
| 10:47:26 14 | Q. It says, "I have located someone |
| 10:47:28 15 | for the GM position who wants to start on |
| 10:47:31 16 | the 20th," correct? |
| 10:47:32 17 | A. Yes. |
| 10:47:33 18 | Q. Who was that? |
| 10:47:35 19 | A. One of the local GM. Her name |
| 10:47:39 20 | was Lynn. |
| 10:47:41 21 | Q. Lynn what? |
| 10:47:42 22 | A. Lynn something. I don't recall |
| 10:47:44 23 | her last name, but I can provide you that. |

16 (Pages 61 to 64)

# FREEDOM COURT REPORTING

65

10:47:47 1    Q. Moody?

10:47:48 2    A. Probably Moody, yes.

10:47:50 3    Q. And it says she's going to start

10:47:52 4  on the 20th, right?

10:47:54 5    A. When I did have -- when Mario

10:47:58 6  first -- we made the first conversation and

10:48:00 7  he told me his plans to leave for Texas to

10:48:05 8  be with his family, I said, no problem, you

10:48:08 9  can hang around over here for a few weeks,

10:48:10 10  see what's going on with you, because he

10:48:12 11  did not know what his sickness is. He did

10:48:14 12  not know.

10:48:16 13     He tell me he got a problem with

10:48:19 14  sugar and he needs to do more tests, and

10:48:21 15  Montgomery did not have the proper, either

10:48:24 16  doctors or something. He was trying to

10:48:26 17  find somebody who can do the test. I don't

10:48:30 18  know exactly, you know. I'm just telling

10:48:32 19  you what he told me. I don't know exactly

10:48:34 20  what sickness is. I don't know.

10:48:37 21    Q. That really has nothing to do

10:48:39 22  with what I asked you. I'm trying to find

10:48:41 23  out -- you said that this replacement was

66

10:48:43 1  going to start on the 20th?

10:48:45 2    A. That's correct.

10:48:45 3    Q. Did she start on the 20th?

10:48:47 4    A. I think by the 20th or by the

10:48:48 5  end of the month, something.

10:48:50 6    Q. Well --

10:48:51 7    A. With the Christmas. When I

10:48:55 8  first interviewed Lynn, she told me she

10:48:58 9  wants to start by the 20th, and after, I

10:49:01 10  think, some family thing with the Christmas

10:49:03 11  and all that she pushed it a week or so,

10:49:05 12  you know.

10:49:05 13    Q. Okay. And it says, "I would

10:49:14 14  like to go ahead and make the change on the

10:49:14 15  20th with the new GM in order to avoid

10:49:15 16  losing this applicant"?

10:49:17 17    A. That's correct.

10:49:18 18    Q. So does that mean, when you say

10:49:20 19  applicant, that means she wasn't hired at

10:49:23 20  that point?

10:49:24 21    A. Well, I would just say this: I

10:49:34 22  did have conversation with her. I told her

10:49:35 23  about the job, but that probably I did not

67

10:49:39 1  told her a hundred percent, you can start

10:49:41 2  on the 20th, until I speak with Mario,

10:49:44 3  until he was okay with that. I did not

10:49:48 4  probably commit to her is what I was trying

10:49:52 5  to tell.

10:49:53 6    Q. So you needed to talk to

10:49:54 7  Mario --

10:49:55 8    A. That's correct.

10:49:55 9    Q. Before you -- before you hired

10:49:56 10  this person?

10:49:58 11    A. Yeah, because Mario told me,

10:50:00 12  hey, I need a few days. I'm going to

10:50:03 13  Texas, and my understanding was -- I said,

10:50:08 14  let me check with Mario and see if this

10:50:11 15  work for him. Based on the conversation I

10:50:13 16  did have with him, he wants to leave, to

10:50:16 17  see if 20th is good, and on the other side,

10:50:18 18  I don't want to lose this manager, you

10:50:23 19  know.

10:50:23 20    Q. But you hadn't hired her on

10:50:26 21  December the 12th of '05?

10:50:29 22    A. I think we discussed with her.

10:50:32 23    Q. That's not what I'm asking. I'm

68

10:50:34 1  asking specifically did you hire her on

10:50:36 2  December the 12th of '05?

10:50:39 3    A. She did not start work on

10:50:40 4  December the 12th, no.

10:50:42 5    Q. Did you agree to hire her on

10:50:46 6  December the 12th of '05?

10:50:52 7    A. We did intention to hire her,

10:50:56 8  but our intention -- my intention was to

10:50:59 9  hire her but only after I spoke with Mario.

10:51:03 10    Q. Okay. And so when did you speak

10:51:09 11  with Mario? This is December the 12th and

10:51:11 12  you sent him this memo?

10:51:13 13    A. Yes.

10:51:13 14    Q. How did you send him this memo?

10:51:15 15    A. I believe via fax.

10:51:16 16    Q. Fax?

10:51:17 17    A. I think so.

10:51:17 18    Q. Was it Brenda Gwin that faxed it

10:51:19 19  to him?

10:51:21 20    A. Probably, yes.

10:51:21 21    Q. And when, after you sent this

10:51:26 22  memo, did you talk with Mario about this

10:51:28 23  issue of the 20th?

17 (Pages 65 to 68)

# FREEDOM COURT REPORTING

|   | 69 |
|---|---|
| 10:51:30 1 | A. Yes. |
| 10:51:30 2 | Q. When did you do that? |
| 10:51:31 3 | A. I don't know. Probably a couple |
| 10:51:33 4 | of days here and there. I was over there |
| 10:51:35 5 | for several time. |
| 10:51:35 6 | Q. Like what day? |
| 10:51:36 7 | A. I don't recall exactly the day. |
| 10:51:38 8 | Q. Well, December the 12th of '05 |
| 10:51:40 9 | was a Monday. |
| 10:51:40 10 | A. Okay. |
| 10:51:41 11 | Q. And so, do you know if it was |
| 10:51:45 12 | within two days, three days? |
| 10:51:46 13 | A. That week for sure, you know. |
| 10:51:48 14 | Q. Before the end of the week? |
| 10:51:50 15 | A. Yeah. If the memo was on |
| 10:51:53 16 | Monday, definitely I was over there before |
| 10:51:55 17 | Friday. |
| 10:51:55 18 | Q. Okay. Do you know if you came |
| 10:51:57 19 | the next day? |
| 10:51:58 20 | A. I don't recall exactly. |
| 10:51:59 21 | Q. What about Wednesday? Did you |
| 10:52:01 22 | come over on Wednesday? |
| 10:52:02 23 | A. I cannot tell you that. |

|   | 70 |
|---|---|
| 10:52:04 1 | Q. You don't know? |
| 10:52:04 2 | A. I don't remember, you know. |
| 10:52:05 3 | Q. Did you talk in person with |
| 10:52:18 4 | Mario about this issue of the 20th? |
| 10:52:18 5 | A. We did have a conversation with |
| 10:52:19 6 | Beverly and the manager, Beverly, Tim |
| 10:52:25 7 | Banks, the chef and the cook, like the head |
| 10:52:30 8 | GMs. We did have a conversation over the |
| 10:52:32 9 | phone and, after that, when I was over |
| 10:52:34 10 | there, I did have one more meeting with |
| 10:52:36 11 | everybody. |
| 10:52:37 12 | Q. When did you talk with Mario? |
| 10:52:39 13 | A. With Mario, I spoke on the phone |
| 10:52:42 14 | when he called me prior to the memo, and |
| 10:52:45 15 | after. |
| 10:52:45 16 | Q. Prior to what memo? |
| 10:52:46 17 | A. To this memo. |
| 10:52:47 18 | Q. Okay. Let's just get our time |
| 10:52:50 19 | frame here. |
| 10:52:50 20 | A. Okay. |
| 10:52:51 21 | Q. I'm past that point now. |
| 10:52:52 22 | A. Okay. |
| 10:52:53 23 | Q. I'm wanting to know, after |

|   | 71 |
|---|---|
| 10:52:54 1 | December the 12th, when did you talk to |
| 10:52:56 2 | Mario -- |
| 10:52:57 3 | A. The week of the 12th. |
| 10:52:58 4 | Q. And let me finish my question so |
| 10:53:00 5 | we're clear on the record here. When did |
| 10:53:02 6 | you talk to Mario after December the 12th |
| 10:53:04 7 | of '05 about leaving on the 20th? When did |
| 10:53:12 8 | you talk to Mario after this memo that's |
| 10:53:14 9 | Exhibit 4? |
| 10:53:16 10 | A. There was conversation to leave |
| 10:53:19 11 | by Mario. You ask me the 20, the exactly |
| 10:53:23 12 | 20 date? |
| 10:53:24 13 | Q. No, I'm -- |
| 10:53:25 14 | A. Was after the memo. |
| 10:53:26 15 | Q. What I'm trying to find out, |
| 10:53:28 16 | sir, is that you told me that you didn't |
| 10:53:30 17 | give the hundred percent go ahead for the |
| 10:53:33 18 | new GM that you had found to replace Mr. |
| 10:53:36 19 | Mendiola -- |
| 10:53:37 20 | A. Yes. |
| 10:53:37 21 | Q. -- until you had gotten an |
| 10:53:38 22 | opportunity -- had an opportunity to speak |
| 10:53:39 23 | with Mr. Mendiola? |

|   | 72 |
|---|---|
| 10:53:40 1 | A. That's correct. |
| 10:53:40 2 | Q. So I'm asking you when did you |
| 10:53:42 3 | speak to Mr. Mendiola to confirm that the |
| 10:53:44 4 | 20th was okay with him? |
| 10:53:46 5 | A. The week of the 12th. |
| 10:53:47 6 | Q. The week of the 12th? |
| 10:53:50 7 | A. Yes. That days -- you're |
| 10:53:54 8 | telling me the 12th was a Monday. It was |
| 10:53:57 9 | in that week. |
| 10:53:58 10 | Q. But you don't know what day? |
| 10:54:00 11 | A. No. |
| 10:54:01 12 | Q. Was it towards the end of the |
| 10:54:03 13 | week? |
| 10:54:03 14 | A. I don't recall. |
| 10:54:03 15 | Q. Was it the next day? |
| 10:54:04 16 | A. I don't recall. |
| 10:54:05 17 | Q. Let me mark Exhibit 5. Take a |
| 10:54:10 18 | look at that. |
| 10:54:10 19 |  |
| 10:54:10 20 | (Whereupon, Plaintiff's exhibit 5 was |
| 10:54:10 21 | marked for identification and same |
| 10:54:10 22 | is attached hereto.) |
| 10:54:41 23 |  |

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

73

| | |
|---|---|
| 10:54:41 1 | A. (Witness reviews document.) |
| 10:54:43 2 | Q. Do you remember that memo? |
| 10:54:44 3 | A. No. |
| 10:54:44 4 | Q. You don't remember this? |
| 10:54:45 5 | A. No. |
| 10:54:46 6 | Q. Are you going to tell the jury |
| 10:54:48 7 | you didn't receive this? |
| 10:54:49 8 | A. I never did. |
| 10:54:50 9 | MR. SMITH: Object to the form. |
| 10:54:51 10 | A. I'm going to tell them what I |
| 10:54:53 11 | know. |
| 10:54:53 12 | Q. Did you receive this memo? |
| 10:54:54 13 | A. No, sir. |
| 10:54:58 14 | Q. Well, what if you had received |
| 10:55:00 15 | this memo? Just assume for a second that |
| 10:55:04 16 | you did. |
| 10:55:04 17 | MR. SMITH: Object to the form |
| 10:55:06 18 | before you even finish, but you can finish. |
| 10:55:08 19 | MR. BRYANT: That's fine. We'll |
| 10:55:09 20 | do it at trial. That's okay. |
| 10:55:11 21 | Q. If you did receive this memo, |
| 10:55:13 22 | sir, would you have understood that Mr. |
| 10:55:14 23 | Mendiola did not resign? Would you have |

74

| | |
|---|---|
| 10:55:18 1 | got the impression that he had no intention |
| 10:55:20 2 | of resigning? |
| 10:55:21 3 | MR. SMITH: Object to the form. |
| 10:55:23 4 | A. Right after December 12th, I |
| 10:55:28 5 | believe Mr. Mendiola still was on the |
| 10:55:32 6 | property until, I don't know, a week more, |
| 10:55:42 7 | ten days more, and as I mentioned to you |
| 10:55:42 8 | probably prior, I was over there several |
| 10:55:42 9 | times, you know. I'm not sure when the |
| 10:55:44 10 | first time was after December 12th, but I |
| 10:55:49 11 | was over there several times, and also we |
| 10:55:51 12 | did have a problem with -- we have a |
| 10:55:54 13 | meeting with all the employees in the |
| 10:55:57 14 | lounge and also daily meetings with the GM |
| 10:56:02 15 | as him and also with the assistant, who was |
| 10:56:06 16 | Beverly then, to see what was going on, |
| 10:56:11 17 | because he was planning to leave. He never |
| 10:56:13 18 | mentioned to me his intention to -- not to |
| 10:56:16 19 | resign. |
| 10:56:17 20 | Q. Well, my question really is: |
| 10:56:22 21 | Exhibit 5 is a memo that I'll tell you Mr. |
| 10:56:24 22 | Mendiola will say he sent to you, and my |
| 10:56:26 23 | question for you is: If you received a |

75

| | |
|---|---|
| 10:56:28 1 | memo like this, would -- |
| 10:56:28 2 | A. I did not. |
| 10:56:30 3 | MR. SMITH: Just let him finish |
| 10:56:31 4 | his question. |
| 10:56:32 5 | Q. I understand you're going to say |
| 10:56:33 6 | you didn't get it. I understand that. |
| 10:56:35 7 | What I'm asking you, though, sir: Isn't it |
| 10:56:37 8 | true or don't you believe, sir, if you read |
| 10:56:39 9 | this memo, it would give you the impression |
| 10:56:42 10 | that Mr. Mendiola did not resign or had no |
| 10:56:45 11 | intention of resigning? |
| 10:56:47 12 | MR. SMITH: Object to the form. |
| 10:56:49 13 | A. Yeah, you're right. |
| 10:56:50 14 | Q. Okay. Because he says here, he |
| 10:56:54 15 | understands your memo to be terminating him |
| 10:56:56 16 | from his position as general manager. |
| 10:57:00 17 | That's what it says, right? |
| 10:57:05 18 | A. This is the first time I see |
| 10:57:07 19 | this memo. |
| 10:57:07 20 | Q. Okay. |
| 10:57:09 21 | A. Okay? |
| 10:57:10 22 | Q. This kind of information, would |
| 10:57:14 23 | that have changed what you actually did in |

76

| | |
|---|---|
| 10:57:18 1 | hiring a new GM? |
| 10:57:19 2 | MR. SMITH: Object to the form. |
| 10:57:21 3 | A. As I mentioned to you, the GM |
| 10:57:23 4 | was not hired a hundred percent commit |
| 10:57:26 5 | until my conversation was with Mario. This |
| 10:57:31 6 | is the first time I see this memo, and |
| 10:57:34 7 | Mario never was terminated and definitely |
| 10:57:38 8 | if Mario wants to stay on the property, he |
| 10:57:50 9 | was more than welcome to stay -- |
| 10 | THE REPORTER: I'm sorry. I |
| 11 | didn't understand the last part. |
| 12 | Q. Can you say again what you were |
| 13 | saying? |
| 14 | THE REPORTER: If Mario wants to |
| 15 | stay on the property -- |
| 16 | THE WITNESS: He was more than |
| 10:57:52 17 | welcome to work. |
| 10:57:52 18 | Q. To work. And you had indicated |
| 10:58:00 19 | that you were concerned about whether Mario |
| 10:58:03 20 | would have a problem moving on the 20th, |
| 10:58:07 21 | right? |
| 10:58:11 22 | A. It's not about having a problem. |
| 10:58:14 23 | Prior to the memo, you know, Mario, he's |

19 (Pages 73 to 76)

# FREEDOM COURT REPORTING

77

10:58:17  1  the one who brought to me his intention to
10:58:20  2  move to San Antonio. He told me, give me a
10:58:23  3  few weeks. After that, I did send him the
10:58:26  4  memo on December 12th and asking him, hey,
10:58:29  5  I did locate the GM, what do you want to
10:58:32  6  do? Do you want to go? She wants to start
10:58:35  7  by the 20th. This day is okay with you, or
10:58:37  8  what do you want to do?
10:58:39  9      Q. Well, when you read this memo,
10:58:40 10  does it look like the 20th is okay?
10:58:42 11      A. I never saw this memo, sir.
10:58:43 12      Q. I'm just asking if you read the
          13  memo, would it indicate to you the 20th is
10:58:54 14  not okay?
10:58:54 15      MR. SMITH: Object to the form.
10:58:54 16      A. I never saw this paper. This is
10:58:54 17  the first time I've seen it.
10:58:54 18      Q. That's fine. I'll mark Exhibit
10:58:57 19  6 now.
          20
          21      (Whereupon, Plaintiff's Exhibit 6 was
          22      marked for identification and same
          23      is attached hereto.)

78

           1
10:58:59  2      Q. Tell us what that is. Do you
10:59:35  3  recognize that memo?
10:59:38  4      A. Yeah, that something like my
10:59:44  5  office did probably.
10:59:45  6      Q. Is this your memo?
10:59:48  7      A. Yes.
10:59:48  8      Q. And you sent that to Mr.
10:59:50  9  Mendiola?
10:59:51 10      A. I did not.
10:59:52 11      Q. Someone on your behalf sent it
10:59:54 12  to Mr. Mendiola?
10:59:55 13      A. Yes.
10:59:55 14      Q. Brenda Gwin?
10:59:58 15      A. Yes.
10:59:58 16      Q. At your request?
10:59:59 17      A. Yes.
11:00:00 18      Q. And this memo complains about
11:00:03 19  things, doesn't it?
11:00:05 20      MR. SMITH: Object to the form.
11:00:06 21      A. It's not complaining. It's
11:00:08 22  addressing some things.
11:00:09 23      Q. Well, this memo addresses some

79

11:00:11  1  things that you have a problem with?
11:00:12  2      A. Issues.
11:00:13  3      Q. And it's dated December the 12th
11:00:15  4  of '05?
11:00:16  5      A. Okay.
11:00:17  6      Q. Do you see that? Did you read
11:00:20  7  that?
11:00:21  8      A. I don't know if that date is
11:00:23  9  what the date. Yes, it sounds like it's my
11:00:27 10  speaking and language.
11:00:32 11      Q. And in this letter you ask him,
11:00:35 12  "Don't you want to work anymore or what,"
11:00:39 13  right?
11:00:40 14      A. I guess.
11:00:41 15      Q. Okay.
11:00:42 16      MR. SMITH: And, again, it
11:00:43 17  speaks for itself.
11:00:44 18      Q. Well, I want to know why you
11:00:46 19  said that?
11:00:47 20      A. Why I said that?
11:00:50 21      Q. Yeah.
11:00:50 22      A. I believe if you read the memo,
11:00:52 23  it's telling you why.

80

11:00:53  1      Q. Right. It says, "Do you want to
11:00:55  2  stay until the 20th or not? If not, just
11:00:59  3  let me know and you can go."
11:01:00  4      A. No, I'm asking you to read the
11:01:01  5  first letter.
11:01:02  6      Q. Sir, it says, right here, at the
11:01:02  7  very end, "Do you want to stay until the
11:01:05  8  20th or not? If not, just let me know" --
11:01:08  9      MR. SMITH: If you're going to
11:01:09 10  ask him what it says, you've got to let him
11:01:12 11  look at it.
11:01:12 12      A. This is ridiculous.
11:01:14 13      Q. Why don't you take the exhibit
11:01:15 14  and hand me that one back. Hand me that
11:01:18 15  one back.
11:01:19 16      A. I just received a call from a
11:01:21 17  customer. The banquet room was dirty. We
11:01:26 18  charged him for glasses that were never
11:01:28 19  provided. Where you are this week? That
11:01:33 20  was the question. What do you want to do?
11:01:35 21  I have customer calling me. The meeting
11:01:39 22  room was dirty. I have a guest calling me,
11:01:42 23  and also you guys were supposed to provide

20  (Pages 77 to 80)

# FREEDOM COURT REPORTING

81

11:01:45 1 glasses, and they were never provided.
11:01:48 2 What's going on? Are you still working
11:01:50 3 there? Are you going by the 20th? Do you
11:01:53 4 want to leave Texas earlier? You still
11:01:56 5 able to work? This is the memo saying.
11:02:00 6 It's not saying how far you go on the 20th.
11:02:05 7 It's saying, hey, everything is dirty over
11:02:07 8 there. What's going on with you? Can you
11:02:11 9 tell me? Because he never tell us.
11:02:11 10
11:02:11 11    (Whereupon, Plaintiff's Exhibit 7 was
11:02:11 12     marked for identification and same
11:02:11 13     is attached hereto.)
11:02:26 14
11:02:26 15    Q. Exhibit 7, tell me if you have
11:02:26 16 seen that document before.
11:03:46 17    MR. SMITH: And while he looks
11:03:48 18 at that, we're obviously going to keep
11:03:51 19 going here, but this is now the second memo
11:03:52 20 that I'm seeing for the first time right
11:03:55 21 now.
11:03:55 22    MR. BRYANT: The first time I'm
11:03:56 23 seeing them, too. Mario was looking for

82

11:03:58 1 them and he found them.
11:03:59 2    MR. SMITH: Before we started
11:04:00 3 this deposition, since there was an
11:04:01 4 outstanding request for production, since
11:04:03 5 there has been no response --
11:04:05 6    MR. BRYANT: How about let's
11:04:06 7 talk about the past. Let's don't do that.
11:04:06 8    MR. SMITH: No, I don't want to
11:04:06 9 talk about the past.
11:04:08 10    MR. BRYANT: I have the same
11:04:09 11 problem, sir. I have the same problem.
11:04:11 12    MR. SMITH: Well, we didn't take
11:04:12 13 those depositions. We didn't take those
11:04:14 14 depositions.
11:04:14 15    MR. BRYANT: I have the same
11:04:15 16 problem with your document production, and
11:04:17 17 I didn't complain about it, because I gave
11:04:18 18 you the benefit of the doubt that something
11:04:19 19 happened. I just saw these and I've given
11:04:19 20 them to you as soon as I've seen them,
11:04:21 21 okay?
11:04:21 22    MR. SMITH: Well, no, you're not
11:04:22 23 giving them to me as soon as you've seen

83

11:04:22 1 them. You're giving them to me after
11:04:24 2 you've shown them to the witness and
11:04:27 3 started asking him questions, and that's
11:04:28 4 not nearly the same thing. If you think it
11:04:29 5 is, you're wrong. I can promise you I'm
11:04:30 6 not going to show your witness documents
11:04:32 7 today that haven't already been produced to
11:04:35 8 you. So I want that to be clear on the
11:04:36 9 record that now Exhibit --
11:04:36 10    MR. BRYANT: That's fine.
11:04:38 11    MR. SMITH: -- 6 was provided to
11:04:39 12 me for the first time after my witness saw
11:04:41 13 it.
11:04:42 14    MR. BRYANT: I'll tell you what,
11:04:43 15 if you want to look through the whole
11:04:45 16 stack, you're welcome to do it right now.
11:04:46 17    MR. SMITH: And Exhibit 5 --
11:04:46 18    MR. BRYANT: Let's take a break,
11:04:47 19 then. You can take the whole stack and you
11:04:49 20 can talk to your witness about them, if you
11:04:50 21 want to. These are his documents.
11:04:52 22    MR. SMITH: It doesn't matter
11:04:54 23 whose they were.

84

11:04:55 1    MR. BRYANT: They were never
11:04:56 2 produced to us, sir. We asked for the same
11:04:57 3 documents and you didn't produce them
11:05:00 4 because -- I don't know why, but we didn't
11:05:01 5 get them until my client had to dig through
11:05:04 6 a stack of something somewhere and get
11:05:07 7 them. Let's take a break. Okay?
11:05:07 8    VIDEOGRAPHER: We are off the
11:05:08 9 record at 11:03 a.m.
11:05:08 10
11:05:08 11    (Whereupon, a brief recess was
11:05:08 12     taken.)
11:20:24 13
11:20:24 14    VIDEOGRAPHER: This begins
11:20:36 15 videotape number two. We are back on the
11:20:39 16 record at 11:19 a.m.
11:20:42 17    Q. Mr. Tampa, we took a break so
11:20:44 18 that you could look through some of the
11:20:46 19 documents that I have here. After looking
11:20:48 20 at those documents, do you feel comfortable
11:20:50 21 talking about them and going forward with
11:20:52 22 your deposition?
11:20:53 23    A. Whatever I know, yes.

21 (Pages 81 to 84)

# FREEDOM COURT REPORTING

85

11:20:55 1     MR. SMITH: And I know we talked
11:20:58 2  earlier or he mentioned earlier, maybe we
11:21:00 3  weren't on the record, that he's got some
11:21:01 4  time constraints. And I know you're doing
11:21:03 5  the best you can, but he's telling me that
11:21:07 6  he's got until about 12:00 and he's got to
11:21:07 7  get out of here at 12:00.
11:21:10 8     MR. BRYANT: I might be done.
11:21:11 9  We'll see.
11:21:12 10     Q. Okay. Exhibit 7, which is a
11:21:14 11  memo dated December the 14th, I asked you
11:21:17 12  to look at that, and I think you sat there
11:21:19 13  and read through it; is that true?
11:21:21 14     A. Yes, I did.
11:21:22 15     Q. Have you seen that document
11:21:23 16  before?
11:21:23 17     A. I don't recall.
11:21:25 18     Q. Are you saying you didn't
11:21:37 19  receive it?
11:21:37 20     A. I don't remember.
11:21:37 21     Q. So you're not saying you didn't
11:21:37 22  receive it. You're just saying -- you're
11:21:37 23  just saying that you don't recall whether

86

11:21:37 1  you received it?
11:21:37 2     A. I don't.
11:21:37 3     Q. Is that correct? Did I state --
11:21:38 4     A. Yes, yes.
11:21:39 5     Q. Because that memo is a response
11:21:42 6  to the other memo we just looked at,
11:21:44 7  Exhibit 6. Would you agree?
11:21:50 8     A. I don't know if I can agree the
11:21:55 9  response.
11:21:55 10     Q. Well, it says, "Response to memo
11:21:57 11  dated 12/12/05" --
11:21:58 12     A. Okay.
11:21:59 13     Q. -- "but received on 12/13/05,"
11:22:01 14  right?
11:22:01 15     A. Okay.
11:22:02 16     Q. Yes?
11:22:03 17     A. That's what the paper say, yes.
11:22:07 18     Q. And the memo, Exhibit 7, talks
11:22:08 19  about some of the issues in Exhibit 6,
11:22:12 20  true?
11:22:12 21     A. It sounds like.
11:22:14 22     Q. Okay. But you're saying you
11:22:16 23  don't know whether you received Exhibit 7

87

11:22:18 1  or not?
11:22:18 2     A. I don't recall.
11:22:20 3     Q. Other than Exhibit 6, which is
11:22:23 4  the memo that we talked about a minute ago,
11:22:26 5  where it says do you want to stay until the
11:22:28 6  20th or not, et cetera, did you talk with
11:22:32 7  Mr. Mendiola at any other time or
11:22:36 8  communicate with him in any way about
11:22:39 9  whether the 20th would be all right with
11:22:41 10  him for moving out?
11:22:46 11     A. After the 12th, the week of the
11:22:49 12  12th, I was over there several times, you
11:22:51 13  know, that week.
11:22:53 14     Q. And did you see him in the
11:22:55 15  parking lot?
11:22:55 16     A. Well, I see him in the hotel and
11:22:58 17  his office.
11:22:59 18     Q. And did you speak with him
11:23:01 19  personally about the issue relating to the
11:23:03 20  20th?
11:23:04 21     A. Yes, I believe we -- I did.
11:23:07 22     Q. And would that be after December
11:23:09 23  the 14th, which would be a Wednesday?

88

11:23:14 1     A. I'm not sure. I'm not sure what
11:23:17 2  day I was back.
11:23:18 3     Q. Well --
11:23:18 4     A. The week of the 12th.
11:23:20 5     Q. Okay. You're saying that you
11:23:27 6  talked to Mr. Mendiola in person during the
11:23:29 7  week of the 12th?
11:23:30 8     A. That's correct.
11:23:30 9     Q. About whether he was going to
11:23:32 10  move out on the 20th?
11:23:34 11     A. That's correct.
11:23:37 12     Q. And are you telling us then that
11:23:41 13  he didn't, at that time, explain to you
11:23:43 14  that he had not resigned?
11:23:45 15     A. No, he did not.
11:23:46 16     Q. He didn't say that to you?
11:23:48 17     A. No.
11:23:48 18     Q. He was okay with leaving on the
11:23:50 19  20th?
11:23:50 20     A. Yes.
11:23:55 21     Q. Okay.
            22
            23     (Whereupon, Plaintiff's Exhibit 8 was

22  (Pages 85 to 88)

## FREEDOM COURT REPORTING

|  | 89 |
|---|---|
| 1 | marked for identification and same |
| 2 | is attached hereto.) |
| 3 | |
| 11:24:08 4 | Q.   Number 8, Exhibit 8, would you |
| 11:24:09 5 | look at that, please? Have you ever seen |
| 11:24:28 6 | Exhibit 8? |
| 11:24:29 7 | A.   I don't recall. |
| 11:24:30 8 | Q.   You're not saying you didn't? |
| 11:24:32 9 | A.   I don't know. |
| 11:24:34 10 | Q.   You might have received it? |
| 11:24:36 11 | A.   I don't know. I don't recall |
| 11:24:38 12 | it. |
| 11:24:40 13 | Q.   This is just a memo basically |
| 11:24:45 14 | reminding you that he's leaving on the 20th |
| 11:24:51 15 | or 21st and he's asking for his paycheck, |
| 11:24:54 16 | right? |
| 11:24:54 17 | A.   That's what the memo says, yes. |
| 11:24:56 18 | Q.   Now, we already talked about his |
| 11:24:58 19 | last paycheck, about the one that you |
| 11:25:03 20 | issued a stop payment on? |
| 11:25:04 21 | A.   I'm not sure if that was his |
| 11:25:06 22 | last paycheck. |
| 11:25:07 23 | Q.   Well, it was dated the 20th of |

|  | 90 |
|---|---|
| 11:25:09 1 | December. |
| 11:25:09 2 | A.   I don't know. I don't know what |
| 11:25:12 3 | that check was. Either reimbursement, I |
| 11:25:15 4 | don't know. I need to check. |
| 11:25:15 5 | |
| 11:25:15 6 | (Whereupon, Plaintiff's Exhibit 9 was |
| 11:25:15 7 | marked for identification and same |
| 11:25:15 8 | is attached hereto.) |
| 11:25:19 9 | |
| 11:25:21 10 | Q.   All right. I'll show you |
| 11:25:22 11 | Exhibit 9. See if you have ever seen that |
| 11:25:26 12 | document before. Have you ever seen |
| 11:25:38 13 | Exhibit 9? |
| 11:25:39 14 | A.   I don't recall. |
| 11:25:40 15 | Q.   You don't recall seeing the |
| 11:25:42 16 | Charge of Discrimination? |
| 11:25:45 17 | A.   I don't. |
| 11:25:46 18 | Q.   January the 11th of '06? |
| 11:25:52 19 | A.   (Witness shakes head.) |
| 11:25:53 20 | Q.   Mr. Tampa? |
| 11:25:54 21 | A.   Yes, sir. |
| 11:25:55 22 | Q.   Do you remember seeing this |
| 11:25:56 23 | document? |

|  | 91 |
|---|---|
| 11:25:56 1 | A.   I don't recall. |
| 11:25:56 2 | Q.   Would you consider this to be a |
| 11:25:58 3 | fairly important document? |
| 11:26:01 4 | A.   I don't know how you look at |
| 11:26:04 5 | what the value is on this paper. I don't |
| 11:26:07 6 | know. |
| 11:26:07 7 | Q.   This document accuses you of |
| 11:26:09 8 | violating Mr. Mendiola's rights under the |
| 11:26:12 9 | Americans with Disabilities Act. Do you |
| 11:26:15 10 | understand that? |
| 11:26:16 11 | A.   Well, I understand what you're |
| 11:26:18 12 | telling me. I don't know if that's true or |
| 11:26:20 13 | not. |
| 11:26:20 14 | Q.   Well, it says Charge of |
| 11:26:23 15 | Discrimination at the top? |
| 11:26:25 16 | A.   Okay. |
| 11:26:25 17 | Q.   Is that true? |
| 11:26:29 18 | A.   That doesn't mean -- I don't |
| 11:26:31 19 | understand the question. What are you |
| 11:26:33 20 | trying to get? Because I really don't |
| 11:26:36 21 | understand. Educate me a little bit. |
| 11:26:39 22 | Q.   Well, are you aware that Mr. |
| 11:26:42 23 | Mendiola has alleged that you violated his |

|  | 92 |
|---|---|
| 11:26:46 1 | rights under the Americans with |
| 11:26:49 2 | Disabilities Act? |
| 11:26:49 3 | A.   Yeah, I understand now, yes. |
| 11:26:51 4 | Q.   How did you first learn of that |
| 11:26:53 5 | allegation? |
| 11:26:54 6 | A.   My attorney. About the |
| 11:26:59 7 | allegation? |
| 11:27:00 8 | Q.   Yes. |
| 11:27:00 9 | A.   I think we received a notice or |
| 11:27:02 10 | something. |
| 11:27:03 11 | Q.   A notice, from who? |
| 11:27:04 12 | A.   Or a lawsuit or -- I don't |
| 11:27:08 13 | remember exactly. I think we just received |
| 11:27:13 14 | -- and the counsel was provided to him from |
| 11:27:18 15 | that time. |
| 11:27:18 16 | Q.   It's my understanding, sir, that |
| 11:27:21 17 | you conducted an investigation into the |
| 11:27:23 18 | allegations made by Mr. Mendiola? |
| 11:27:25 19 | A.   Okay. |
| 11:27:26 20 | Q.   Is that true? |
| 11:27:28 21 | A.   I did the investigation? |
| 11:27:29 22 | Q.   Yes. |
| 11:27:35 23 | A.   I'm not sure what you're talking |

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

93

11:27:37 1 about.

11:27:49 2    Q. I sent something to your

11:27:49 3 attorney. It's called an interrogatory.

11:27:49 4    A. Uh-huh (positive response).

11:27:50 5    Q. And it says: Identify all of

11:27:55 6 defendants' employees, representatives, or

11:27:56 7 agents who were in any way involved in any

11:27:59 8 investigation of the discrimination alleged

11:28:01 9 by plaintiff, et cetera.

11:28:04 10    The answer is: Defendant states

11:28:06 11 that John Tampa investigated the allegation

11:28:08 12 of discrimination contained in plaintiff's

11:28:11 13 EEOC charge. Tampa did so in his capacity

11:28:14 14 as managing member of IT Montgomery, LLC.

11:28:18 15 All right?

11:28:19 16    A. Yeah, based on the attorney

11:28:21 17 knowledge and what he decide. He knows

11:28:24 18 more about allegation than me, you know.

11:28:26 19    Q. So did you investigate this

11:28:28 20 allegation or did your attorneys

11:28:29 21 investigate this allegation?

11:28:35 22    A. I don't understand when you talk

11:28:38 23 about investigation. Like what?

94

11:28:40 1    Q. Okay. Sir, do you believe it

11:28:48 2 would be important -- scratch that. Do you

11:28:51 3 understand who or what the EEOC is?

11:28:56 4    A. No.

11:29:01 5    Q. Are you aware that the EEOC is

11:29:06 6 referred to as the Equal Employment

11:29:16 7 Opportunity Commission?

11:29:16 8    A. If that's what you're saying,

11:29:16 9 yes.

11:29:16 10    Q. I'm asking if you know that?

11:29:16 11    A. No, I do not.

11:29:16 12    Q. Is Brenda Gwin your HR manager?

11:29:20 13    A. Pretty much, yes.

11:29:22 14    Q. And has she been the HR manager

11:29:27 15 for --

11:29:27 16    A. What do you mean HR?

11:29:28 17    Q. Human resources manager.

11:29:30 18    A. Probably she knows more than me,

11:29:33 19 yes, in this kind of questions.

11:29:35 20    Q. Did Brenda Gwin investigate the

11:29:38 21 allegations made by Mr. Mendiola at the

11:29:40 22 EEOC?

11:29:41 23    A. Probably.

95

11:29:42 1    Q. Do you know that?

11:29:44 2    A. Well, if we did it, she's the

11:29:46 3 one probably file, if anything was filed.

11:29:49 4    Q. So did she talk with you?

11:29:51 5    A. Probably, yes.

11:29:52 6    Q. Hold on. Let's be very clear.

11:29:55 7 I don't want to know probably. I want to

11:29:56 8 know what you know. Because when you say

11:29:58 9 probably, it makes me think you're

11:30:01 10 guessing.

11:30:02 11    A. Yeah.

11:30:02 12    Q. Let's don't do that. Let me ask

11:30:04 13 the question. Did Brenda Gwin ask you

11:30:07 14 about the allegations that you had violated

11:30:09 15 Mr. Mendiola's rights under the ADA?

11:30:15 16    A. I know we did have some

11:30:18 17 conversation. I don't know if it was

11:30:21 18 regarding this, you know, whatever you're

11:30:24 19 saying, charge of discrimination, some

11:30:27 20 agency or something. I know I did have

11:30:29 21 conversation with her about that, you know,

11:30:31 22 and I think we respond to a complaint or

11:30:33 23 something.

96

11:30:35 1    Q. Do you know how long it took her

11:30:38 2 to respond to the complaint?

11:30:39 3    A. I do not.

11:30:40 4    MR. SMITH: Object to the form.

11:30:41 5 He didn't say she did.

11:30:42 6    Q. Do you know how long it took

11:30:44 7 your company to respond to the complaint?

11:30:46 8    A. I don't.

11:30:46 9    Q. Do you think it was more than

11:30:48 10 two hundred days?

11:30:49 11    A. I don't know, sir.

11:30:51 12    Q. Does it concern you when someone

11:30:53 13 makes an allegation that you have violated

11:30:55 14 their rights under the Americans with

11:30:57 15 Disabilities Act?

11:30:59 16    A. No, if you don't violate

11:31:02 17 nothing. I mean, anyone can make any, you

11:31:06 18 know, claim.

11:31:06 19

11:31:06 20    (Whereupon, Plaintiff's Exhibit 10

11:31:06 21    was marked for identification and

11:31:06 22    same is attached hereto.)

11:31:10 23

24 (Pages 93 to 96)

# FREEDOM COURT REPORTING

97

11:31:26 1    Q.  I want to show you Exhibit 10.
11:31:32 2  Take a look and see if you have seen that
11:31:34 3  document before.
11:32:00 4    A.  What was the question?
11:32:01 5    Q.  Have you ever seen that document
11:32:02 6  before?
11:32:03 7    A.  Probably.  I'm not sure exactly.
11:32:04 8    Q.  Do you understand what that
11:32:08 9  document is?
11:32:09 10    A.  Something Determination
11:32:15 11  regarding the claim I believe he got to the
11:32:21 12  employment whatever commission.
11:32:22 13    Q.  And do you understand, sir, that
11:32:24 14  that is a Determination by the EEOC that
11:32:28 15  there is reason to believe a violation of
11:32:31 16  the ADA has occurred with respect to Mr.
11:32:34 17  Mendiola in your hotel?
11:32:37 18    A.  What was the question?
11:32:38 19    Q.  Do you understand, sir, that
11:32:40 20  this Determination is put out by the EEOC,
11:32:45 21  by the EEOC?
11:32:46 22    A.  The Determination is made based
11:32:48 23  on the -- on an understanding on all the

98

11:32:55 1  thing that were provided.  I'm not sure how
11:32:57 2  they make that determination.
11:32:58 3    Q.  And, sir, isn't it true that you
11:33:08 4  provided to the EEOC information about the
11:33:08 5  alleged violation of the Americans with
11:33:08 6  Disabilities Act in this case?
11:33:10 7    A.  I'm not sure we provide
11:33:12 8  everything, no.
11:33:13 9    Q.  You didn't provide everything?
11:33:14 10    A.  Probably not.
11:33:15 11    Q.  Why is that?
11:33:16 12    A.  I don't think, sir, we know
11:33:19 13  exactly.  We just find out more in digging
11:33:23 14  about all the things.  We thought there is
11:33:26 15  no problem.  We did not do nothing wrong to
11:33:28 16  nobody.
11:33:29 17    Q.  I will tell you, sir, one of the
11:33:43 18  documents that you provided to the EEOC,
11:33:46 19  according to the documents produced by the
11:33:47 20  EEOC and by your attorney, one of those
11:33:50 21  documents was Exhibit 4, which was the memo
11:33:52 22  we talked about before, December 12th, that
11:33:57 23  you have located a GM and they want to

99

11:33:59 1  start on the 20th.
11:34:00 2    A.  Okay.
11:34:00 3    Q.  Do you know of any other
11:34:02 4  documentation, memos, or anything that you
11:34:05 5  provided to the EEOC?
11:34:06 6    A.  I do not know, sir.
11:34:15 7    Q.  Sir, have you told anyone that
11:34:46 8  when Mr. Mendiola recovers from his
11:34:51 9  illness, he can come back to work for you?
11:34:54 10    A.  If somebody asks me, yes.
11:34:58 11    Q.  I'm asking have you ever told
11:34:59 12  anybody that?
11:35:00 13    A.  I don't recall exactly.
11:35:03 14    Q.  Why would he have to recover --
11:35:06 15  let me ask you this:  What does recover
11:35:08 16  mean?  If you told someone that Mr.
11:35:10 17  Mendiola could come back to work after he
11:35:13 18  recovers, what do you mean by that?
11:35:15 19    MR. SMITH:  Object to the form.
11:35:17 20  You're asking what he means by something he
11:35:19 21  might have said?
11:35:19 22
11:35:19 23    (Whereupon, Plaintiff's Exhibit 11

100

11:35:19 1    was marked for identification and
11:35:19 2    same is attached hereto.)
11:35:20 3
11:35:20 4    Q.  Well, let's look at Exhibit 11.
11:35:22 5  Take a look at that, sir.  This is a
11:35:30 6  document, sir, that was sent out by the
11:35:33 7  State of Alabama.
11:35:36 8    A.  Uh-huh (positive response).
11:35:37 9    Q.  And do you see that?
11:35:38 10    A.  Yes.
11:35:39 11    Q.  Have you ever seen this document
11:35:40 12  before?
11:35:41 13    A.  No.
11:35:41 14    Q.  If you'll notice right here,
11:35:45 15  where the box is checked?
11:35:46 16    A.  Uh-huh (positive response).
11:35:48 17    Q.  This is addressed to Mr.
11:35:50 18  Mendiola and it indicates that he was
11:35:54 19  informed by IT Montgomery that when he
11:35:59 20  recovers, he can come back to work?
11:36:01 21    A.  That's right.
11:36:02 22    Q.  Why would he need to, quote,
11:36:04 23  recover to come back to work?

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

| | 101 |
|---|---|

11:36:06  1     A.  I'm not sure the proper word
11:36:10  2  probably, you know, wording recover, mean
11:36:14  3  what we were trying to say is.  What we
11:36:16  4  were trying to say, if he got the issues
11:36:18  5  and he's going to Texas to resolve his
11:36:20  6  problem, he's welcome to come back to work.
11:36:23  7  I'm not sure if recovery, you know, really
11:36:31  8  engage what we were trying to say.
11:36:33  9     Q.  Did you understand that Mr.
11:36:34 10  Mendiola was scheduled to have additional
11:36:37 11  testing regarding his condition at the time
11:36:43 12  you sent your December the 12th memo?
11:36:47 13     A.  No.
11:36:47 14     Q.  He didn't tell you that he
11:36:50 15  needed additional testing?
11:37:00 16     A.  He was working, but he did not.
11:37:00 17  I do not know next thing he did, no.
11:37:00 18     Q.  So you're telling the jury that
11:37:00 19  you were not aware that he had some
11:37:00 20  additional tests that would clarify whether
11:37:03 21  he had leukemia or not?
11:37:06 22     A.  I did not know -- repeat the
11:37:10 23  question.

| | 102 |
|---|---|

11:37:10  1     Q.  Sir, isn't it true, I think
11:37:12  2  you've already testified, that you were
11:37:14  3  aware Mr. Mendiola had additional testing
11:37:16  4  that needed to be done?
11:37:18  5     A.  To see more doctor or testing,
11:37:20  6  something like that.
11:37:21  7     Q.  Right.  So did you call Mr.
11:37:23  8  Mendiola to find out what the results of
11:37:26  9  those tests were?
11:37:27 10     A.  I think we spoke a few weeks
11:37:30 11  after he left, you know.
11:37:31 12     Q.  And he told you?
11:37:33 13     A.  Pretty much nothing.
11:37:35 14     Q.  He didn't tell you that his
11:37:37 15  cancer is in remission?
11:37:38 16     A.  No, sir.
11:37:39 17     Q.  Let me go back to Exhibit 1.
11:38:11 18  Exhibit 1 is the letter regarding Mr.
11:38:14 19  Mendiola's employment with your company; is
11:38:20 20  that correct?
11:38:20 21     A.  Yes.
11:38:21 22     Q.  It says the salary is forty-two
11:38:25 23  thousand dollars?

| | 103 |
|---|---|

11:38:26  1     A.  Yes, sir.
11:38:26  2     Q.  And there's some bonus that
11:38:28  3  might occur as well?
11:38:29  4     A.  Uh-huh (positive response).
11:38:30  5     Q.  The forty-two thousand dollars,
11:38:32  6  is that the current salary of your GM
11:38:35  7  position?
11:38:36  8     A.  No.  Less than that.
11:38:38  9     Q.  It's less than that?
11:38:39 10     A.  Uh-huh (positive response).
11:38:39 11     Q.  Did you understand that this was
11:38:41 12  going to be the most salary Mr. Mendiola
11:38:44 13  would ever make, is forty-two thousand
11:38:46 14  dollars, or was there a possibility he
11:38:47 15  might earn more in the future?
11:38:51 16     A.  No.  There was a possibility
11:38:53 17  to --
11:38:53 18     Q.  To increase?
11:38:54 19     A.  -- increase, yes.
11:38:55 20     Q.  To what degree?  What amount of
11:38:58 21  increase -- what was your expectation in
11:39:02 22  that regard?
11:39:03 23     A.  I cannot tell you exactly how

| | 104 |
|---|---|

11:39:05  1  much increase, but anyone who provide
11:39:10  2  proper work should be compensated
11:39:12  3  accordingly, you know.  That was based on
11:39:16  4  his performance.  I think he's the one who
11:39:18  5  is supposed to provide that, and based on
11:39:21  6  his performance, the increase was made.
11:39:24  7     Q.  Okay.  So this is not a ceiling?
11:39:26  8  This was not intended as a ceiling for Mr.
11:39:30  9  -- or a maximum for Mr. Mendiola in terms
11:39:32 10  of salary?
11:39:34 11     A.  At that time it was, but for
11:39:38 12  years to come for working for us, we don't
11:39:45 13  know.
11:39:45 14     Q.  What is the -- what kind of
11:39:46 15  salary are you paying to your other general
11:39:48 16  managers at the other hotels like the
11:39:50 17  Hampton Inn?
11:39:52 18     A.  Hampton Inn, I'm not sure
11:39:56 19  exactly.  Probably around forty something.
11:39:58 20     Q.  Forty?
11:39:59 21     A.  Yeah, something like that.
11:40:01 22     Q.  Are they all in line with this
11:40:04 23  forty-two thousand dollar figure, or are

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

105

11:40:06  1  there general managers that work for one of
11:40:09  2  your companies that make more?
11:40:10  3      A.  I don't know.  I need to check
11:40:12  4  that out.
11:40:13  5      Q.  You could find that out, right?
11:40:15  6      A.  Yes.
11:40:17  7      Q.  Let me talk to you about this
11:40:58  8  replacement general manager, Lynn.
11:40:58  9      A.  Okay.
11:40:58 10      Q.  Lynn Moody?
11:40:58 11      A.  Yes.
11:40:58 12      Q.  How did you find her?
11:40:58 13      A.  She was the GM for another
11:41:01 14  property in Montgomery.  I'm not sure
11:41:06 15  exactly how was the first conversation with
11:41:09 16  that occurred.  I don't know.  I don't
11:41:12 17  remember.
11:41:12 18      Q.  Did you tell her why Mr.
11:41:14 19  Mendiola was leaving?
11:41:16 20      A.  I don't remember.
11:41:20 21      Q.  And why is that person no longer
11:41:30 22  with your hotel?
11:41:32 23      A.  She just decide she wants to go

106

11:41:37  1  in different directions.
11:41:38  2      Q.  It's not because you owe her
11:41:40  3  money?
11:41:40  4      A.  What's that?
11:41:41  5      Q.  It's not because you owe her
11:41:43  6  money?
11:41:43  7      A.  Not that I know, sir.
11:41:44  8      Q.  Okay.  Did you fire her?
11:41:49  9      A.  I believe, you know, she was
11:42:01 10  found in the property drinking alcohol
11:42:03 11  several times, and by my conversation with
11:42:05 12  her, she just decide to move in a different
11:42:10 13  direction by me not allowing that to
11:42:12 14  happen, you know.
11:42:13 15      Q.  Did she have more or less
11:42:16 16  experience as a general manager of a hotel
11:42:18 17  than Mr. Mendiola had?
11:42:28 18      A.  I don't know about experience.
11:42:28 19  It depends how you look at it, you know.  But
11:42:31 20  she did have more experience, probably due
11:42:35 21  to the fact she was local, you know.  She
11:42:38 22  know better the area.  The experience, I'm
11:42:41 23  not sure.  Probably not.

107

11:42:43  1      Q.  So Mr. Mendiola was more
11:42:46  2  qualified overall than this replacement?
11:42:49  3          MR. SMITH:  Object to the form.
11:42:53  4      A.  I don't know.  It depends how
11:42:54  5  you look at it, you know.
11:42:56  6      Q.  I'm asking you how you looked at
11:42:58  7  it.  That's what I want to know.
11:42:59  8      A.  I was forced to look at it that
11:43:03  9  way.
11:43:04 10      Q.  And Mr. Mendiola wasn't drinking
11:43:07 11  on the property, was he?  You didn't catch
11:43:10 12  Mr. Mendiola doing something like that?
11:43:12 13      A.  No.
11:43:13 14      Q.  And when you talked to this
11:43:22 15  person that replaced Mr. Mendiola, did you
11:43:25 16  ask her about her health?
11:43:30 17      A.  I don't recall.
11:43:32 18      Q.  You don't recall?
11:43:33 19      A.  No.
11:43:33 20      Q.  You don't recall if you asked
11:43:35 21  her if she was in good health?
11:43:37 22      A.  I don't know.  Probably.  I'm
11:43:38 23  not sure.

108

11:43:40  1      Q.  And then, when Ms. Moody left,
11:43:43  2  who did you hire to replace her?
11:43:46  3      A.  I believe Beverly Woods.  She's
11:43:50  4  the one who pretty much replaced her.
11:43:54  5      Q.  Are you sure about that?  Could
11:43:55  6  there have been one other person?
11:43:57  7      A.  I don't recall exact.
11:43:57  8
11:43:57  9      (Whereupon, Plaintiff's Exhibits
11:43:57 10      12-13 were marked for identification
11:43:57 11      and same are attached hereto.)
11:43:58 12
11:43:58 13      Q.  Okay.  Let me show you Exhibit
11:44:43 14  12 and ask you if you know what that
11:44:44 15  document is?
11:44:51 16      A.  (Witness reviews document.)  It
11:45:17 17  sounds like affidavit.
11:45:19 18      Q.  Who signed this document?
11:45:19 19      A.  Beverly Woods.
11:45:21 20      Q.  Do you recognize her signature?
11:45:23 21      A.  I don't know.
11:45:23 22      Q.  Okay.  We'll ask her later.  But
11:45:26 23  is it true, sir, this indicates that -- or

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

---

### 109

11:45:28 1  she says, "After several attempts of hiring
11:45:30 2  a couple of general managers, I was forced
11:45:34 3  to step up to the position of general
11:45:36 4  manager"?
11:45:37 5      A.  That's what she say, yes.
11:45:42 6      Q.  Does that cause you to recall
11:45:42 7  other general managers that you hired after
11:45:44 8  Ms. Moody left?
11:45:46 9      A.  I don't believe they were hired.
11:45:50 10  They were attempts trying to find a GM.  I
11:45:53 11  think that's what she's trying to say.  We
11:45:54 12  did try to find.
11:45:55 13      Q.  So you didn't actually hire
11:45:56 14  anyone?
11:45:57 15      A.  No, not that I know.
11:46:59 16      MR. BRYANT:  Let's take a break
11:47:00 17  for a minute.
11:47:01 18      VIDEOGRAPHER:  We are off the
11:47:03 19  record at 11:45 a.m.
11:47:03 20      (Whereupon, a brief recess was
11:47:03 21      taken.)
11:54:27 22      VIDEOGRAPHER:  We are back on
11:54:28 23  the record at 11:53 a.m.

### 111

11:55:48 1      A.  At that time, I was just thought
11:55:51 2  I need a GM.  I don't think so.  I did look
11:55:54 3  at, due to the situation we're in, I was
11:55:58 4  forced to get a GM.  Not long, short.  I
11:56:02 5  just need somebody to take care of the
11:56:04 6  position at this time and deal with it
11:56:05 7  later on based on what's going to happen.
11:56:07 8      Q.  So you thought Mr. Mendiola
11:56:09 9  might come back at some point?
11:56:11 10      A.  I did not know.  That was his
11:56:13 11  decision, you know.
11:56:14 12      Q.  Did you think it was possible?
11:56:15 13      A.  Anything is possible.
11:56:16 14      Q.  So when you terminated Ms. Moody
11:56:19 15  or when she left, did you call Mr. Mendiola
11:56:24 16  and ask him how he was doing?
11:56:26 17      MR. SMITH:  Object to the form.
11:56:29 18      A.  I believe Mr. Mendiola at the
11:56:31 19  time, he start to follow this inappropriate
11:56:35 20  actions.
11:56:35 21      Q.  What?  What are you talking
11:56:38 22  about?
11:56:39 23      A.  You don't understand?

---

### 110

11:54:34 1      Q.  When you hired Lynn Moody to
11:54:43 2  replace Mr. Mendiola, was your intention
11:54:52 3  that Ms. Moody would be a temporary general
11:54:57 4  manager?
11:55:08 5      A.  To be the GM for that time, yes,
11:55:08 6  temporary.
11:55:08 7      Q.  Temporary?
11:55:09 8      A.  Depends how you put the word
11:55:13 9  temporary, you know.  We hired a GM because
11:55:17 10  we were forced to hire a GM.
11:55:19 11      Q.  Well, you don't hire temporary
11:55:22 12  employees, do you, for your GM position?
11:55:25 13      A.  Sometimes you've got to replace
11:55:29 14  some people if you have to temporarily,
11:55:32 15  somebody to cover for other.
11:55:34 16      Q.  Was your intention, though, to
11:55:36 17  have a temporary GM to replace Mr.
11:55:39 18  Mendiola?
11:55:39 19      A.  If Mr. Mendiola never come back,
11:55:42 20  yes.
11:55:42 21      Q.  All right.  But that was your
11:55:45 22  intention at the time you located a
11:55:47 23  replacement general manager?

### 112

11:56:41 1      Q.  What I'm asking you is:  When
11:56:43 2  you realized that Ms. Moody was leaving --
11:56:47 3      A.  Yes.
11:56:48 4      Q.  -- sometime in 2006?
11:56:51 5      A.  Probably, yeah.
11:56:52 6      Q.  Did you call Mr. Mendiola to ask
11:56:54 7  him if he was ready to come back?
11:56:58 8      A.  No, because I think all this
11:57:00 9  conversation start and we feel he lied to
11:57:03 10  us and misled us by his actions.
11:57:07 11      Q.  When did you determine that?
11:57:09 12      A.  When we start receiving all this
11:57:13 13  letter and employment or whatever was
11:57:17 14  discrimination things.
11:57:18 15      Q.  So because he filed a complaint
11:57:21 16  with the EEOC, you decided he couldn't come
11:57:25 17  back to work for you?
11:57:25 18      MR. SMITH:  Object to the form.
11:57:26 19  That's not what he said.
11:57:27 20      A.  No, because he lied.
11:57:28 21      Q.  He lied about what?
11:57:29 22      A.  In the complaint.
11:57:30 23      Q.  Really?

---

28  (Pages 109 to 112)

# FREEDOM COURT REPORTING

113

| | | |
|---|---|---|
| 11:57:31 | 1 | A.  Yes, sir. |
| 11:57:32 | 2 | Q.  And he lied in what complaint? |
| 11:57:54 | 3 | A.  I don't know.  Just all this. |
| 11:57:56 | 4 | There were several things done.  I don't |
| 11:57:58 | 5 | know exactly when was done, but I cannot |
| 11:58:02 | 6 | consider employing the same person after |
| 11:58:04 | 7 | misled you and lying to you, you know, and |
| 11:58:07 | 8 | still trying to rob you. |
| 11:58:08 | 9 | Q.  Trying to do what? |
| 11:58:10 | 10 | A.  Rob you. |
| 11:58:10 | 11 | Q.  Rob you? |
| 11:58:11 | 12 | A.  Yes, sir. |
| 11:58:16 | 13 | MR. BRYANT:  I'll pass the |
| 11:58:17 | 14 | witness. |
| 11:58:18 | 15 | MR. SMITH:  I don't have any |
| 11:58:19 | 16 | questions. |
| 11:58:21 | 17 | THE WITNESS:  Shame on you guys, |
| 11:58:22 | 18 | you know. |
| 11:58:23 | 19 | VIDEOGRAPHER:  We are off the |
| 11:58:24 | 20 | record at 11:54 a.m.  This concludes the |
| 11:58:26 | 21 | deposition. |
| | 22 | |
| | 23 | FURTHER DEPONENT SAITH NOT |

114

| | |
|---|---|
| 1 | C E R T I F I C A T E |
| 2 | |
| 3 | STATE OF ALABAMA  ) |
| 4 | JEFFERSON COUNTY  ) |
| 5 | |
| 6 | I HEREBY CERTIFY that the |
| 7 | above and foregoing transcript was taken |
| 8 | down by me in stenotype, and the questions |
| 9 | and answers thereto were transcribed by |
| 10 | means of computer-aided transcription, and |
| 11 | that the foregoing represents a true and |
| 12 | correct transcript of the testimony given |
| 13 | by said witness. |
| 14 | I FURTHER CERTIFY that I am |
| 15 | neither of counsel, nor of any relation to |
| 16 | the parties to the action, nor am I anywise |
| 17 | interested in the result of said cause. |
| 18 | |
| 19 | |
| 20 | |
| 21 | TANYA D. CORNELIUS |
| 22 | CCR No. 378 |
| 23 | |

29  (Pages 113 to 114)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# EXHIBIT "5"

# FREEDOM COURT REPORTING

**1**

13:49:19 1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE MIDDLE DISTRICT OF ALABAMA

3

4    CIVIL ACTION NUMBER: CV-2:07 CV 469-MEF

5    MARIO MENDIOLA,

6        Plaintiff,

7        vs.

8    VISION HOSPITALITY, LLC,

9    and I.T. MONTGOMERY, LLC,

10    d/b/a QUALITY INN & SUITES

11    CONFERENCE CENTER

12        Defendants.

13

14

15

16

17        VIDEO DEPOSITION OF

18        BEVERLY WOODS

19        MAY 15, 2008

20

21

22

23

**2**

1        S T I P U L A T I O N

2        IT IS STIPULATED AND AGREED by

3    and between the parties through their

4    respective counsel that the video

5    deposition of BEVERLY WOODS may be taken

6    before Tanya D. Cornelius, Certified

7    Shorthand Reporter and Notary Public, at

8    the Law Offices of Sirote & Permutt, PC,

9    2311 Highland Avenue South, Birmingham,

10    Alabama 35205, on the 15th day of May,

11    2008.

12        IT IS FURTHER STIPULATED AND

13    AGREED that the signature to and the

14    reading of the deposition by the witness is

15    waived, the deposition to have the same

16    force and effect as if full compliance had

17    been had with all laws and rules of Court

18    relating to the taking of depositions.

19        IT IS FURTHER STIPULATED AND

20    AGREED that it shall not be necessary for

21    any objections to be made by counsel to any

22    questions, except as to form or leading

23    questions, and that counsel for the parties

**3**

1    may make objections and assign grounds at

2    the time of the trial, or at the time said

3    deposition is offered in evidence, or prior

4    thereto.

5        IT IS FURTHER STIPULATED AND

6    AGREED that notice of filing of the

7    deposition by the Commissioner is waived.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

**4**

1        I N D E X

2    EXAMINATION BY:        PAGE NUMBER:

3    Mr. Bryant        8

4

5        E X H I B I T S

6    PLAINTIFF'S EXHIBITS:        PAGE NUMBER:

7    14 - Declaration of

8        Beverly Woods        23

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

5

```
 1           A P P E A R A N C E S
 2
 3    FOR THE PLAINTIFF:
 4         DAVID A. BRYANT, Attorney at Law
 5         18 Augusta Pines Drive
 6         Suite 200 W
 7         Spring, Texas 77389
 8
 9         MORRIS & McANNALLY, LLC
10         BY Mr. D. Jason Britt
11         50 Wisteria Place
12         Millbrook, Alabama 36054
13
14    FOR THE DEFENDANT:
15         SIROTE & PERMUTT, PC
16         BY Mr. Kyle T. Smith
17         2311 Highland Avenue South
18         Birmingham, Alabama 35205
19
20    ALSO PRESENT:
21         Mr. Mario Mendiola
22         Mr. Phillip Brewer, Videographer
23
```

7

```
13:51:02  1    at 1:49 p.m. on Thursday, May the 15th of
13:51:07  2    2008. This deposition is taking place at
13:51:10  3    the office of Sirote and --
13:51:14  4         MR. SMITH: Sirote & Permutt.
13:51:18  5         VIDEOGRAPHER: I'm sorry, yes,
13:51:19  6    Sirote & Permutt, PC. My name is Phillip
13:51:23  7    Brewer representing Freedom Court
13:51:25  8    Reporting. Would counsel please identify
13:51:27  9    yourself and state whom you represent?
13:51:29 10         MR. BRYANT: David Bryant here
13:51:31 11    for the plaintiff, Mario Mendiola.
13:51:33 12         MR. BRITT: Jason Britt here for
13:51:34 13    the plaintiff.
13:51:36 14         MR. SMITH: Kyle Smith here for
13:51:37 15    Vision Hospitality and IT Montgomery.
13:51:41 16         VIDEOGRAPHER: And would the
13:51:41 17    reporter please swear in the witness?
         18
         19
         20         BEVERLY WOODS,
         21    being first duly sworn, was
         22    examined and testified as follows:
         23
```

6

```
          1    I, Tanya D. Cornelius,
          2    Certified Shorthand Reporter and Notary
          3    Public, acting as Commissioner, certify
          4    that on this date, as provided by the
          5    Federal Rules of Civil Procedure, and the
          6    foregoing stipulation of counsel, there
          7    came before me at the Law Offices of Sirote
          8    & Permutt, PC, 2311 Highland Avenue South,
          9    Birmingham, Alabama 35205, beginning at
         10    1:50 p.m., BEVERLY WOODS, witness in the
         11    above cause, for oral examination,
         12    whereupon the following proceedings were
         13    had:
         14
13:50:25 15         VIDEOGRAPHER: This begins
13:50:26 16    videotape number one in the deposition of
13:50:30 17    Beverly Woods in the matter of Mario
13:50:33 18    Mendiola versus Vision Hospitality, LLC and
13:50:39 19    IT Montgomery, LLC, d/b/a Quality Inn &
13:50:46 20    Suites Conference Center, Case Number
13:50:49 21    CV-2:07 CV 469-MEF in the Court of the
13:50:58 22    United States District Court for the Middle
13:51:00 23    District of Alabama. We are on the record
```

8

```
          1         THE REPORTER: Will this be
13:51:51  2    usual stipulations?
13:51:53  3         MR. BRYANT: Same as the last
13:51:54  4    deposition.
13:51:54  5         MR. SMITH: That's fine.
13:51:54  6
13:51:54  7         EXAMINATION
13:51:55  8    BY MR. BRYANT:
13:51:55  9         Q. Would you state your name,
13:51:57 10    please?
13:51:57 11         A. Beverly Woods.
13:51:58 12         Q. Ms. Woods, what do you do for a
13:52:00 13    living?
13:52:00 14         A. I work at the Quality Inn &
13:52:05 15    Suites Convention Center as general
13:52:05 16    manager.
13:52:06 17         Q. How long has that been your
13:52:07 18    employment?
13:52:08 19         A. I've been with the Quality Inn &
13:52:11 20    Suites, Governor's House for almost nine
13:52:15 21    years.
13:52:16 22         Q. And as a general manager, how
13:52:20 23    long?
```

2 (Pages 5 to 8)

# FREEDOM COURT REPORTING

### 9

13:52:20 1    A. Since May of 2006, I think, in
13:52:25 2  that area.
13:52:27 3    Q. Prior to becoming the general
13:52:29 4  manager in May of 2006, had you ever been
13:52:34 5  general manager of a hotel?
13:52:36 6    A. No.
13:52:37 7    Q. Or an assistant manager?
13:52:39 8    A. AGM, yes.
13:52:41 9    Q. Where were you an assistant GM?
13:52:44 10    A. Days Inn in Andalusia, Alabama.
13:52:46 11    Q. That has nothing to do with Mr.
13:52:48 12  Tampa?
13:52:49 13    A. No.
13:52:49 14    Q. Was that before you came on
13:52:51 15  board with Mr. Tampa's company?
13:52:54 16    A. Yes.
13:52:59 17    Q. Are you -- as the general
13:53:05 18  manager, are you permitted or do you have
13:53:08 19  the authority to make corporate decisions
13:53:13 20  on behalf of IT Montgomery, LLC?
13:53:16 21    MR. SMITH: Object to the form.
13:53:17 22    A. No.
13:53:18 23    Q. And I think I'm going to fix

### 10

13:53:19 1  what he's objected to. When I say
13:53:21 2  corporate decisions, I mean something other
13:53:24 3  than your day-to-day general manager
13:53:30 4  duties, something that might affect the
13:53:31 5  company in some broader sense?
13:53:35 6    A. No.
13:53:35 7    Q. So if you wanted to sell IT
13:53:38 8  Montgomery, you wouldn't have the authority
13:53:40 9  to do that?
13:53:41 10    A. No.
13:53:41 11    Q. And do you set policy on behalf
13:53:44 12  of IT Montgomery?
13:53:46 13    A. No.
13:53:46 14    Q. You follow policy that's set by
13:53:49 15  Mr. Tampa?
13:53:50 16    A. Yes.
13:53:50 17    Q. Tell me what Mr. Tampa has told
13:54:02 18  you about this lawsuit.
13:54:02 19    A. No more than it was a lawsuit
13:54:02 20  and I would be here today and I think I
13:54:04 21  signed a affidavit a couple -- prior to.
13:54:08 22  That was it.
13:54:08 23    Q. I missed the last part of that.

### 11

13:54:11 1    A. I mean, it's been a couple
13:54:12 2  months back as far as I spoke with Mr.
13:54:15 3  Smith, and that's as much as --
13:54:17 4    MR. SMITH: Let's don't talk
13:54:19 5  about -- distinguish between what you spoke
13:54:20 6  to Mr. Tampa about and what you talked to
13:54:22 7  me about.
13:54:23 8    Q. I'm not going to ask you about
13:54:25 9  what the lawyer here, Mr. Smith, has talked
13:54:29 10  to you about, but I want to know
13:54:30 11  specifically what Mr. Tampa told you about
13:54:33 12  the allegations in this lawsuit.
13:54:35 13    A. Nothing.
13:54:35 14    Q. Do you understand what the
13:54:36 15  lawsuit is about?
13:54:38 16    A. Yes, somewhat.
13:54:40 17    Q. All right. Could you tell us
13:54:41 18  what you understand it's about?
13:54:44 19    A. Just me knowing that Mr.
13:54:46 20  Mendiola has a lawsuit against Mr. Tampa.
13:54:49 21    Q. Okay. Do you know what the
13:54:50 22  claim is?
13:54:51 23    A. Not per se, I don't.

### 12

13:54:52 1    Q. Okay. So are you familiar with
13:54:54 2  the Americans with Disabilities Act?
13:54:56 3    A. Somewhat.
13:54:57 4    Q. What do you mean by that?
13:54:58 5    A. I mean in the course of business
13:55:00 6  and being in -- you hear different acts or
13:55:04 7  whatever. As far as being familiar with it
13:55:06 8  and knowledgeable of it, no, I'm not.
13:55:08 9    Q. Is there someone at the hotel
13:55:10 10  that you work at at the Quality Inn, is
13:55:14 11  there someone there that is charged with
13:55:16 12  the responsibility of making sure -- well,
13:55:20 13  of overseeing human resources, I guess is
13:55:24 14  my question?
13:55:24 15    A. Yes.
13:55:25 16    Q. Who is that?
13:55:26 17    A. Mr. Timothy Banks.
13:55:27 18    Q. How long has that been his job?
13:55:31 19    A. I know over four years.
13:55:36 20    Q. And do you know, is Mr. Banks
13:55:39 21  trained in -- is he EEOC trained? Do you
13:55:45 22  know what I'm talking about when I say EEOC
13:55:47 23  trained?

3 (Pages 9 to 12)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

| | 13 |
|---|---|
| 13:55:47 1 | A. No. |
| 13:55:48 2 | Q. Have you ever received any |
| 13:55:50 3 | training relating to the Americans with |
| 13:55:55 4 | Disabilities Act? |
| 13:55:56 5 | A. No. |
| 13:55:56 6 | Q. Or Title 7, Employment |
| 13:56:00 7 | Discrimination Laws? |
| 13:56:01 8 | A. No. |
| 13:56:01 9 | Q. Okay. When you say Mr. Banks is |
| 13:56:06 10 | in charge of HR, human resources, what are |
| 13:56:09 11 | you referring to specifically? |
| 13:56:10 12 | A. I'm referring to like if we have |
| 13:56:12 13 | some -- as far as employee relations, |
| 13:56:15 14 | pretty much as far as payroll, bringing |
| 13:56:20 15 | them aboard, filling out the paperwork, |
| 13:56:23 16 | anything related to the employee as far as |
| 13:56:26 17 | employment there at the hotel. |
| 13:56:31 18 | Q. Do you remember when Mr. |
| 13:56:33 19 | Mendiola left the Quality Inn? |
| 13:56:36 20 | A. Yes. |
| 13:56:37 21 | Q. Do you remember what year that |
| 13:56:40 22 | was? |
| 13:56:40 23 | A. 2005. |

| | 14 |
|---|---|
| 13:56:43 1 | Q. 2005? We have marked some |
| 13:56:50 2 | exhibits in this deposition or in the prior |
| 13:56:54 3 | deposition of Mr. Tampa, and I'm going to |
| 13:56:59 4 | show you Exhibit 4 from that deposition and |
| 13:57:01 5 | ask you if you've ever seen that document |
| 13:57:03 6 | before? |
| 13:57:15 7 | A. No. |
| 13:57:15 8 | Q. Do you recall whether Mr. |
| 13:57:15 9 | Mendiola ever showed you that document? |
| 13:57:18 10 | A. No. |
| 13:57:20 11 | Q. Was there a point in time where |
| 13:57:25 12 | Mr. Mendiola told you that he had been |
| 13:57:25 13 | fired? |
| 13:57:25 14 | A. No. |
| 13:57:25 15 | Q. He never came to you and said, |
| 13:57:28 16 | I've been terminated? |
| 13:57:29 17 | A. No. |
| 13:57:29 18 | Q. Or words to that effect? |
| 13:57:31 19 | A. No. |
| 13:57:32 20 | Q. What discussions did you have |
| 13:57:34 21 | with him regarding the reasons for his |
| 13:57:37 22 | departure? |
| 13:57:38 23 | A. I never had discussions with him |

| | 15 |
|---|---|
| 13:57:43 1 | the reasons as far as his departure. |
| 13:57:45 2 | Q. Do you know -- do you have any |
| 13:57:46 3 | idea why he left? Have you been told |
| 13:57:49 4 | something? |
| 13:57:50 5 | A. My understanding of why was the |
| 13:57:54 6 | discussion with Mr. Mendiola of the reason |
| 13:57:58 7 | that he was leaving the hotel. |
| 13:58:00 8 | Q. I'm sorry. Say that one more |
| 13:58:01 9 | time? |
| 13:58:02 10 | A. A discussion that I had with Mr. |
| 13:58:03 11 | Mendiola the reason that he was leaving the |
| 13:58:05 12 | hotel. |
| 13:58:06 13 | Q. When was that? |
| 13:58:07 14 | A. That he was sick and that he was |
| 13:58:10 15 | going back home for treatment because he |
| 13:58:14 16 | would get free treatment, because he didn't |
| 13:58:16 17 | have any insurance. |
| 13:58:17 18 | Q. When did you talk to him about |
| 13:58:18 19 | that? |
| 13:58:19 20 | A. That had to be -- I would say it |
| 13:58:20 21 | was probably sometime in the latter part of |
| 13:58:22 22 | November, somewhere in that area. |
| 13:58:23 23 | Q. What were his exact words? Do |

| | 16 |
|---|---|
| 13:58:25 1 | you remember the exact words he used? |
| 13:58:26 2 | A. Well, he come in my office and |
| 13:58:29 3 | sat down and told me that he was sick and I |
| 13:58:31 4 | asked him why. He said he had been |
| 13:58:33 5 | diagnosed with leukemia, and then -- which |
| 13:58:37 6 | I said I was sorry, you know, that he was |
| 13:58:40 7 | sick, and that everything would be okay. |
| 13:58:43 8 | And he said that he didn't have any |
| 13:58:45 9 | insurance and that he could get free |
| 13:58:47 10 | treatment back home in Texas, and that was |
| 13:58:49 11 | pretty much it. |
| 13:58:50 12 | Q. Did he tell you that it was a |
| 13:58:52 13 | certainty he was leaving or was it a |
| 13:58:54 14 | possibility that he might have to have |
| 13:58:56 15 | treatment? |
| 13:58:56 16 | A. It wasn't no might have the |
| 13:58:59 17 | treatment. He just said that he could get |
| 13:59:01 18 | free treatment back home. |
| 13:59:03 19 | Q. Did he say -- I'm sorry? |
| 13:59:06 20 | A. That's it. |
| 13:59:07 21 | Q. Did he say to you that he was |
| 13:59:08 22 | resigning? |
| 13:59:08 23 | A. No. |

4 (Pages 13 to 16)

# FREEDOM COURT REPORTING

17

13:59:09 1    Q. Okay. Were there any other
13:59:11 2    conversations you had with Mr. Mendiola
13:59:13 3    about this issue of his illness?
13:59:17 4    A. That was it. No.
13:59:19 5    Q. And has Mr. Tampa told you
13:59:22 6    anything about Mr. Mendiola's illness?
13:59:25 7    A. Yes.
13:59:26 8    Q. What did he tell you?
13:59:27 9    A. The day that he called everybody
13:59:29 10    into the office, all the managers was in
13:59:33 11    the office, and -- with Mr. Mendiola, and
13:59:36 12    he announced that, unfortunately, due to
13:59:38 13    Mr. Mendiola's illness, that he would have
13:59:40 14    to go back home, and he was leaving the
13:59:43 15    company and had to go back home for
13:59:45 16    treatment and that for us to all pray for
13:59:47 17    him.
13:59:47 18    Q. Do you remember when that was?
13:59:48 19    A. I can't give you the exact date,
13:59:50 20    but I know it had to be the early part of
13:59:53 21    December or somewhere around up in there
13:59:55 22    because we was all excited about the
13:59:57 23    Christmas holidays. It was during the

18

13:59:59 1    Christmas time.
13:59:59 2    Q. How close to the date Mr.
14:00:01 3    Mendiola left did that meeting take place?
14:00:05 4    A. I'm not -- I don't know.
14:00:07 5    Q. Can you say it was within a week
14:00:20 6    or something else?
14:00:20 7    A. I would say over a week,
14:00:20 8    probably way over a week.
14:00:20 9    Q. Okay. And did Mr. Mendiola say
14:00:21 10    anything during that meeting?
14:00:22 11    A. No.
14:00:23 12    Q. Okay. Other than what you've
14:00:34 13    told us so far, were there any other
14:00:38 14    discussions that you had with Mr. Mendiola
14:00:41 15    or discussions that you witnessed taking
14:00:44 16    place relating to Mr. Mendiola's departure
14:00:49 17    from the Quality Inn?
14:00:53 18    A. As far as departure -- ask the
14:00:55 19    question again.
14:00:55 20    Q. I'm wondering if there's
14:00:57 21    anything else, any other conversations that
14:00:58 22    you were part of or that you heard where
14:01:01 23    the issue of Mr. Mendiola leaving Quality

19

14:01:05 1    Inn was discussed?
14:01:06 2    A. Yes.
14:01:06 3    Q. What? What other conversations?
14:01:08 4    A. With Ms. Roxanne Luker.
14:01:11 5    Q. Okay. What did Roxanne tell
14:01:13 6    you?
14:01:13 7    A. Roxanne, before my discussion
14:01:15 8    with Mr. Mendiola, Ms. Luker had come into
14:01:19 9    the office and told us that, probably a
14:01:21 10    couple of days prior to that, maybe four or
14:01:23 11    five days, that -- she come back upset
14:01:26 12    because they had been to the doctor and
14:01:27 13    that he was sick and he had been diagnosed
14:01:29 14    with leukemia, and that they was going to
14:01:32 15    move back home, that -because he could get
14:01:35 16    free treatment and he had no insurance.
14:01:37 17    Q. And do you remember when that
14:01:40 18    was?
14:01:40 19    A. I can't say the exact date, but
14:01:42 20    I know it was before Mr. Mendiola come in
14:01:44 21    my office. We knew -- I knew before he
14:01:47 22    came into my office and told me that.
14:01:49 23    Q. Was there ever a time where you

20

14:01:51 1    spoke with Mr. Mendiola and he indicated
14:01:53 2    that additional testing had to be done to
14:01:56 3    determine whether he actually had active
14:01:58 4    cancer or not?
14:02:00 5    A. No.
14:02:01 6    Q. Okay. Any other conversations?
14:02:04 7    A. No.
14:02:05 8    Q. Nothing else about the illness
14:02:08 9    or him leaving?
14:02:11 10    A. No more than our conversation
14:02:13 11    that I had with him and, prior to that, Ms.
14:02:17 12    Luker, no more.
14:02:18 13    Q. Okay. Was there a point in time
14:02:24 14    where someone came to you and asked you if
14:02:27 15    you would sign a document that looks like
14:02:33 16    this (indicating), Exhibit 12?
14:02:37 17    A. Yes.
14:02:38 18    Q. Okay. Who is it that asked you
14:02:40 19    to sign that?
14:02:41 20    A. Not asked me to sign it. He
14:02:43 21    asked me to give a statement as far as in
14:02:47 22    related to this. Mr. Tampa.
14:02:49 23    Q. He asked you to do that?

5 (Pages 17 to 20)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

| | 21 |
|---|---|
| 14:02:51 1 | A. Yes, he asked me to write down |
| 14:02:54 2 | what I knew about as far as this, as far as |
| 14:02:57 3 | Mr. Mendiola and his leaving. |
| 14:03:00 4 | Q. Did you type that? |
| 14:03:02 5 | A. No. |
| 14:03:02 6 | Q. Who typed that? |
| 14:03:04 7 | A. That was done with my |
| 14:03:06 8 | conversation. I think, Ms. Brenda Gwin |
| 14:03:09 9 | from the corporate office, I talked to her |
| 14:03:11 10 | over the phone and she typed it, and I want |
| 14:03:14 11 | to say it was e-mailed to me. |
| 14:03:16 12 | Q. And are those words that are on |
| 14:03:18 13 | the page, are those your exact words? |
| 14:03:24 14 | A. Not my exact words, but pretty |
| 14:03:33 15 | much, pretty much, that's what I just said. |
| 14:03:33 16 | That's not my exact words, but that's |
| 14:03:35 17 | pretty much what we discussed over the |
| 14:03:37 18 | phone. |
| 14:03:37 19 | Q. You didn't write down a |
| 14:03:38 20 | statement? |
| 14:03:38 21 | A. I did not write that. |
| 14:03:40 22 | Q. Did Ms. Gwin tell you why she |
| 14:03:42 23 | wanted you to do that? |

| | 22 |
|---|---|
| 14:03:43 1 | A. It was in regards to where she |
| 14:03:45 2 | said that it was related to a lawsuit from |
| 14:03:47 3 | Mr. Mendiola against Mr. Tampa. |
| 14:03:49 4 | Q. What about prior to the lawsuit? |
| 14:03:53 5 | Did anyone -- |
| 14:03:53 6 | A. No. |
| 14:03:54 7 | Q. So prior to the lawsuit no one |
| 14:03:58 8 | asked you to provide a statement -- |
| 14:04:00 9 | A. No. |
| 14:04:00 10 | Q. -- about what happened with Mr. |
| 14:04:02 11 | Mendiola? |
| 14:04:02 12 | A. No. |
| 14:04:03 13 | Q. And did anyone come and talk to |
| 14:04:05 14 | you about what had happened? |
| 14:04:06 15 | A. No. |
| 14:04:54 16 | MR. BRYANT: Let's just go off |
| 14:04:55 17 | for just a minute. |
| 14:04:58 18 | VIDEOGRAPHER: We are off the |
| 14:04:59 19 | record at 2:03 p.m. |
| 14:04:59 20 | |
| 14:04:59 21 | (Whereupon, a brief recess was |
| 14:04:59 22 | taken.) |
| 14:05:27 23 | |

| | 23 |
|---|---|
| 14:05:27 1 | VIDEOGRAPHER: We are back on |
| 14:05:30 2 | the record at 2:04 p.m. |
| 14:05:34 3 | Q. What is your current salary as a |
| 14:05:36 4 | general manager at Quality Inn? |
| 14:05:39 5 | A. Thirty-four. |
| 14:05:40 6 | Q. Thirty-four? |
| 14:05:41 7 | A. I think so. Thirty-four, in |
| 14:05:43 8 | that range. |
| 14:05:43 9 | |
| 14:05:43 10 | (Whereupon, Plaintiff's Exhibit 14 |
| 14:05:43 11 | was marked for identification and |
| 14:05:43 12 | same is attached hereto.) |
| 14:05:47 13 | |
| 14:05:47 14 | Q. And let me see here. Let me |
| 14:06:26 15 | show you Exhibit 14. Do you recognize |
| 14:06:31 16 | that? |
| 14:06:32 17 | A. Yes. |
| 14:06:35 18 | Q. You didn't draft this document, |
| 14:06:37 19 | correct? |
| 14:06:37 20 | A. No. |
| 14:06:46 21 | Q. This is dated, what, March the |
| 14:06:48 22 | 12th, of 2008? |
| 14:06:52 23 | A. Yes. |

| | 24 |
|---|---|
| 14:06:53 1 | Q. Okay. Other than this document, |
| 14:06:56 2 | Exhibit 14, and the document I showed you a |
| 14:06:59 3 | minute ago, I guess it was Number 12, have |
| 14:07:03 4 | you given any other statements relating to |
| 14:07:05 5 | what happened with Mr. Mendiola? |
| 14:07:07 6 | A. No. |
| 14:07:08 7 | Q. And no one else has asked you to |
| 14:07:10 8 | do so? |
| 14:07:12 9 | A. No. |
| 14:07:12 10 | MR. BRYANT: All right. I'll |
| 14:07:13 11 | pass the witness. |
| 14:07:14 12 | MR. SMITH: I don't have any |
| 14:07:16 13 | questions. |
| 14:07:18 14 | MR. BRYANT: Okay. That's it. |
| 14:07:19 15 | VIDEOGRAPHER: We are off the |
| 14:07:20 16 | record at 2:05 p.m. This concludes the |
| 14:07:23 17 | deposition and this is the end of tape |
| 14:07:25 18 | number one. |
| 19 | |
| 20 | FURTHER DEPONENT SAITH NOT |
| 21 | |
| 22 | |
| 23 | |

6 (Pages 21 to 24)

# FREEDOM COURT REPORTING

25

```
1              C E R T I F I C A T E
2
3    STATE OF ALABAMA )
4    JEFFERSON COUNTY )
5
6           I HEREBY CERTIFY that the
7    above and foregoing transcript was taken
8    down by me in stenotype, and the questions
9    and answers thereto were transcribed by
10   means of computer-aided transcription, and
11   that the foregoing represents a true and
12   correct transcript of the testimony given
13   by said witness.
14           I FURTHER CERTIFY that I am
15   neither of counsel, nor of any relation to
16   the parties to the action, nor am I anywise
17   interested in the result of said cause.
18
19
20
21           TANYA D. CORNELIUS
22           CCR No. 378
23
```

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# EXHIBIT "6"

# FREEDOM COURT REPORTING

**1**

14:12:08 1   IN THE UNITED STATES DISTRICT COURT

2   FOR THE MIDDLE DISTRICT OF ALABAMA

3

4   CIVIL ACTION NUMBER: CV-2:07 CV 469-MEF

5   MARIO MENDIOLA,

6        Plaintiff,

7        vs.

8   VISION HOSPITALITY, LLC,

9   and I.T. MONTGOMERY, LLC,

10   d/b/a QUALITY INN & SUITES

11   CONFERENCE CENTER

12        Defendants.

13

14

15

16

17        VIDEO DEPOSITION OF

18        TIMOTHY BANKS

19        MAY 15, 2008

20

21

22

23

**2**

1        S T I P U L A T I O N

2        IT IS STIPULATED AND AGREED by

3   and between the parties through their

4   respective counsel that the video

5   deposition of TIMOTHY BANKS may be taken

6   before Tanya D. Cornelius, Certified

7   Shorthand Reporter and Notary Public, at

8   the Law Offices of Sirote & Permutt, PC,

9   2311 Highland Avenue South, Birmingham,

10   Alabama 35205, on the 15th day of May,

11   2008.

12        IT IS FURTHER STIPULATED AND

13   AGREED that the signature to and the

14   reading of the deposition by the witness is

15   waived, the deposition to have the same

16   force and effect as if full compliance had

17   been had with all laws and rules of Court

18   relating to the taking of depositions.

19        IT IS FURTHER STIPULATED AND

20   AGREED that it shall not be necessary for

21   any objections to be made by counsel to any

22   questions, except as to form or leading

23   questions, and that counsel for the parties

**3**

1   may make objections and assign grounds at

2   the time of the trial, or at the time said

3   deposition is offered in evidence, or prior

4   thereto.

5        IT IS FURTHER STIPULATED AND

6   AGREED that notice of filing of the

7   deposition by the Commissioner is waived.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

**4**

1        I N D E X

2   EXAMINATION BY:        PAGE NUMBER:

3   Mr. Bryant        8

4   Mr. Smith        27

5   Mr. Bryant        28

6

7        E X H I B I T S

8   PLAINTIFF'S EXHIBITS:        PAGE NUMBER:

9   15 - Declaration of

10        Timothy Banks        20

11

12

13

14

15

16

17

18

19

20

21

22

23

**367 VALLEY AVENUE**

**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

5

```
 1              A P P E A R A N C E S
 2
 3    FOR THE PLAINTIFF:
 4         DAVID A. BRYANT, Attorney at Law
 5         18 Augusta Pines Drive
 6         Suite 200 W
 7         Spring, Texas 77389
 8
 9         MORRIS & McANNALLY, LLC
10         BY Mr. D. Jason Britt
11         50 Wisteria Place
12         Millbrook, Alabama 36054
13
14    FOR THE DEFENDANT:
15         SIROTE & PERMUTT, PC
16         BY Mr. Kyle T. Smith
17         2311 Highland Avenue South
18         Birmingham, Alabama 35205
19
20    ALSO PRESENT:
21         Mr. Mario Mendiola
22         Mr. Phillip Brewer, Videographer
23
```

6

```
 1              I, Tanya D. Cornelius,
 2    Certified Shorthand Reporter and Notary
 3    Public, acting as Commissioner, certify
 4    that on this date, as provided by the
 5    Federal Rules of Civil Procedure, and the
 6    foregoing stipulation of counsel, there
 7    came before me at the Law Offices of Sirote
 8    & Permutt, PC, 2311 Highland Avenue South,
 9    Birmingham, Alabama 35205, beginning at
10    2:12 p.m., TIMOTHY BANKS, witness in the
11    above cause, for oral examination,
12    whereupon the following proceedings were
13    had:
14
14:13:43 15         VIDEOGRAPHER:  This begins
14:13:44 16    videotape number one in the deposition of
14:13:47 17    Tim Banks in the matter of Mario Mendiola
14:13:52 18    versus Vision Hospitality, LLC and IT
14:13:57 19    Montgomery, LLC d/b/a Quality Inn & Suites
14:14:03 20    Conference Center, Case Number CV-2:07
14:14:07 21    CV 469-MEF in the Court of the United
14:14:12 22    States District Court for the Middle
14:14:14 23    District of Alabama.  We are on the record
```

7

```
14:14:16  1    at 12:12 p.m. (sic) on Thursday of April --
14:14:22  2    I mean, of May the 15th of 2008.  This
14:14:24  3    deposition is taking place at the office of
14:14:27  4    Sirote & Permutt, PC.  My name is Phillip
14:14:31  5    Brewer representing Freedom Court
14:14:34  6    Reporting.  Would counsel please identify
14:14:36  7    yourself and state whom you represent?
14:14:38  8         MR. BRYANT:  David Bryant for
14:14:40  9    the plaintiff, Mario Mendiola.
14:14:40 10         MR. BRITT:  Jason Britt for the
14:14:43 11    plaintiff, Mario Mendiola.
14:14:43 12         MR. SMITH:  Kyle Smith for IT
14:14:46 13    Montgomery, LLC and Vision Hospitality,
14:14:47 14    LLC.
14:14:47 15         VIDEOGRAPHER:  Will the reporter
         16    please swear in the witness?
         17
         18         TIMOTHY BANKS,
         19         being first duly sworn, was
         20         examined and testified as follows:
         21
         22         THE REPORTER:  Will this be
14:14:56 23    usual stipulations?
```

8

```
14:14:56  1         MR. BRYANT:  Same as the last
14:14:58  2    depositions.
14:14:58  3         MR. SMITH:  That's fine.
14:14:58  4
14:14:58  5              EXAMINATION
14:15:00  6    BY MR. BRYANT:
14:15:00  7         Q.  Mr. Banks, what do you do for a
14:15:06  8    living, sir?
14:15:06  9         A.  I work at the Quality Inn &
14:15:09 10    Suites as human resource.
14:15:12 11         Q.  Quality Inn?
14:15:13 12         A.  Yes, sir.
14:15:15 13         Q.  And Suites?
14:15:16 14         A.  Uh-huh (positive response).
14:15:17 15         Q.  In the human --
14:15:18 16         A.  Human resource department.  I
14:15:20 17    run the human resource.  I do all the
14:15:22 18    payroll.
14:15:23 19         Q.  Do you do anything else besides
14:15:25 20    payroll?
14:15:27 21         A.  I run the Super 8 Hotel.
14:15:36 22         Q.  Are you the general manager of
14:15:37 23    the Super 8 Hotel?
```

2  (Pages 5 to 8)

# FREEDOM COURT REPORTING

**9**

14:15:38  1    A.  Yes, sir.

14:15:39  2    Q.  How long has that been your

14:15:41  3  position?

14:15:41  4    A.  Two years.

14:16:05  5    Q.  When you say you run HR, is that

14:16:05  6  for the Quality Inn and the Super 8?

14:16:05  7    A.  And the Super 8, yes.

14:16:05  8    Q.  What other job duties do you

14:16:05  9  have running HR for these two hotels?

14:16:06  10    A.  Helping out with banquets.

14:16:08  11    Q.  Anything else?

14:16:09  12    A.  That's it.

14:16:10  13    Q.  Have you received any EEOC

14:16:14  14  training in your position as -- what is

14:16:18  15  your position?  Is it director of HR?  Do

14:16:20  16  you have a title?

14:16:21  17    A.  Director of HR.

14:16:23  18    Q.  In your position as director of

14:16:25  19  HR, have you had any training with respect

14:16:27  20  to EEOC policy?

14:16:28  21    A.  Not training as sorts, no.  No,

14:16:32  22  sir,

14:16:32  23    Q.  What about with respect to

**10**

14:16:33  1  Americans with Disabilities Act?

14:16:35  2    A.  Not the training.  I have took

14:16:37  3  -- well, you could say I had some classes

14:16:40  4  on it, yes.

14:16:40  5    Q.  When did you have those?

14:16:44  6    A.  It was years ago.

14:16:46  7    Q.  And what would have caused you

14:16:48  8  to take those classes?

14:16:50  9    A.  I always wanted to, because I

14:16:53  10  worked for Montgomery Ward's before I came

14:16:54  11  to Alabama and I had to take some classes

14:16:57  12  during that time.

14:16:57  13    Q.  Was that a class designed to

14:16:59  14  teach you how to handle employment

14:17:02  15  discrimination claims?

14:17:03  16    A.  Yes.

14:17:03  17    Q.  It was?

14:17:03  18    A.  Yes.

14:17:04  19    Q.  Okay.  And in the classes you

14:17:07  20  took, did they talk about investigation?

14:17:15  21    A.  We didn't go over investigation.

14:17:15  22  It was just basically discrimination, the

14:17:15  23  legal part about it and basic -- it was

**11**

14:17:17  1  just a lot of human resources, different

14:17:20  2  things on the employees, their rights.

14:17:23  3    Q.  Are you familiar with the

14:17:25  4  Americans with Disabilities Act?

14:17:27  5    A.  No, sir.

14:17:28  6    Q.  Do you know what that is?

14:17:30  7    A.  I've heard of it, yes.

14:17:31  8    Q.  But you don't know what it

14:17:33  9  protects?

14:17:34  10    A.  I don't, no.

14:17:46  11    Q.  Are you aware of what this

14:17:46  12  lawsuit is about?

14:17:46  13    A.  Briefly, yes.

14:17:47  14    Q.  How have you become familiar

14:17:49  15  with what this lawsuit is about?

14:17:52  16    A.  Repeat that again now.

14:17:54  17    Q.  How do you know what this

14:17:55  18  lawsuit is about?

14:17:56  19    A.  I was contacted by the attorney

14:18:01  20  that Mr. Mendiola had a lawsuit.

14:18:07  21    Q.  So an attorney called you?

14:18:09  22    A.  Uh-huh (positive response).

14:18:10  23    Q.  And asked you some questions?

**12**

14:18:11  1    A.  Some, yes.

14:18:13  2    Q.  Is that the first time you knew

14:18:14  3  that Mr. Mendiola had made a complaint

14:18:17  4  about what happened to him at the Quality

14:18:21  5  Inn?

14:18:21  6    A.  Yes, yes.

14:18:22  7    Q.  Okay.  We've marked some

14:18:26  8  exhibits in the prior depositions.  I want

14:18:30  9  to show you Exhibit 4.  Take a look at that

14:18:37  10  real quick.

14:18:38  11    A.  (Witness complies.)

14:19:30  12    Q.  Have you read it?

14:19:31  13    A.  Uh-huh (positive response).

14:19:31  14    Q.  Have you seen that before?

14:19:33  15    A.  No, sir.  This is my first.

14:19:36  16    Q.  So Mr. Mendiola didn't show this

14:19:40  17  to you at some point before he left Quality

14:19:45  18  Inn?

14:19:45  19    A.  I can't recall this, no, sir.

14:19:47  20    Q.  Are you saying it didn't happen

14:19:50  21  or are you saying you don't remember?

14:19:52  22    A.  I can't remember this one memo,

14:19:54  23  per se, no.

3 (Pages 9 to 12)

# FREEDOM COURT REPORTING

13

14:19:58 1   Q. What about Exhibit 5? This is a
14:20:04 2   memo from Mr. Mendiola to Mr. Tampa dated
14:20:08 3   December the 14th of '05. Have you ever
14:20:10 4   seen this one?
14:20:12 5   A. No, sir.
14:20:30 6   Q. Okay. You don't recall a time
14:20:35 7   where Mr. Mendiola told you he thought he
14:20:38 8   was being terminated?
14:20:39 9   A. Never, no.
14:20:41 10  Q. So if Mr. Mendiola was to say
14:20:44 11  that he showed you Exhibit 4, which is the
14:20:46 12  memo of December the 12th of '05, and
14:20:50 13  showed it to you and you said, that's cold,
14:20:53 14  that would be incorrect?
14:20:54 15  MR. SMITH: Object to the form.
14:20:56 16  Q. You never said those words?
14:20:58 17  A. No.
14:21:11 18  Q. We've also marked Exhibit 13.
14:21:23 19  Take a look at that.
14:21:40 20  A. Uh-huh (positive response).
14:21:40 21  Q. Is that your signature there?
14:21:43 22  A. Yes, sir.
14:21:43 23  Q. And what is this?

14

14:21:46 1   A. Sir?
14:21:46 2   Q. What is this document?
14:21:48 3   A. This is a document that's
14:21:51 4   stating that Mr. Mendiola was telling me
14:21:56 5   that he had leukemia and that he was going
14:21:59 6   to have to go back to Texas to get
14:22:01 7   treatment.
14:22:01 8   Q. Do you remember talking to Mr.
14:22:03 9   Mendiola about leukemia?
14:22:05 10  A. In his office, yes.
14:22:06 11  Q. Did he tell you that there was
14:22:08 12  some additional testing that had to take
14:22:10 13  place before he knew for sure if he had
14:22:12 14  active cancer?
14:22:14 15  A. Additional -- repeat.
14:22:20 16  Q. Blood tests?
14:22:20 17  A. He said he was going through
14:22:20 18  some tests and that he would have to go
14:22:22 19  back, yes.
14:22:24 20  Q. Did he tell you he would have to
14:22:25 21  go back if he had active cancer?
14:22:28 22  A. My understanding that he already
14:22:29 23  knew that he had leukemia and he was going

15

14:22:32 1   back to get treatment at that time.
14:22:34 2   Q. You say your understanding. Why
14:22:36 3   do you say it's your understanding?
14:22:37 4   A. Because in his office when he
14:22:39 5   told me.
14:22:42 6   Q. Did he tell you in his office
14:22:43 7   that he was resigning? Did he say those
14:22:46 8   words?
14:22:48 9   A. He said -- no, he did not say
14:22:50 10  those exact words.
14:22:51 11  Q. Who told you Mr. Mendiola was
14:22:53 12  resigning?
14:22:54 13  MR. SMITH: Object to the form.
14:22:56 14  Q. Well, did someone tell you that
14:22:58 15  Mr. Mendiola was resigning?
14:23:00 16  A. Yes.
14:23:00 17  Q. Who told you that?
14:23:02 18  A. He did. He came -- we had a
14:23:06 19  conference call by the owner who told us
14:23:09 20  that, you know, unfortunately, you know,
14:23:12 21  that Mr. Mendiola, you know, had leukemia
14:23:16 22  and that he would have to go back to Texas
14:23:19 23  to get treatment.

16

14:23:20 1   Q. What I'm saying is: Was there a
14:23:22 2   conversation where you heard Mr. Mendiola
14:23:24 3   himself say, I'm resigning?
14:23:26 4   A. No, he never did tell me he was
14:23:28 5   resigning. He just told me he had to go
14:23:30 6   back to Texas to get treatment, because
14:23:32 7   that was the only affordable place.
14:23:35 8   Q. Do you remember when that was,
14:23:36 9   when that conversation took place?
14:23:38 10  A. It was the beginning part of
14:23:40 11  December.
14:23:49 12  Q. How close to the time that he
14:23:51 13  left the Quality Inn did that conversation
14:23:53 14  take place? Was it a week before he left?
14:23:56 15  Was it a month before he left? Do you
14:23:58 16  remember?
14:23:58 17  MR. SMITH: I'm sorry. Just for
14:24:01 18  the record, the conversation between the
14:24:03 19  two of them?
14:24:04 20  MR. BRYANT: Yeah, the one he
14:24:05 21  just described.
14:24:05 22  A. You're talking about when we was
14:24:07 23  in his office and he explained to me?

4 (Pages 13 to 16)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

17

14:24:09 1    Q.   Yeah.
14:24:10 2    A.   It was probably two weeks prior
14:24:13 3   before he left, two or three weeks.
14:24:16 4    Q.   And what about the conference
14:24:17 5   call, when did that take place?
14:24:19 6    A.   That was probably if I -- man,
14:24:25 7   that's a long time.  Around about probably
14:24:31 8   a week, two weeks before he left.  It was
14:24:37 9   about a week or two before he left.
14:24:39 10    Q.   Is it closer to a week or closer
14:24:41 11   to two weeks?
14:24:42 12    A.   Well, it's -- a week.  It was
14:24:46 13   about a week.
14:24:47 14    Q.   A week?
14:24:47 15    A.   That I can remember, about a
14:24:49 16   week.
14:24:49 17    Q.   And it was a conference call?
14:24:50 18    A.   Yes.
14:24:51 19    Q.   Who was on the conference call?
14:24:56 20    A.   Uh --
14:24:57 21    Q.   Ma'am -- sir?  Sorry.  I'm still
14:24:59 22   in the last depo.  Sorry.
14:25:01 23    A.   Mr. John Tampa.

18

14:25:02 1    Q.   Anybody else?
14:25:03 2    A.   And the staff.
14:25:05 3    Q.   What do you mean by the staff?
14:25:06 4    A.   The employees, the managers that
14:25:09 5   was there, that was in the room with us.
14:25:11 6    Q.   Who were they?
14:25:15 7    A.   Again, director of sales, Ms.
14:25:23 8   Woods, Mr. Cook, Kedrick McCall.
14:25:38 9    Q.   Kedrick?
14:25:38 10    A.   Kedrick McCall.
14:25:38 11    Q.   How do you spell McCall?
14:25:39 12    A.   M-c-C-a-l-l.
14:25:42 13    Q.   Where is Kedrick now?
14:25:44 14    A.   He's working for another
14:25:45 15   company.
14:25:46 16    Q.   Are you in contact with Kedrick?
14:25:49 17    A.   No.
14:25:50 18    Q.   Is that other company in
14:25:51 19   Montgomery?
14:25:53 20    A.   Yes.
14:25:54 21    Q.   What's the name of it?
14:25:58 22    A.   I want to say the Hyundai plant,
14:26:00 23   if I'm not mistaken.

19

14:26:08 1    Q.   Any other conversations that you
14:26:09 2   were either part of or a witness to where
14:26:11 3   the issue of Mr. Mendiola leaving the
14:26:14 4   Quality Inn was discussed?
14:26:15 5    A.   No.
14:26:16 6    Q.   You've told me everything?
14:26:18 7    A.   Pretty much, yes, sir.
14:26:20 8    Q.   Okay.  This Exhibit 13 that I
14:26:25 9   had you look at a minute ago, is that the
14:26:31 10   first time someone asked you to give a
14:26:34 11   statement, I guess, relating to what
14:26:37 12   happened with Mr. Mendiola?
14:26:38 13    A.   Yes.
14:26:38 14    Q.   So prior to that time nobody
14:26:40 15   called you to find out what you knew?
14:26:42 16    A.   No.
14:26:42 17    Q.   And that would be prior to July
14:26:44 18   of '07?
14:26:45 19    A.   Right.
14:26:46 20    Q.   And what was your understanding
14:26:47 21   of why they needed this document?
14:27:00 22    A.   Just with the lawsuit or
14:27:00 23   something to the fact.  They didn't really,

20

14:27:03 1   you know, go into details, details that
14:27:05 2   some things were taking place and that
14:27:07 3   there was a lawsuit and that they needed my
14:27:10 4   statement.
14:27:10 5    Q.   Did you ask them what the
14:27:12 6   lawsuit was about?
14:27:13 7    A.   No, not -- I really can't
14:27:17 8   recall.  If I sit here and say, I did, I --
9
10    (Whereupon, Plaintiff's Exhibit 15
11    was marked for identification and
12    same is attached hereto.)
13
14:27:30 14    Q.   Exhibit 15 I'm going to show
14:27:45 15   you.  Take a look at that.  Do you
14:27:47 16   recognize that document?
14:27:49 17    A.   Yes, sir.
14:27:49 18    Q.   Is that something that you were
14:27:51 19   asked to sign as well?
14:27:53 20    A.   Yes, sir.
14:27:55 21    Q.   But that's dated March the 12th
14:27:59 22   of 2008?
14:28:00 23    A.   Right.

5   (Pages 17 to 20)

# FREEDOM COURT REPORTING

| | 21 |
|---|---|

14:28:01 1   Q. Other than these two documents,
14:28:02 2   Number 14 and 15, are there any other
14:28:06 3   statements that you've given to anyone
14:28:08 4   about what happened with Mr. Mendiola?
14:28:09 5   A. No, sir.
14:28:10 6   Q. And aside from those two
14:28:11 7   documents, nobody has asked you to provide
14:28:14 8   such a statement?
14:28:15 9   A. No, sir.
14:28:15 10   Q. Okay. What has Mr. Tampa told
14:28:18 11   you about this lawsuit?
14:28:22 12   MR. SMITH: Object to the form.
14:28:23 13   A. Nothing Mr. Tampa. I've
14:28:27 14   basically been speaking with the attorney.
14:28:28 15   Q. Okay. That's enough. You don't
14:28:30 16   have to say what they said. That's fine.
14:28:33 17   I'm not going to worry about that. I'm
14:28:34 18   trying to find out if Mr. Tampa has told
14:28:37 19   you anything about what the claims in the
14:28:40 20   lawsuit are?
14:28:40 21   A. No.
14:28:41 22   Q. Or did Mr. Tampa tell you what
14:28:43 23   he thinks happened?

| | 22 |
|---|---|

14:28:45 1   A. No.
14:28:45 2   Q. Okay. So he didn't talk to you
14:28:47 3   about it at all?
14:28:48 4   A. No, not in deep what you just,
14:28:52 5   the questions you just -- there was no
14:28:58 6   questions asked about -- no, none. Me and
14:28:58 7   Mr. Tampa don't have that relationship like
14:29:00 8   that.
14:29:01 9   Q. What do you mean?
14:29:02 10   A. Where, you know, when it come to
14:29:04 11   something business-wise dealing with what I
14:29:07 12   need to do at the hotel or deal with the
14:29:10 13   employees.
14:29:12 14   Q. Is an illness -- is an employee
14:29:48 15   with an illness -- scratch that. Is
14:29:51 16   illness a legitimate reason to terminate
14:29:54 17   someone's employment?
14:29:56 18   MR. SMITH: Object to the form.
14:29:57 19   Q. You're the HR director.
14:29:59 20   MR. SMITH: Object to the form
14:30:00 21   to the extent he didn't have any authority
14:30:02 22   over the employee in question in this case,
14:30:04 23   but --

| | 23 |
|---|---|

14:30:04 1   Q. You're the HR director.
14:30:07 2   A. Is a illness --
14:30:10 3   Q. Is there ever a circumstance
14:30:11 4   where an illness would be grounds for
14:30:13 5   termination?
14:30:14 6   A. No.
14:30:15 7   Q. Okay.
14:30:15 8   A. It depends on if I had an
14:30:21 9   employee who had a illness that we would
14:30:25 10   let them work part-time or, you know, see
14:30:27 11   what we can do to help them continue on
14:30:31 12   unless they make the decision.
14:30:33 13   Q. You could call that an
14:30:34 14   accommodation, right?
14:30:35 15   A. Right.
14:30:36 16   Q. Do you know about that? Do you
14:30:38 17   know what an accommodation means?
14:30:40 18   A. It has a couple of meanings
14:30:43 19   behind it, yes.
14:30:44 20   Q. That's something you would want
14:30:46 21   to discuss with that particular employee,
14:30:48 22   correct?
14:30:48 23   A. Employee, right.

| | 24 |
|---|---|

14:30:49 1   Q. In that situation, right?
14:30:50 2   A. Uh-huh (positive response).
14:30:51 3   Q. You would want to know exactly
14:30:53 4   what their options are?
14:30:54 5   A. Yes.
14:30:55 6   Q. Are you aware that IT Montgomery
14:31:00 7   has told the State of Alabama that when Mr.
14:31:03 8   Mendiola recovers from his illness, he can
14:31:07 9   come back to work?
14:31:08 10   MR. SMITH: Object to the form.
14:31:09 11   A. I'm not aware of that.
14:31:11 12   Q. Or that he would be eligible for
14:31:13 13   rehire?
14:31:13 14   A. I'm not aware of that.
14:31:14 15   Q. You're not aware of that?
14:31:16 16   A. There's nothing in the files or
14:31:17 17   anything.
14:31:17 18   Q. Mr. Tampa hasn't told you that?
14:31:19 19   A. No.
14:31:29 20   Q. Do you think that would be
14:31:21 21   feasible for Mr. Tampa to -- I mean, for
14:31:22 22   Mr. Tampa to hire Mr. Mendiola back?
14:31:32 23   A. Would it be feasible?

6 (Pages 21 to 24)

# FREEDOM COURT REPORTING

25

14:31:34 1  Q. Right. Or would it be futile?
14:31:40 2  A. It would be feasible to me. I
14:31:43 3  mean, that's not my company, so I couldn't
14:31:46 4  really --
14:31:46 5  Q. But you know Mr. Tampa?
14:31:48 6  A. Again, I don't know him that way
14:31:51 7  of saying what his intention would do, but,
14:31:53 8  you know, I would voice my opinion and tell
14:31:57 9  him the reason I should, yes.
14:31:58 10  Q. He certainly hasn't told you
14:32:00 11  that when Mr. Mendiola recovers from his
14:32:02 12  illness, he can come back to work?
14:32:05 13  A. No.
14:32:05 14  Q. Mr. Tampa hasn't told you that?
14:32:07 15  A. No.
14:32:09 16  Q. Did you have any problems with
14:32:11 17  Mr. Mendiola?
14:32:13 18  MR. SMITH: Object to the form.
14:32:14 19  Q. And what I mean by that is: Did
14:32:16 20  you and he have any significant differences
14:32:26 21  of opinion or disputes?
14:32:26 22  A. Well, in every company you have
14:32:26 23  with your boss, you're going to have your

26

14:32:26 1  opinion, his opinion, you know, but we
14:32:27 2  didn't have no bumping heads. You know, he
14:32:30 3  was my boss, so therefore, you know, we
14:32:33 4  discussed what we need to discuss in the
14:32:35 5  matter and move on. We're always going to
14:32:47 6  have -- I'm always -- you're always going
14:32:48 7  to have some views that you feel that the
14:32:50 8  person is -- when they give you tasks and
14:32:57 9  duties to do.
14:33:08 10  Q. Well, somebody said something
14:33:10 11  about Mr. Mendiola stealing something. Do
14:33:12 12  you know anything about that?
14:33:14 13  A. I don't recall anything about
14:33:17 14  stealing, no.
14:33:18 15  Q. You don't know if he's ever
14:33:20 16  robbed anybody, do you?
14:33:21 17  A. No, sir.
14:33:21 18  Q. Mr. Tampa never told you that
14:33:24 19  he's tired of Mr. Mendiola robbing him?
14:33:27 20  A. No.
14:33:29 21  MR. BRYANT: Okay. I'll pass
14:33:30 22  the witness.
14:33:30 23

27

14:33:30 1  EXAMINATION
14:33:31 2  BY MR. SMITH:
14:33:31 3  Q. Just a couple of quick
14:33:34 4  questions, Mr. Banks. You testified a
14:33:36 5  moment ago about a meeting of managers
14:33:39 6  where Mr. Tampa was on the intercom?
14:33:40 7  A. Uh-huh (positive response).
14:33:41 8  Q. And you listed out for Mr.
14:33:43 9  Bryant the folks that were there. You did
14:33:45 10  not list Mr. Mendiola. Was he there also?
14:33:48 11  A. He was there, too, yes, sir.
14:33:49 12  Yes, sir, he was sitting in there in the
14:33:51 13  room as well.
14:33:51 14  Q. When Mr. Tampa announced on the
14:33:54 15  intercom that Mr. Mendiola would be leaving
14:33:58 16  and wouldn't be employed any longer, did
14:34:00 17  Mr. Mendiola raise any objection to that?
14:34:03 18  A. No. He was sitting there
14:34:06 19  quietly, and I hate to say it, but sad, you
14:34:13 20  know, like we all worked together as a
14:34:16 21  team, so it seems like he was just -- hate
14:34:21 22  to leave, but that was something that he
14:34:23 23  had to do in order to -- for his medical

28

14:34:26 1  reasons.
14:34:26 2  MR. SMITH: That's all I have.
14:34:26 3
14:34:26 4  RE-EXAMINATION
14:34:29 5  BY MR. BRYANT:
14:34:29 6  Q. Do you know when that conference
14:34:30 7  call took place? Do you know the exact
14:34:32 8  date?
14:34:32 9  MR. SMITH: Object just because
14:34:34 10  I think it's been asked and answered, but
14:34:36 11  you can try again.
14:34:38 12  MR. BRYANT: I know, but you
14:34:38 13  brought it back up, so I want to focus on
14:34:40 14  whether you know the exact date.
14:34:42 15  MR. SMITH: Okay.
14:34:42 16  A. I can't remember the date.
14:34:43 17  Q. It could have been after
14:34:45 18  December the 12th, couldn't it?
14:34:46 19  A. I can't remember the date. I
14:34:48 20  really can't. I wouldn't want to sit here
14:34:51 21  and say, yes, you know, the 13th or the
14:34:54 22  11th. I can't say.
14:34:58 23  Q. Do you know when Mr. Mendiola's

7 (Pages 25 to 28)

# FREEDOM COURT REPORTING

29

| | |
|---|---|
| 14:35:00 1 | replacement was hired? |
| 14:35:04 2 | A. No, because we went through some |
| 14:35:08 3 | -- went through some managers, some GMs. |
| 14:35:12 4 | Q. I'm trying to figure out right, |
| 14:35:15 5 | immediately when he was leaving, were you |
| 14:35:17 6 | told there was a new GM coming in? |
| 14:35:19 7 | A. No, because I was still the |
| 14:35:21 8 | assistant GM. |
| 14:35:22 9 | Q. Did you anticipate yourself |
| 14:35:24 10 | becoming the general manager? |
| 14:35:25 11 | A. No. |
| 14:35:25 12 | Q. But you are general manager now? |
| 14:35:35 13 | A. Yes. |
| 14:35:35 14 | Q. Of the Super 8? |
| 14:35:35 15 | A. Super 8. |
| 14:35:35 16 | Q. Okay. And if I could ask, what |
| 14:35:35 17 | is your salary over there? |
| 14:35:46 18 | A. That's personal. |
| 14:35:46 19 | Q. Well, let me ask you this: Is |
| 14:35:47 20 | it more than forty thousand dollars? |
| 14:35:49 21 | A. No. |
| 14:35:49 22 | Q. Okay. I'm not trying to get |
| 14:35:52 23 | personal. I just want to know. |

30

| | |
|---|---|
| 14:35:55 1 | MR. BRYANT: I'll pass the |
| 14:35:56 2 | witness. |
| 14:35:57 3 | MR. SMITH: No further |
| 14:35:58 4 | questions. |
| 14:35:58 5 | VIDEOGRAPHER: We are off the |
| 14:35:59 6 | record at 2:34 p.m. This is the end of |
| 14:36:03 7 | tape number one and this concludes the |
| 14:36:08 8 | deposition. |
| 9 | |
| 10 | FURTHER DEPONENT SAITH NOT |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |

31

| | |
|---|---|
| 1 | C E R T I F I C A T E |
| 2 | |
| 3 | STATE OF ALABAMA ) |
| 4 | JEFFERSON COUNTY ) |
| 5 | |
| 6 | I HEREBY CERTIFY that the |
| 7 | above and foregoing transcript was taken |
| 8 | down by me in stenotype, and the questions |
| 9 | and answers thereto were transcribed by |
| 10 | means of computer-aided transcription, and |
| 11 | that the foregoing represents a true and |
| 12 | correct transcript of the testimony given |
| 13 | by said witness. |
| 14 | I FURTHER CERTIFY that I am |
| 15 | neither of counsel, nor of any relation to |
| 16 | the parties to the action, nor am I anywise |
| 17 | interested in the result of said cause. |
| 18 | |
| 19 | |
| 20 | |
| 21 | TANYA D. CORNELIUS |
| 22 | CCR No. 378 |
| 23 | |

8 (Pages 29 to 31)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

EXHIBIT "7"

# FREEDOM COURT REPORTING

**1**

1  IN THE UNITED STATES DISTRICT COURT
2  FOR THE MIDDLE DISTRICT OF ALABAMA
3
4  CIVIL ACTION NUMBER: CV-2:07 CV 469-MEF
5  MARIO MENDIOLA,
6      Plaintiff,
7      vs.
8  VISION HOSPITALITY, LLC,
9  and I.T. MONTGOMERY, LLC,
10  d/b/a QUALITY INN & SUITES
11  CONFERENCE CENTER
12      Defendants.
13
14
15
16
17      DEPOSITION OF
18  MARIO ALBERTO MENDIOLA
19      MAY 15, 2008
20
21
22
23

**2**

1      STIPULATION
2      IT IS STIPULATED AND AGREED by
3  and between the parties through their
4  respective counsel that the deposition of
5  MARIO ALBERTO MENDIOLA may be taken before
6  Tanya D. Cornelius, Certified Shorthand
7  Reporter and Notary Public, at the Law
8  Offices of Sirote & Permutt, PC, 2311
9  Highland Avenue South, Birmingham, Alabama
10  35205, on the 15th day of May, 2008.
11      IT IS FURTHER STIPULATED AND
12  AGREED that the signature to and the
13  reading of the deposition by the witness is
14  waived, the deposition to have the same
15  force and effect as if full compliance had
16  been had with all laws and rules of Court
17  relating to the taking of depositions.
18      IT IS FURTHER STIPULATED AND
19  AGREED that it shall not be necessary for
20  any objections to be made by counsel to any
21  questions, except as to form or leading
22  questions, and that counsel for the parties
23  may make objections and assign grounds at

**3**

1  the time of the trial, or at the time said
2  deposition is offered in evidence, or prior
3  thereto.
4      IT IS FURTHER STIPULATED AND
5  AGREED that notice of filing of the
6  deposition by the Commissioner is waived.
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

**4**

1      INDEX
2  EXAMINATION BY:      PAGE NUMBER:
3  Mr. Smith      7
4
5
6      EXHIBITS
7  DEFENDANT'S EXHIBITS:      PAGE NUMBER:
8  1 - Affidavit      61
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

1 (Pages 1 to 4)

# FREEDOM COURT REPORTING

### 5

```
1              APPEARANCES
2
3    FOR THE PLAINTIFF:
4        DAVID A. BRYANT, Attorney at Law
5        18 Augusta Pines Drive
6        Suite 200 W
7        Spring, Texas 77389
8
9        MORRIS & McANNALLY, LLC
10       BY Mr. D. Jason Britt
11       50 Wisteria Place
12       Millbrook, Alabama 36054
13
14   FOR THE DEFENDANT:
15       SIROTE & PERMUTT, PC
16       BY Mr. Kyle T. Smith
17       2311 Highland Avenue South
18       Birmingham, Alabama 35205
19
20
21
22
23
```

### 6

```
1        I, Tanya D. Cornelius,
2    Certified Shorthand Reporter and Notary
3    Public, acting as Commissioner, certify
4    that on this date, as provided by the
5    Federal Rules of Civil Procedure, and the
6    foregoing stipulation of counsel, there
7    came before me at the Law Offices of Sirote
8    & Permutt, PC, 2311 Highland Avenue South,
9    Birmingham, Alabama 35205, beginning at
10   2:45 a.m., MARIO ALBERTO MENDIOLA, witness
11   in the above cause, for oral examination,
12   whereupon the following proceedings were
13   had:
14
15       MARIO ALBERTO MENDIOLA,
16   being first duly sworn, was
17   examined and testified as follows:
18
19       THE REPORTER: Will this be
14:47:31 20  usual stipulations?
14:47:31 21      MR. SMITH: That's fine. The
14:47:33 22  usual stipulations we've used in the other
14:47:36 23  depositions today.
```

### 7

```
14:47:36 1       MR. BRYANT: Correct.
14:47:36 2
14:47:36 3           EXAMINATION
14:47:38 4    BY MR. SMITH:
14:47:38 5       Q.  This is the deposition of Mario
14:47:39 6    Mendiola. Mr. Mendiola, my name is Kyle
14:47:42 7    Smith. I just introduced myself to you.
14:47:45 8    Could you just state your name for the
14:47:46 9    record, please?
14:47:47 10      A.  Yes, Mario Alberto Mendiola.
14:47:50 11      Q.  Mr. Mendiola, have you ever
14:47:52 12   given a deposition before?
14:47:53 13      A.  I have.
14:47:53 14      Q.  You probably know generally what
14:47:55 15   to expect, then, and you've been sitting in
14:47:57 16   earlier today. It's a fairly
14:47:59 17   straightforward process. I'm going to ask
14:48:00 18   you a series of questions. You just answer
14:48:03 19   those questions the best way you can, okay?
14:48:05 20      A.  Very well.
14:48:06 21      Q.  If at some point you don't
14:48:07 22   understand my question, you would like me
14:48:08 23   to re-ask it or rephrase it, you just tell
```

### 8

```
14:48:11 1    me that and I'll try to do that for you,
14:48:13 2    okay?
14:48:13 3       A.  Very well.
14:48:14 4       Q.  You're already doing a good job
14:48:16 5    of answering out loud. Keep trying to
14:48:17 6    continue to answer out loud so the court
14:48:19 7    reporter can get down everything we're
14:48:22 8    saying, okay?
14:48:22 9       A.  Very well.
14:48:23 10      Q.  Okay. In what capacity have you
14:48:25 11   given a deposition before?
14:48:25 12      A.  As a general manager.
14:48:28 13      Q.  General manager of a hotel
14:48:30 14   property?
14:48:30 15      A.  Absolutely not, sir. It was a
14:48:33 16   ground transportation company.
14:48:37 17      Q.  What kind of case was that?
14:48:38 18      A.  It was a case where the
14:48:41 19   individual that I worked for was in
14:48:45 20   litigation with a fleet of vehicles he had
14:48:48 21   purchased and was returning the fleet
14:48:50 22   vehicles and there was some, I guess,
14:48:54 23   liability on the excess miles that was used
```

2  (Pages 5 to 8)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

**9**

14:48:57 1 and we were asked to pay and he didn't want
14:48:58 2 to pay it, so it went through that process.
14:49:01 3      Q.  Other than that case, have you
14:49:02 4 been involved in any other depositions?
14:49:03 5      A.  No, sir.
14:49:04 6      Q.  Okay.  Can I get your current
14:49:09 7 address, please?
14:49:10 8      A.
14:49:16 9             And that's San Antonio,
14:49:21 10 Texas
14:49:26 11      Q.  Where are you from originally?
14:49:28 12      A.  San Antonio, Texas.
14:49:30 13      Q.  Have you lived there -- other
14:49:33 14 than the period of time you lived in
14:49:34 15 Montgomery, have you lived in San Antonio
14:49:37 16 your whole life?
14:49:38 17      A.  No.
14:49:39 18      Q.  Okay.  Have you lived away from
14:49:42 19 San Antonio for extended periods of time?
14:49:44 20      A.  I have.
14:49:44 21      Q.  Where else have you lived?
14:49:45 22      A.  I've lived in the city of
14:49:47 23 Houston, Texas.

**10**

14:49:49 1      Q.  During what time period did you
14:49:51 2 live in Houston?
14:49:52 3      A.  It was probably early or say
14:49:57 4 late '90s.
14:49:59 5      Q.  Okay.  Anywhere else other than
14:50:02 6 Houston and Montgomery that you've lived
14:50:04 7 for an extended period of time?
14:50:06 8      A.  McAllen, Texas.
14:50:08 9      Q.  About when did you live there?
14:50:09 10      A.  That was probably mid '90s.
14:50:12 11      Q.  Anywhere else?
14:50:17 12      A.  No.
14:50:19 13      Q.  Are you currently married?
14:50:21 14      A.  Yes.
14:50:22 15      Q.  What's your wife's name?
14:50:27 16      A.  Olivia Mendiola.
14:50:27 17      Q.  How long have you and Olivia
14:50:28 18 been married?
14:50:29 19      A.  Thirty years, I want to say.
14:50:35 20      Q.  Do you have children?
14:50:36 21      A.  I do.
14:50:37 22      Q.  How many?
14:50:38 23      A.  Three.

**11**

14:50:38 1      Q.  How old are they?
14:50:40 2      A.  Twenty-seven, thirty,
14:50:46 3 thirty-five.
14:50:47 4      Q.  Where do they live?
14:50:49 5      A.  San Antonio.
14:50:53 6      Q.  Where are you currently
14:50:55 7 employed?
14:50:55 8      A.  I work for Accuaire Mechanical
14:50:59 9 in San Antonio, Texas.
14:51:01 10      Q.  Say that again, please?
14:51:02 11      A.  Accuaire Mechanical.
14:51:05 12      Q.  Can you spell the first word?
14:51:06 13      A.  A-c-c-u-a-i-r-e Mechanical.
14:51:13 14      Q.  Okay.  What do you do for
14:51:14 15 Accuaire Mechanical?
14:51:16 16      A.  I'm territory sales manager.
14:51:19 17      Q.  Okay.  I guess I should ask what
14:51:22 18 does Accuaire Mechanical sell?
14:51:26 19      A.  We are in the commercial air
14:51:28 20 conditioning business.  We're a mechanical
14:51:29 21 company.
14:51:32 22      Q.  Are you selling actual AC units
14:51:36 23 or are you selling service?

**12**

14:51:37 1      A.  Both.  I sell projects, service.
14:51:44 2      Q.  How long have you worked for
14:51:45 3 Accuaire Mechanical?
14:51:49 4      A.  Seven months.
14:51:50 5      Q.  November '07 sound about right?
14:52:04 6      A.  Let me think about that.
14:52:08 7 November?  No, it's more like the end of
14:52:17 8 October.  It could be November.  I don't
14:52:18 9 recall.  I think it was October, though,
14:52:20 10 late October.
14:52:21 11      Q.  What do you make?  What kind of
14:52:24 12 compensation do you have?
14:52:25 13      A.  I'm at thirty-seven fifty a
14:52:31 14 year.
14:52:32 15      Q.  Thirty-seven thousand five
14:52:33 16 hundred a year?
14:52:34 17      A.  Yes, sir.
14:52:35 18      Q.  Is that salary?
14:52:36 19      A.  That is a base salary, yes, sir.
14:52:38 20      Q.  Can you make more than that?
14:52:40 21      A.  Absolutely.
14:52:41 22      Q.  Is it a commission schedule?
14:52:43 23      A.  Yes, sir.

3 (Pages 9 to 12)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

## 13

| | |
|---|---|
| 14:52:44 1 | Q. Have you made any commissions? |
| 14:52:46 2 | A. Some. |
| 14:52:49 3 | Q. I know you haven't been there an |
| 14:52:51 4 | entire year, but do you have any gauge as |
| 14:52:54 5 | to what you'll make in a year's worth of |
| 14:52:56 6 | work? |
| 14:52:58 7 | A. No, but I can tell you what the |
| 14:53:00 8 | structure is, if you would like to know |
| 14:53:01 9 | that. |
| 14:53:01 10 | Q. That's fine. |
| 14:53:02 11 | A. The structure on sales and |
| 14:53:04 12 | service is fourteen percent of the profit |
| 14:53:06 13 | margin and one percent of the profit margin |
| 14:53:10 14 | on projects. A project can be anywhere |
| 14:53:17 15 | from ten dollars to two hundred thousand. |
| 14:53:23 16 | Sales and service can be anywhere from a |
| 14:53:26 17 | hundred dollars a month to a thousand |
| 14:53:29 18 | dollars a month. |
| 14:53:29 19 | Q. Can you give an estimate as to |
| 14:53:32 20 | how much commission you have made so far on |
| 14:53:34 21 | that job? |
| 14:53:35 22 | A. Probably not to exceed a |
| 14:53:39 23 | thousand dollars currently in seven months |

## 14

| | |
|---|---|
| 14:53:41 1 | or eight months. |
| 14:53:43 2 | Q. Do you expect to make more in |
| 14:53:45 3 | the next five months say? |
| 14:53:55 4 | A. I don't foresee it. |
| 14:53:55 5 | Q. Why not? |
| 14:53:55 6 | A. It's a very, very tough |
| 14:53:58 7 | business. |
| 14:54:00 8 | Q. Do you have benefits with that |
| 14:54:03 9 | job? |
| 14:54:03 10 | A. I do not. |
| 14:54:07 11 | Q. Of any kind? Do you have health |
| 14:54:11 12 | insurance? |
| 14:54:12 13 | A. I do not. |
| 14:54:12 14 | Q. Retirement? |
| 14:54:13 15 | A. I do not. |
| 14:54:31 16 | Q. Prior to going to work for |
| 14:54:35 17 | Accuaire Mechanical in October, November of |
| 14:54:40 18 | '07, were you employed anywhere? |
| 14:54:45 19 | A. I was. |
| 14:54:45 20 | Q. Where were you employed? |
| 14:54:45 21 | A. At the Red Roof Inn. |
| 14:54:45 22 | Q. Where is that Red Roof Inn? |
| 14:54:46 23 | A. In San Antonio. |

## 15

| | |
|---|---|
| 14:54:49 1 | Q. And let me go back. On |
| 14:54:52 2 | Accuaire, can you give me an address on |
| 14:54:54 3 | Accuaire? |
| 14:54:55 4 | A. You would ask me that. No, I |
| 14:54:57 5 | have it, as a matter of fact. 6825 East |
| 14:55:17 6 | Highway 87, Suite D, San Antonio, Texas |
| 14:55:25 7 | 78263. |
| 14:55:28 8 | Q. Thank you. And tell me again, |
| 14:55:32 9 | where was the Red Roof Inn? |
| 14:55:33 10 | A. In San Antonio, Texas. |
| 14:55:35 11 | Q. Where specifically? |
| 14:55:36 12 | A. It was located -- it was called |
| 14:55:39 13 | the Red Roof Inn Sea World, located at |
| 14:55:42 14 | Ingram and 410, and I don't have the exact |
| 14:55:44 15 | address. |
| 14:55:45 16 | Q. That's fine. What time period |
| 14:55:46 17 | did you work for the Red Roof Inn? |
| 14:55:50 18 | A. It wasn't for very long. I want |
| 14:55:57 19 | to say -- I want to say August through |
| 14:56:15 20 | middle of November, September. |
| 14:56:19 21 | Q. Of '07? |
| 14:56:21 22 | A. Correct. |
| 14:56:22 23 | Q. Was there a break in time |

## 16

| | |
|---|---|
| 14:56:24 1 | between your job at Red Roof and Accuaire? |
| 14:56:28 2 | A. There was, like thirty days or |
| 14:56:29 3 | so. |
| 14:56:29 4 | Q. So about thirty days before |
| 14:56:31 5 | Accuaire, you were no longer working at Red |
| 14:56:34 6 | Roof? |
| 14:56:34 7 | A. Correct. |
| 14:56:34 8 | Q. Why did you no longer work at |
| 14:56:36 9 | Red Roof? |
| 14:56:36 10 | A. I elected to resign my position. |
| 14:56:39 11 | Q. I don't think I asked you, what |
| 14:56:40 12 | was your position? |
| 14:56:40 13 | A. General manager. |
| 14:56:41 14 | Q. Why did you elect to resign your |
| 14:56:43 15 | position? |
| 14:56:43 16 | A. I elected to resign my position. |
| 14:56:46 17 | I just felt that that property was not a -- |
| 14:56:49 18 | was a dead end situation for me, with no |
| 14:56:52 19 | benefits and a hundred and twenty-two |
| 14:56:55 20 | property, with no food and beverage, GM. I |
| 14:56:58 21 | thought that that property would be a cake |
| 14:57:01 22 | walk. Unfortunately, you were the general |
| 14:57:06 23 | manager, front desk clerk, night auditor, |

# FREEDOM COURT REPORTING

|  | 17 |
|---|---|
| 14:57:09 1 | maintenance, and housekeeper.  So that |
| 14:57:12 2 | wasn't my cup of tea, so I decided to |
| 14:57:15 3 | resign.  Resigned my position in writing, |
| 14:57:18 4 | and exhausted my resignation and asked to |
| 14:57:23 5 | stay longer until a position was found or |
| 14:57:26 6 | someone was found to fill the position, and |
| 14:57:30 7 | that went on for another thirty days and no |
| 14:57:33 8 | one filled the position, so I just elected |
| 14:57:35 9 | to move on and start looking for work. |
| 14:57:37 10 | Q.  How much were you paid in that |
| 14:57:39 11 | position? |
| 14:57:40 12 | A.  Forty-five. |
| 14:57:43 13 | Q.  Forty-five thousand dollars a |
| 14:57:44 14 | year? |
| 14:57:45 15 | A.  Yes, sir. |
| 14:57:49 16 | Q.  You had not been given any |
| 14:57:51 17 | indication by the folks at Red Roof that |
| 14:57:54 18 | your employment was going to end, had you? |
| 14:57:56 19 | I mean, before you resigned, you had an |
| 14:57:59 20 | expectation that you could remain employed |
| 14:58:01 21 | there? |
| 14:58:01 22 | A.  Oh, absolutely. |
| 14:58:03 23 | Q.  And the decision not to remain |

|  | 18 |
|---|---|
| 14:58:06 1 | employed there was your decision? |
| 14:58:07 2 | A.  Absolutely. |
| 14:58:17 3 | Q.  Did you live there also? |
| 14:58:17 4 | A.  I did not. |
| 14:58:17 5 | Q.  All right.  Just prior to Red |
| 14:58:20 6 | Roof, were you employed somewhere? |
| 14:58:22 7 | A.  No, sir. |
| 14:58:23 8 | Q.  For what period were you |
| 14:58:34 9 | unemployed before going to work for Red |
| 14:58:34 10 | Roof? |
| 14:58:34 11 | A.  Since I left Tampa in '05, which |
| 14:58:34 12 | was December, all the way up until, I |
| 14:58:37 13 | guess, '06 or whenever I went to apply for |
| 14:58:41 14 | -- I got hired at Red Roof, actually. |
| 14:58:43 15 | Q.  And I want to be sure I'm clear |
| 14:58:45 16 | on those dates, then, because you left |
| 14:58:48 17 | Quality Inn & Suites in December of '05? |
| 14:58:50 18 | A.  Correct. |
| 14:58:51 19 | Q.  Were you out of work for all of |
| 14:58:53 20 | '06? |
| 14:58:53 21 | A.  Just about, yes, sir.  As a |
| 14:58:56 22 | matter of fact, yes, I can tell you that. |
| 14:58:58 23 | Q.  That's what I was trying to get |

|  | 19 |
|---|---|
| 14:59:00 1 | out, because you said you started working |
| 14:59:01 2 | at the Red Roof in August and I thought |
| 14:59:03 3 | that was '07.  So I'm trying to figure out, |
| 14:59:07 4 | were you out of work for eight months or |
| 14:59:09 5 | were you out of work for a year and eight |
| 14:59:12 6 | months?  Was that August '07 or August '06 |
| 14:59:15 7 | that you went to work for Red Roof? |
| 14:59:17 8 | A.  I went to work for Red Roof in |
| 14:59:19 9 | August of '07.  I was out of work for a |
| 14:59:22 10 | long time. |
| 14:59:38 11 | Q.  And how long did you say you |
| 14:59:38 12 | worked at Red Roof, do you think?  I don't |
| 14:59:38 13 | need to know the exact dates, but about how |
| 14:59:41 14 | long do you think you worked there? |
| 14:59:42 15 | A.  I would say three or four |
| 14:59:43 16 | months. |
| 14:59:43 17 | Q.  So you were out of work for a |
| 14:59:46 18 | year and eight months.  You got a job |
| 14:59:48 19 | making forty-five thousand dollars a year, |
| 14:59:51 20 | and you worked there for three or four |
| 14:59:52 21 | months and you quit? |
| 14:59:53 22 | A.  Yes, sir. |
| 14:59:54 23 | Q.  And you quit even though you |

|  | 20 |
|---|---|
| 14:59:56 1 | didn't have another job to go to? |
| 14:59:57 2 | A.  I did. |
| 15:00:06 3 | Q.  And your resignation from that |
| 15:00:07 4 | job at Red Roof was not in any way related |
| 15:00:10 5 | to your health, correct? |
| 15:00:11 6 | A.  No. |
| 15:00:24 7 | Q.  After your employment ended at |
| 15:00:30 8 | Quality Inn in Montgomery -- |
| 15:00:31 9 | A.  Yes, sir. |
| 15:00:34 10 | Q.  -- what was the first job you |
| 15:00:36 11 | applied for? |
| 15:00:42 12 | A.  Well, I applied for several.  I |
| 15:00:46 13 | don't remember -- recall which one was |
| 15:00:47 14 | first, but I do have a schedule which I |
| 15:00:50 15 | would be happy to provide to both of you, |
| 15:00:53 16 | if you need, via Internet search and |
| 15:00:56 17 | sending e-mails and applying online, et |
| 15:00:58 18 | cetera, et cetera. |
| 15:00:58 19 | Q.  And the schedule you referred |
| 15:01:00 20 | to, describe that to me. |
| 15:01:01 21 | A.  Meaning that there's entities |
| 15:01:03 22 | that I applied and sent cover letters with, |
| 15:01:06 23 | you know, applying for those jobs. |

5  (Pages 17 to 20)

# FREEDOM COURT REPORTING

## 21

15:01:08 1    Q.   And do you still have those
15:01:09 2  cover letters?
15:01:10 3    A.   Yes, sir.
15:01:10 4    Q.   And did the cover letters
15:01:12 5  include -- within the letter was there
15:01:14 6  maybe a resume?
15:01:16 7    A.   Absolutely.
15:01:18 8    Q.   And do you think you have copies
15:01:21 9  of all of those that you would have sent?
15:01:22 10   A.   I have probably some, and I have
15:01:24 11 some I just applied online.
15:01:27 12   Q.   If you applied online, did you
15:01:29 13 keep any record of that?
15:01:31 14   A.   Some I did.  Some I did not.
15:01:50 15   Q.   All right.  And I'll probably
15:01:50 16 make a request through your lawyer for
15:01:50 17 those documents, but my only request to you
15:01:50 18 is whatever you have kept, that you still
15:01:52 19 keep whatever you have related to that.
15:01:58 20         Were you offered any job --
15:02:00 21 between leaving the Quality Inn and
15:02:02 22 starting at the Red Roof, were you offered
15:02:04 23 any job?

## 22

15:02:05 1    A.   No, sir.
15:02:06 2    Q.   Did you actually interview for
15:02:10 3  any jobs?
15:02:11 4    A.   The only job that I ever
15:02:13 5  interviewed was with Red Roof Inn.
15:02:15 6    Q.   The one you ultimately obtained?
15:02:18 7    A.   Yes, sir.  And I also applied
15:02:22 8  for that job online, and I got a response
15:02:25 9  online.
15:02:29 10   Q.   What location were you looking
15:02:31 11 for jobs in geographically?
15:02:34 12   A.   Texas; Houston, San Antonio,
15:02:39 13 Dallas area, and the Rio Grande valley.
15:02:44 14   Q.   And what types of jobs were you
15:02:46 15 looking for?
15:02:47 16   A.   Hotel management.
15:02:49 17   Q.   Did you look for jobs of any
15:02:51 18 other type other than hotel management?
15:02:53 19   A.   No, sir.
15:02:54 20   Q.   Did you consider looking for any
15:02:56 21 jobs other than hotel management?
15:02:57 22   A.   Not at the time.
15:03:12 23   Q.   Did you reach any conclusion on

## 23

15:03:12 1  your end as to why you weren't having any
15:03:14 2  success finding jobs?
15:03:15 3    A.   No, I did not.
15:03:18 4    Q.   Did anybody -- did you get any
15:03:23 5  response back?  You didn't have any
15:03:25 6  interviews.  Did you get any response back
15:03:26 7  from folks?
15:03:27 8    A.   I did.
15:03:29 9    Q.   What kind of things did they
15:03:31 10 tell you?
15:03:31 11   A.   Something like we'll just keep
15:03:33 12 you in mind.  We've already hired somebody.
15:03:35 13 The usual, you know, respond employment
15:03:39 14 thing.  We received -- some we received,
15:03:41 15 thank you for the interest in our company.
15:03:44 16 We've received your resume, it will be
15:03:47 17 reviewed, et cetera, things of that nature.
15:04:04 18   Q.   How is your health currently?
15:04:04 19   A.   I would say it's okay.
15:04:08 20   Q.   Do you have any particular
15:04:11 21 medical conditions currently?
15:04:17 22   A.   Do I have any illnesses
15:04:19 23 currently, meaning --

## 24

15:04:21 1    Q.   Well, let me start with:  Are
15:04:23 2  you receiving any treatment for any medical
15:04:25 3  conditions?
15:04:25 4    A.   Yes, I am.
15:04:27 5    Q.   What medical conditions are you
15:04:28 6  receiving treatment for?
15:04:29 7    A.   Diabetic.
15:04:33 8    Q.   What kind of treatment do you
15:04:36 9  receive for that?
15:04:36 10   A.   Two.  Just go for my evaluations
15:04:39 11 and my blood testing and make sure my
15:04:42 12 levels are where they are supposed to be
15:04:44 13 and refilling my prescriptions.
15:04:47 14   Q.   And that condition doesn't
15:04:49 15 prevent you from working?
15:04:50 16   A.   Absolutely not.
15:04:51 17   Q.   Or inhibit you from working?
15:04:54 18   A.   Absolutely not.
15:04:55 19   Q.   How long have you known you had
15:04:57 20 diabetes?
15:04:59 21   A.   Since November of '05.
15:05:04 22   Q.   And in November of '05 you were
15:05:06 23 working at Quality Inn & Suites?

6 (Pages 21 to 24)

# FREEDOM COURT REPORTING

### 25

15:05:08 1    A. I was.

15:05:19 2    Q. How was your diabetes treated
15:05:23 3 then, say November, December of '05? The
15:05:26 4 same as now or different?

15:05:27 5    A. Actually that's where I
15:05:29 6 discovered that I had diabetes, because I
15:05:32 7 was going to the bathroom a lot at night,
15:05:42 8 and then I developed a penis infection.
15:05:42 9 And so I immediately went to the doctor to
15:05:43 10 see what -- I actually didn't go to a
15:05:45 11 doctor. I went to one of those med clinics
15:05:48 12 just to get an evaluation and, having said
15:05:52 13 what I said to you, the urinating at night
15:05:55 14 and the infection, I guess they kind of
15:05:58 15 made an analogy that that was the cause.
15:06:01 16 So they immediately took a sample and at
15:06:04 17 that point, he discovered that my sugar
15:06:06 18 count was like 490. It was really high.

15:06:09 19    It wasn't treated there, because
15:06:10 20 they were not able to treat it. They
15:06:12 21 referred me to a diabetic doctor, which
15:06:15 22 they did, Dr. Lambert in Montgomery,
15:06:17 23 Alabama, which he put me on Avandia and a

### 26

15:06:22 1 very strict diet. And then I went to the
15:06:24 2 classes in Montgomery, you know, the
15:06:29 3 diabetic classes to change my eating
15:06:31 4 habits, if you will, and so forth.

15:06:35 5    Q. All right. The first place you
15:06:37 6 went, the sort of medical clinic, do you
15:06:40 7 remember the name of that place?

15:06:41 8    A. No, sir, but I'm sure that I
15:06:43 9 could put my hands on some documents that
15:06:45 10 will.

15:06:45 11    Q. It was in Montgomery?

15:06:46 12    A. It was in Montgomery, yes.

15:06:47 13    Q. Do you think you have some
15:06:48 14 documents that would reflect it?

15:06:50 15    A. In fact, I'm sure I do.

15:06:51 16    Q. How about Dr. Lambert, where is
15:06:53 17 he in Montgomery? Do you remember?

15:06:54 18    A. I have in my briefcase. I could
15:06:56 19 probably give you an address. It's in
15:06:58 20 Montgomery.

15:06:58 21    Q. All right. We'll get that
15:07:00 22 later. Thanks. And back to, sort of
15:07:08 23 currently, which is where this started.

### 27

15:07:10 1    A. Yes, sir.

15:07:10 2    Q. I asked you about medical
15:07:12 3 conditions. Other than diabetes, any
15:07:13 4 medical condition that you have right now?

15:07:16 5    A. No. Well, leukemia, but it
15:07:21 6 doesn't keep me from working.

15:07:22 7    Q. Tell me what the current status
15:07:25 8 of your leukemia is.

15:07:26 9    A. It's still in remission.

15:07:31 10    Q. And since it is in remission,
15:07:33 11 does it have any effect on your day-to-day
15:07:36 12 activities?

15:07:37 13    A. No, sir.

15:07:49 14    Q. Do you have a doctor who you see
15:07:50 15 about your leukemia at times?

15:07:52 16    A. I use the CTR Center -- CTRC
15:07:59 17 Center in San Antonio, Texas.

15:08:02 18    Q. CTRC?

15:08:04 19    A. Yes, sir.

15:08:15 20    Q. Is there a particular physician
15:08:15 21 there?

15:08:15 22    A. It is a facility that is -- I
15:08:19 23 guess it's kind of an assistant kind of

### 28

15:08:25 1 thing. So whoever is there is whoever I
15:08:27 2 see.

15:08:27 3    Q. Okay. Any plans to change jobs
15:08:43 4 any time soon or are you going to stick it
15:08:46 5 out where you are?

15:08:48 6    A. Yes. Well, there's always
15:08:54 7 looking for opportunity, of course. That
15:08:57 8 is not really my field. I took that job
15:09:01 9 simply because it was made available to me.
15:09:02 10 As a matter of fact, that job came across
15:09:05 11 them calling me as a hotel general manager,
15:09:09 12 and that's how I got to know the owners of
15:09:11 13 that business. They asked me if I would
15:09:13 14 help them with some sales. I'm a native of
15:09:16 15 San Antonio, know a lot of people there, so
15:09:18 16 I figured that that was kind of fitting
15:09:19 17 with -- I'm an outgoing kind of, people
15:09:21 18 kind of person, so it kind of fits well,
15:09:24 19 although it's not my forte, if you will.
15:09:28 20 I've been in the hospitality business since
15:09:30 21 '72 when I was in high school and that's
15:09:32 22 what I enjoy doing.

15:09:34 23    Q. That leads me right to what I

7 (Pages 25 to 28)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

### 29

15:09:36 1 was going to ask you about next, which was
15:09:37 2 your employment before you came to work for
15:09:39 3 Quality Inn & Suites. Based on what you
15:09:43 4 just said, were you in the hospitality
15:09:45 5 industry before?
15:09:45 6     A. Yes, sir.
15:09:46 7     Q. And I think you just said you've
15:09:48 8 been in it since '72?
15:09:49 9     A. Yes, sir.
15:09:50 10     Q. Have you been in any other
15:09:52 11 professions during that time frame?
15:09:54 12     A. I worked for a ground
15:09:56 13 transportation company that was related to
15:09:58 14 the hospitality industry. We provided
15:10:01 15 ground transportation to the hotel
15:10:04 16 industry, which refers to ground
15:10:06 17 transportation to and from the airport,
15:10:08 18 transfers from the hotels, as well as
15:10:11 19 making the charter buses available to
15:10:13 20 convention, conventioneers. So it was
15:10:15 21 hospitality related, although not operating
15:10:17 22 a hotel.
15:10:19 23     Q. And in addition to that you've

### 30

15:10:21 1 also operated other hotels?
15:10:23 2     A. Yes, I have.
15:10:24 3     Q. I don't want to go through all
15:10:26 4 the places you've worked since '72, but, I
15:10:28 5 mean, about how many hotels have you been
15:10:31 6 the general manager of?
15:10:32 7     A. I'll give you just an idea for
15:10:35 8 the chains I've worked for. I've worked
15:10:36 9 for Embassy Suites corporate, and I've
15:10:39 10 worked for Embassy Suites as a franchise.
15:10:41 11 I've worked for Windsor Capital, which has
15:10:45 12 a big conglomerate, I guess a big umbrella
15:10:47 13 of Embassy Suites. I've worked for
15:10:50 14 Sheraton full service hotels and I've
15:10:52 15 worked for Holiday Inn.
15:10:56 16     Q. Have you ever been terminated
15:10:57 17 from any job, and let's exclude for now
15:11:01 18 Quality Inn & Suites. We'll talk about
15:11:03 19 that in a minute. But any other job, have
15:11:05 20 you ever been terminated from any job?
15:11:07 21     A. No, sir.
15:11:08 22     Q. Have you ever filed a charge of
15:11:13 23 discrimination with the EEOC against any

### 31

15:11:16 1 entity other than the Quality Inn & Suites?
15:11:19 2     A. No, sir.
15:11:20 3     Q. Have you ever filed a lawsuit
15:11:21 4 against anybody?
15:11:22 5     A. No, sir.
15:11:22 6     Q. Have you ever been sued?
15:11:24 7     A. No, sir.
15:11:24 8     Q. Have you ever filed for
15:11:25 9 bankruptcy?
15:11:26 10     A. No, sir.
15:11:27 11     Q. Have you ever been convicted of
15:11:28 12 a crime?
15:11:29 13     A. No, sir.
15:11:38 14     Q. Just prior to working for
15:11:38 15 Quality Inn & Suites, where were you
15:11:38 16 working?
15:11:38 17     A. I worked for Alamo City Hotels.
15:11:41 18     Q. I'm sorry. Alamo?
15:11:43 19     A. Alamo City Hotels.
15:11:46 20     Q. Was that one property or more
15:11:51 21 than one property?
15:11:51 22     A. It was a -- well, I guess it's a
15:11:51 23 group of investors. It operates like

### 32

15:11:54 1 fifteen hotels in San Antonio and in all
15:11:56 2 different brands, Hilton Garden Inns, Best
15:11:59 3 Westerns, Holiday Expresses.
15:12:09 4     Q. Why did your employment with
15:12:09 5 Alamo City Hotels end?
15:12:09 6     A. We were in the process of -- the
15:12:13 7 property I was managing was a Clarion
15:12:16 8 Suites by the airport, and they've sold
15:12:18 9 that property. Actually, rephrase that.
15:12:21 10 They didn't sell that property. They
15:12:23 11 closed that property down for a complete
15:12:25 12 rehab. It was being converted from a
15:12:27 13 Clarion to a Hilton Garden Inns and,
15:12:30 14 therefore, once that -- once that hotel
15:12:36 15 shut down, they actually shut the hotel
15:12:39 16 down and emptied it and got it ready for
15:12:42 17 construction. Nothing was available at the
15:12:44 18 time. I was kind of just running back and
15:12:46 19 forth for the company and not in the
15:12:50 20 operations aspects of it, more in the, I
15:12:54 21 guess in the construction side, because
15:12:56 22 they had a lot of hotels that were under
15:12:59 23 construction.

8  (Pages 29 to 32)

# FREEDOM COURT REPORTING

### 33

15:12:59 1       That's where I met Mr. Tampa.

15:13:01 2 Mr. Tampa was the contractor of the Hilton

15:13:05 3 Garden Inn, and he got wind that I could be

15:13:09 4 looking for work, and he approached me and

15:13:11 5 asked me if I could help him with the

15:13:15 6 property in Montgomery, Alabama, which I

15:13:16 7 thought would be a good opportunity for me

15:13:19 8 and I had that discussion with him.

15:13:20 9     Q.  Why did you see that as a good

15:13:22 10 opportunity since you had been in San

15:13:24 11 Antonio in the hospitality industry for so

15:13:25 12 long?

15:13:27 13     A.  It was a large property.  It was

15:13:29 14 a property that had excessive banquet

15:13:36 15 space.  It was somewhat -- I did a little

15:13:41 16 research, the old Governor's House, which

15:13:44 17 was the, I guess the largest property in

15:13:46 18 Montgomery, and a lot of the, I guess being

15:13:49 19 a state's capital and everything, all the

15:13:51 20 legislators were there and all the

15:13:54 21 conventions.  I felt that -- that intrigued

15:13:56 22 me a lot to go there and try to make

15:13:58 23 something with that hotel.  Even though it

### 34

15:14:00 1 was a Quality Inn, you know, it changed the

15:14:02 2 name from Quality and Governor's House.  A

15:14:05 3 lot of people just know it as the

15:14:06 4 Governor's House, and I kind of like those

15:14:10 5 kind of properties.  I started working at

15:14:11 6 an antique hotel.  I worked at the St.

15:14:14 7 Anthony Hotel in San Antonio, which is a

15:14:17 8 very old hotel.  It was built in 1909, so I

15:14:21 9 kind of like those older properties.

15:14:23 10     Q.  Did you go -- you talked to Mr.

15:14:25 11 Tampa while he was in San Antonio, correct?

15:14:28 12     A.  Yes, sir.

15:14:28 13     Q.  And y'all talked about the

15:14:30 14 possibility that you could come to work for

15:14:32 15 him?

15:14:32 16     A.  Yes, sir.

15:14:42 17     Q.  Did you come see the hotel?

15:14:42 18     A.  I did.

15:14:42 19     Q.  Before?

15:14:42 20     A.  I did.

15:14:42 21     Q.  When did -- at some point, did

15:14:44 22 Mr. Tampa offer you a job?

15:14:46 23     A.  He did.

### 35

15:14:47 1     Q.  When did that happen?

15:14:49 2     A.  I don't recall.  April sometime.

15:14:56 3 I just don't know exactly when.

15:15:19 4     Q.  Let's just do this:  Let me show

15:15:19 5 you what was previously marked today as

15:15:21 6 Plaintiff's Exhibit 1.  Have you seen that

15:15:24 7 document before?

15:15:25 8     A.  I have.

15:15:26 9     Q.  Is this a document you drafted?

15:15:29 10     A.  It is.

15:15:31 11     Q.  It's dated April 27th, and it

15:15:33 12 says as per our meeting, April 25th.  Does

15:15:40 13 that help refresh your recollection as to

15:15:42 14 when you were offered a job?

15:15:44 15     A.  So it was April 25th.

15:15:46 16     Q.  Okay.  And the meeting on April

15:15:48 17 25th, was that a meeting in Montgomery?

15:15:50 18     A.  It was.

15:15:51 19     Q.  Okay.  Did Mr. Tampa ask you to

15:15:59 20 put this in writing or did you just decide

15:16:01 21 to do that yourself?

15:16:02 22     A.  I did it on my own.

15:16:06 23     Q.  The terms that are listed in

### 36

15:16:08 1 here, one through five, were those all

15:16:11 2 things that you and Mr. Tampa had

15:16:13 3 discussed?

15:16:14 4     A.  Yes, sir.

15:16:17 5     Q.  And things he agreed to?

15:16:19 6     A.  Yes, sir.

15:16:20 7     Q.  The first one says you're going

15:16:21 8 to get a salary of forty-two thousand

15:16:26 9 dollars.  When you went to work, were you

15:16:29 10 paid an amount that would have been

15:16:30 11 equivalent to a forty-two thousand dollar

15:16:32 12 annual salary?

15:16:33 13     A.  Would you please repeat the

15:16:35 14 question?

15:16:35 15     Q.  Yeah.  I know you didn't work

15:16:36 16 there for a whole year.  The question I

15:16:38 17 have is:  Did you get a salary that was

15:16:44 18 commensurate with something that would have

15:16:46 19 equaled forty-two thousand dollars a year?

15:16:48 20     A.  At the Quality Inn?

15:16:49 21     Q.  Yeah.

15:16:49 22     A.  Or somewhere else?

15:16:50 23     Q.  No, no.  I'm asking at the

9  (Pages 33 to 36)

# FREEDOM COURT REPORTING

### 37

15:16:52 1 Quality Inn, once you began working at the
15:16:54 2 Quality Inn.
15:16:55 3    A. No, I was paid the forty-two
15:16:56 4 thousand.
15:16:56 5    Q. Okay. I'm just trying to make
15:16:58 6 sure that that was what was agreed to and
15:17:01 7 that's what you were paid?
15:17:02 8    A. Absolutely.
15:17:03 9    Q. It says plus four percent bonus
15:17:05 10 over budgeted goal. Tell me about the
15:17:09 11 budgeted goal. Did you have a budgeted
15:17:14 12 goal?
15:17:14 13    A. We looked at some numbers. Yes,
15:17:17 14 the answer -- that's a two-part question --
15:17:20 15 that's a two-part answer, yes and no.
15:17:23 16 Budgeted goals are numbers that he wants to
15:17:24 17 reach, and then there's a real budget. You
15:17:27 18 know, this year -- last year they did two
15:17:30 19 hundred thousand, so next year they want to
15:17:32 20 do twenty thousand dollars more. These
15:17:33 21 were numbers. They were on just a loose
15:17:37 22 scratch piece of paper. There was no
15:17:39 23 expenses associated with it. There was no

### 38

15:17:41 1 -- anything that related to that. He just
15:17:43 2 wanted to make sure that we reached those
15:17:45 3 numbers.
15:17:45 4    Q. And so once you did begin
15:17:48 5 working there, you were told what those
15:17:50 6 numbers were?
15:17:51 7    A. I was told what those numbers
15:18:03 8 were before.
15:18:03 9    Q. Okay. The second thing on this
15:18:03 10 list is that there was an agreement that
15:18:03 11 the hotel would provide a job in the hotel
15:18:04 12 for Roxanna Luker at ten dollars per hour?
15:18:07 13    A. Yes, sir.
15:18:08 14    Q. Who is Roxanna Luker?
15:18:10 15    A. She is my girlfriend.
15:18:12 16    Q. Is she still your girlfriend?
15:18:14 17    A. No, sir.
15:18:16 18    Q. Do you still keep in touch with
15:18:18 19 her?
15:18:18 20    A. Yes, sir.
15:18:19 21    Q. Where does she live?
15:18:20 22    A. She lives in San Antonio.
15:18:21 23    Q. Do you know her actual address?

### 39

15:18:24 1    A. No, sir.
15:18:26 2    Q. Do you know her phone number?
15:18:27 3    A. Yes.
15:18:27 4    Q. What's her phone number?
15:18:29 5    A. .
15:18:38 6    Q. What part of town does she live
15:18:41 7 in?
15:18:41 8    A. I believe it's in a little town
15:18:44 9 close to Seguin. It's not actually in San
15:18:47 10 Antonio.
15:18:47 11    Q. Can you spell Seguin for me?
15:18:49 12    A. S-e-g-u-i-n.
15:18:54 13    Q. Did the hotel provide a job for
15:18:56 14 Roxanna Luker?
15:18:58 15    A. They did.
15:18:59 16    Q. What job did she have?
15:19:00 17    A. She worked in the accounting
15:19:02 18 office.
15:19:02 19    Q. Did she report to you?
15:19:04 20    A. Yes.
15:19:08 21    Q. And did she make the ten dollars
15:19:10 22 per hour that's listed in this?
15:19:12 23    A. Yes, sir.

### 40

15:19:21 1    Q. I think you told me you've been
15:19:21 2 married for thirty years. I take it, then,
15:19:22 3 you were married when you took the job at
15:19:23 4 the Quality Inn & Suites?
15:19:25 5    A. Yes, sir.
15:19:26 6    Q. Your wife, did she live in San
15:19:32 7 Antonio while you lived in Montgomery?
15:19:33 8    A. Yes, sir.
15:19:36 9    Q. Were you formally separated in
15:19:39 10 any way?
15:19:39 11    A. I've been -- I'm still
15:19:42 12 separated. I've been separated for over
15:19:43 13 fifteen years.
15:19:44 14    Q. Fifteen?
15:19:44 15    A. Yes, sir.
15:19:45 16    Q. Is that legally separated or
15:19:47 17 just physically separated?
15:19:48 18    A. Just physically separated.
15:20:03 19    Q. Any reason why you haven't
15:20:03 20 gotten divorced?
15:20:03 21    A. No.
15:20:03 22    Q. Do you currently have a
15:20:05 23 girlfriend?

10 (Pages 37 to 40)

# FREEDOM COURT REPORTING

41

15:20:06  1    A. No, sir.

15:20:09  2    Q. Do you know where Roxanna Luker

15:20:14  3    works?

15:20:15  4    A. I believe she works at a travel

15:20:18  5    -- works at a travel -- Exxon travel

15:20:24  6    center, like a travel center.

15:20:24  7    Q. Like a truck stop kind of place?

15:20:27  8    A. Yes, sir.

15:20:36  9    Q. Do you know what her job is

15:20:36 10    there?  Is she like a clerk?

15:20:36 11    A. She's a clerk, cashier/clerk.

15:20:38 12    Q. And is that in Seguin?

15:20:41 13    A. It's halfway between Seguin and

15:20:45 14    San Antonio.  It's on the interstate.

15:20:47 15    Q. Okay.  Y'all agreed that the

15:20:56 16    hotel would pay some of your moving

15:20:59 17    expenses.  Did they pay those?

15:21:00 18    A. They did.

15:21:01 19    Q. That you would be provided a

15:21:04 20    bedroom and living room area, not to

15:21:06 21    include the office as part of the living

15:21:08 22    arrangements?

15:21:09 23    A. That's correct.

42

15:21:09  1    Q. Did that happen?

15:21:10  2    A. No.

15:21:10  3    Q. Tell me, what were your living

15:21:12  4    arrangements?

15:21:13  5    A. Well, the office and the living

15:21:15  6    arrangements were all in the same suite.

15:21:18  7    It was a bedroom, a living room, and then

15:21:22  8    there was an office all in the -- it had

15:21:35  9    petitions, but it was all in the same.

15:21:36 10    Q. Was the entryway into these

15:21:36 11    living quarters like a hotel room?

15:21:36 12    A. Yes.

15:21:36 13    Q. So from the outside, it looks

15:21:38 14    like a hotel room?

15:21:39 15    A. Correct.

15:21:39 16    Q. And you open it up, it's not

15:21:42 17    just a regular hotel room.  There's a

15:21:44 18    bedroom, a living room area, and an office

15:21:46 19    area within?

15:21:48 20    A. No.  It looks like a hotel room.

15:21:52 21    You entered and you entered into an office,

15:21:56 22    which would have been my office.  And then

15:21:58 23    you go through a hallway and you go into

43

15:22:00  1    the bedroom and then the living room.  So

15:22:02  2    the first thing you see is an office.

15:22:04  3    Q. But there was a bathroom off the

15:22:06  4    bedroom, I guess?

15:22:07  5    A. Yes.

15:22:10  6    Q. Did Ms. Luker live in the same

15:22:14  7    quarters you did?

15:22:15  8    A. Yes.

15:22:29  9    Q. All right.  And at the bottom of

15:22:35 10    this letter you say you're going to give

15:22:36 11    your resignation notice today and start

15:22:38 12    making preparations to head that direction.

15:22:41 13    This letter is April 27th.  Do you have a

15:22:42 14    gauge as to how long after that it was

15:22:44 15    before you started working?

15:22:45 16    A. I started on the 9th.

15:22:47 17    Q. May the 9th?

15:22:48 18    A. Uh-huh (positive response), as

15:22:49 19    we agreed.

15:22:58 20    Q. And your job was general

15:22:59 21    manager?

15:22:59 22    A. Yes, sir.

15:23:00 23    Q. Tell me -- I think I know what

44

15:23:01  1    that means, but tell me what that means in

15:23:02  2    terms of your duties and responsibilities.

15:23:05  3    A. Hotel general manager, as was

15:23:07  4    agreed, is I would be in charge of the

15:23:09  5    operation of that property and anyone under

15:23:13  6    that, from department managers to

15:23:17  7    back-of-the-house employees.  Normally, I

15:23:20  8    worked through the department managers to

15:23:21  9    manage those departments.

15:23:22 10    I normally don't go into a

15:23:26 11    department and try to run housekeeping.

15:23:28 12    There is an executive housekeeper in place.

15:23:31 13    I manage that department through that

15:23:34 14    individual, the same as a restaurant

15:23:37 15    manager or a sales director or a restaurant

15:23:39 16    manager and their employees below them.

15:23:42 17    Now, should they identify

15:23:46 18    something that needs to be addressed, I

15:23:48 19    usually address the department manager and

15:23:50 20    have that issue addressed.

15:23:54 21    Q. Who did you consider your

15:23:56 22    employer to be?

15:23:58 23    A. As far as --

11 (Pages 41 to 44)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

45

15:24:00 1  Q. Who did you think you were
15:24:01 2  working for?
15:24:01 3  A. Well, I worked for John Tampa.
15:24:04 4  Q. But in terms of a business
15:24:06 5  entity, did you know what business entity
15:24:08 6  you were working for?
15:24:09 7  A. No. I know it was Quality Inn &
15:24:14 8  Suites, and I know it was a franchise, but
15:24:16 9  I didn't know what he had it listed under.
15:24:18 10 It could have been Monkeys John Tampa
15:24:20 11 business for all I know.
15:24:21 12 Q. Had you ever heard of IT
15:24:23 13 Montgomery, LLC?
15:24:25 14 A. I heard it in conversations.
15:24:28 15 Q. In what context?
15:24:29 16 A. Just when John was in the office
15:24:35 17 on the phone and he would be talking
15:24:35 18 business, I'd hear the IT Montgomery, but I
15:24:39 19 didn't know what he's referring to.
15:24:40 20 Q. What about Vision Hospitality?
15:24:42 21 A. I heard that, too.
15:24:43 22 Q. You didn't know what that
15:24:44 23 referred to either?

46

15:24:45 1  A. No.
15:24:59 2  Q. Is it fair to say you don't know
15:24:59 3  what corporate entity you were employed by?
15:24:59 4  A. It's fair to say that.
15:25:03 5  Q. Looking back at the letter --
15:25:04 6  you don't really have to look at the letter
15:25:07 7  -- am I correct you did not have health
15:25:08 8  insurance?
15:25:09 9  A. Correct.
15:25:12 10 Q. You reported to John Tampa?
15:25:33 11 A. That's correct.
15:25:33 12 Q. He was your boss?
15:25:34 13 A. Yes, sir.
15:25:36 14 Q. You mentioned having other
15:25:38 15 managers. Who reported to you that you can
15:25:40 16 remember?
15:25:42 17 A. Mr. Tim Banks was my assistant
15:25:45 18 general manager. Beverly Woods was the
15:25:50 19 director of sales. Gaylon, and I don't
15:25:58 20 recall his last name, but Gaylon was the
15:26:03 21 banquet manager in charge of banquets.
15:26:10 22 Ivory Montgomery was the executive chef,
15:26:17 23 and then there's a young lady at the front

47

15:26:20 1  desk. I don't recall her name. She was
15:26:21 2  front desk manager. I'm sure we can find
15:26:24 3  her name. But she also reported to me, as
15:26:28 4  well as all department managers. And,
15:26:29 5  then, there was a gentleman named Willie.
15:26:32 6  I don't recall his last name either. He
15:26:34 7  was a restaurant manager. And then Ms.
15:26:40 8  Evelyn was our director of housekeeping.
15:26:43 9  She reported to me.
15:26:52 10 Q. During your employment as the GM
15:26:52 11 at the Quality Inn & Suites, were you able
15:26:53 12 to meet goals that were set?
15:26:58 13 A. No.
15:27:09 14 Q. Anything you attribute that to?
15:27:09 15 A. Yes. It would take a day, but
15:27:12 16 we'll try to get it done pretty quickly.
15:27:14 17 Q. You've got a flight to catch. I
15:27:16 18 don't want to run you late, but just
15:27:17 19 generally.
15:27:18 20 A. Well, in general, when I went to
15:27:21 21 do -- went for a site inspection and looked
15:27:23 22 at the property, the property seemed to be
15:27:25 23 relatively sellable, if you will.

48

15:27:30 1  Unfortunately, I looked at some of the
15:27:36 2  P&Ls. From what I could see, it looked
15:27:40 3  like there was room for improvement.
15:27:42 4     The issues that were there on
15:27:43 5  hand is -- the primary issue as I see it
15:27:50 6  was not having the -- even though it's here
15:27:55 7  in writing, not having the opportunity to
15:27:57 8  really manage the property. Mr. Tampa
15:28:00 9  would interfere with the operation almost
15:28:02 10 on a daily basis. For example, when you
15:28:07 11 tell someone that you have full control of
15:28:10 12 the operation, but doesn't give you an
15:28:12 13 operating account to work with, your hands
15:28:14 14 are tied.
15:28:15 15    I had vendors knocking on my
15:28:16 16 door every single day looking for money. I
15:28:21 17 was almost -- well, that can be easily
15:28:31 18 found, but a full house with every banquet
15:28:31 19 room filled and banquets to occur that
15:28:31 20 evening on a Friday and Saturday, and I've
15:28:32 21 got Montgomery Power and Light asking for
15:28:35 22 twenty-seven thousand dollars at my door
15:28:36 23 before 5:00 or we're going to turn the

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

**49**

15:28:38 1    power off. You know, and it just goes on
15:28:41 2    and on and on.
15:28:44 3          I later found out that Mr.
15:28:47 4    Tampa, I guess, had a partner in this
15:28:51 5    business and the partner, I guess,
15:28:56 6    separated, and so when vendors came up,
15:28:59 7    vendor -- Tampa would say, no, that's the
15:29:02 8    other guy's bill. Well, where does that
15:29:04 9    leave us? I mean, he's in Dalton, you
15:29:05 10   know, or running around all over the
15:29:07 11   country and we have no operating -- can we
15:29:10 12   call the corporate office and talk to -- at
15:29:12 13   the time there was a guy named Tommy that
15:29:14 14   was the controller. You know, he said,
15:29:17 15   well, you know, just tell them to call me.
15:29:20 16   Tell them to call me is not going to work.
15:29:22 17   You guys are in Dalton. I've got the guy
15:29:25 18   here with a tool in his hand ready to turn
15:29:28 19   the power off. So it made it very
15:29:30 20   difficult for us to operate.
15:29:33 21         He -- these goals were very
15:29:36 22   obtainable had we really pushed forward and
15:29:41 23   tried to do the things that we wanted to

**50**

15:29:43 1    do. He expected salespeople to go out,
15:29:46 2    including Ms. Woods, to go out and make
15:29:49 3    sales calls, but don't give them a car
15:29:52 4    allowance. Use your own car, use your own
15:29:55 5    gas and go out and make sales calls every
15:29:57 6    day. And I believe I memo'd him regarding
15:30:00 7    that, and I'll try to put my hands on some
15:30:03 8    of those documents. Ms. Woods may have a
15:30:06 9    copy of that, I don't know, where I
15:30:09 10   e-mailed him and said, look -- not e-mailed
15:30:12 11   him, but actually sent him a fax and said,
15:30:14 12   you expect our guys to go out and do sales
15:30:17 13   and you don't want to compensate them for
15:30:19 14   it.
15:30:20 15         You know, I don't expect them to
15:30:21 16   go out and use their own vehicle and fuel
15:30:25 17   when fuel was at two fifty and two sixty a
15:30:28 18   gallon and go out and do sales calls. It's
15:30:31 19   just not practical, you know, so we need
15:30:33 20   your help on this, and he never responded
15:30:36 21   to that.
15:30:37 22         So those are some of the things
15:30:38 23   that we encountered. We're a choice

**51**

15:30:41 1    product, Quality Inn & Suites is. We were
15:30:46 2    under, I guess, serious, I guess,
15:30:50 3    restraints and I think he even got some --
15:30:53 4    in fact, I know he did, some termination,
15:30:59 5    franchisee termination notices because we
15:30:59 6    wouldn't bring our property up to standard.
15:31:03 7    Choice product. You have to have Serta
15:31:06 8    mattresses. That's a standard. If you
15:31:08 9    don't have them, you automatically failed
15:31:09 10   inspection. You know, certain weight of
15:31:12 11   terry, certain weight of things. He
15:31:14 12   eventually brought the property up to par.
15:31:17 13   So it's like pulling teeth.
15:31:18 14         During inspection, we failed
15:31:20 15   inspections and he felt that the
15:31:22 16   inspections were because, yeah -- no matter
15:31:24 17   how tight or how well you try to run a
15:31:27 18   hotel, you're always going to have some
15:31:30 19   deficiency in the housekeeping. He would
15:31:31 20   look at the deficiencies in the
15:31:33 21   housekeeping area and say, that's where we
15:31:35 22   failed the inspection. And we'd say, no,
15:31:38 23   we have documents here that say that you

**52**

15:31:41 1    failed the inspection, because if you don't
15:31:43 2    have your, number one, your Serta mattress,
15:31:46 3    which is a brand identity, brand item, you
15:31:50 4    automatically fail the inspection. I don't
15:31:53 5    give a damn if you do a hundred percent in
15:31:56 6    your cleanliness and everything else. So
15:31:57 7    those are the kind of things that I
15:31:59 8    encountered as the general manager working
15:32:01 9    for him. And you bring those things to the
15:32:05 10   table and let me worry about the franchise.
15:32:09 11   Well, you know --
15:32:11 12         Q.  Well, is it fair to say you
15:32:14 13   weren't all that happy working there?
15:32:16 14         A.  No, I'm not going to say -- no,
15:32:19 15   it's not fair to say that. I was happy
15:32:21 16   working there. I enjoyed working there. I
15:32:24 17   wanted to be the individual that was going
15:32:25 18   to make the difference.
15:32:26 19         Q.  Did you think that was ever
15:32:28 20   going to happen, based on the way it was
15:32:30 21   going?
15:32:31 22         A.  I think that it could have
15:32:33 23   happened. You know, I think Mr. Tampa is

13  (Pages 49 to 52)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

53

15:32:36  1   the type of person it takes him, you know,
15:32:41  2   some time to digest things, but I think
15:32:44  3   eventually he comes around, you know, and
15:32:46  4   that's the way I perceived it, you know. I
15:32:50  5   don't go into an opportunity not knowing
15:32:53  6   there's going to be challenges there. My
15:32:55  7   goal and my personal goals and challenges
15:32:58  8   are to overturn that property. I want to
15:33:01  9   pat myself on the back and say, this is
15:33:03  10  what I did, in spite of having to deal with
15:33:09  11  owners or an owner that doesn't see it the
15:33:13  12  way it should be.
15:33:15  13          I think probably eighty percent
15:33:16  14  of the properties I work for were all
15:33:19  15  franchises and I enjoy working for those
15:33:21  16  franchises, because it's more on a one-on-
15:33:24  17  one basis rather than to work for corporate
15:33:26  18  and you have to go through all the red
15:33:28  19  tape. But I did feel there was a lot of
15:33:30  20  opportunity there and I think having given
15:33:35  21  the -- as the agreement says, full
15:33:38  22  opportunity to really run the property, I
15:33:52  23  think changes would have happened.

54

15:33:52  1           We were shut down by the city of
15:33:52  2   Montgomery several times because of some
15:33:52  3   serious sewer issues in the kitchen. I
15:33:57  4   mean, we were shut down when I had five or
15:34:00  5   six weddings going on in the back and there
15:34:02  6   was sewer coming up in the banquet rooms,
15:34:03  7   and we knew that it was going on for years
15:34:05  8   and it was never fixed. I sent him a memo
15:34:08  9   regarding that.
15:34:08  10          You know, he talked about
15:34:09  11  revenue wasn't being made. We had
15:34:11  12  opportunities of getting whatever that -- I
15:34:14  13  can't recall right at the moment. The
15:34:19  14  military base that's in Montgomery,
15:34:21  15  whatever that is, came in for several site
15:34:23  16  inspections. They had that business
15:34:25  17  before. We tried to obtain it back. They
15:34:27  18  came and did an inspection. They asked us
15:34:29  19  to correct some things. We weren't able to
15:34:32  20  correct them, so we didn't get the
15:34:34  21  contract.
15:34:34  22          We probably lost, you know, a
15:34:36  23  hundred thousand dollars a month on

55

15:34:38  1   business regarding that. So, again, it's,
15:34:42  2   you know, go after other business, you
15:34:45  3   know. So, no, I wasn't unhappy. It's not
15:34:48  4   fair to say I wasn't happy. I'm not a
15:34:50  5   quitter, you know. I wanted to make things
15:34:53  6   happen.
15:34:54  7       Q.  When did you first learn that
15:34:57  8   you might have leukemia?
15:34:59  9       A.  It was at Dr. Lambert's office,
15:35:04  10  the diabetic office, where I had gone in
15:35:09  11  for further evaluation or a checkup, if you
15:35:13  12  will, and did some more blood tests and he
15:35:15  13  actually called me to come in. He wanted
15:35:17  14  to talk to me about something. So I went
15:35:20  15  in. And I -- he said that he noticed some
15:35:25  16  irregulary blood counts in my blood and
15:35:29  17  felt that this is what was occurring, but
15:35:32  18  he wanted to refer me to a specialist,
15:35:35  19  which was Dr. Morrison at the Baptist
15:35:38  20  system there in Montgomery, which I have
15:35:40  21  documents of that as well.
15:35:44  22          He sent me over with a copy of
15:35:47  23  his documents. I presented them to Dr.

56

15:35:50  1   Morrison at the -- or the specialist, the
15:35:54  2   cancer specialist, and he stated to me that
15:35:59  3   he would rather run his own tests, but
15:36:01  4   based on what Dr. Lambert had sent over,
15:36:03  5   that that was kind of what was happening,
15:36:05  6   but we didn't know where we were with that.
15:36:07  7   He wanted to make sure. So I guess they
15:36:09  8   run different kinds of lab work.
15:36:12  9       Q.  Let me slow you down here for a
15:36:14  10  second. Dr. Lambert, who was treating you
15:36:16  11  for diabetes --
15:36:17  12      A.  Yes, sir.
15:36:17  13      Q.  -- told you to come in. You
15:36:19  14  went in and met with him. He told you you
15:36:21  15  had an irregular blood count?
15:36:22  16      A.  Correct.
15:36:23  17      Q.  Did he give you any conclusion
15:36:26  18  that he thought you had leukemia?
15:36:28  19      A.  He did.
15:36:29  20      Q.  And based on that, he referred
15:36:33  21  you to Dr. Morrison?
15:36:33  22      A.  Correct.
15:36:33  23      Q.  When you saw Dr. Morrison at

14  (Pages 53 to 56)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

57

15:36:33 1 Baptist, he looked at whatever medical

15:36:37 2 documentation Dr. Lambert sent over?

15:36:39 3     A.  Correct.

15:36:40 4     Q.  Did he give you any preliminary

15:36:42 5 indication of what his diagnosis was before

15:36:45 6 doing his own test?

15:36:46 7     A.  He did not.

15:36:47 8     Q.  Okay.  He just said he wanted to

15:36:49 9 do his own test?

15:36:50 10     A.  Absolutely.

15:36:50 11     Q.  When -- let's put some time

15:36:53 12 frames in this to the best way we can.

15:36:55 13 When did you meet with Dr. Lambert and he

15:36:58 14 told you what his conclusion was?

15:37:04 15     A.  Somewhere around December 2nd.

15:37:06 16 I have exact dates, because I have the

15:37:07 17 documents.  So I can get those documents.

15:37:09 18     Q.  Do you have the documents with

15:37:10 19 you?

15:37:10 20     A.  I do.

15:37:11 21     Q.  If you would look at them, can

15:37:13 22 you figure out what the exact dates are?

15:37:14 23     A.  I can't read the doctor's

58

15:37:16 1 writing, but I'll be happy to let you guys

15:37:18 2 look at them.  They are there.

15:37:23 3     MR. BRYANT:  Do you want to get

15:37:24 4 some copies?

15:37:25 5     MR. SMITH:  Yeah, let's do that.

15:37:26 6 Let's take a break.

15:37:26 7

15:37:26 8     (Whereupon, a brief recess was

15:37:26 9         taken.)

15:37:26 10

15:45:48 11     Q.  Mr. Mendiola, I don't really

15:45:50 12 necessarily want to go through all these

15:45:52 13 documents.  I was really just flipping

15:45:55 14 through them so that I could try to put

15:45:57 15 some dates --

15:45:58 16     A.  Okay.

15:45:58 17     Q.  -- to what we were discussing

15:46:00 18 right before we took a break.

15:46:24 19     MR. BRYANT:  Here's one that

15:46:25 20 says 12/2.

15:46:26 21     Q.  I've got a 12/2 and a 12/7.

15:46:28 22     A.  12/2 is when he told me and I

15:46:30 23 think 12/7 was when I went to the --

59

15:46:33 1     MR. BRYANT:  Here's a 12/17.

15:46:35 2     Q.  Okay.  I'm not going to mark

15:46:36 3 these right now, but let me just show you

15:46:38 4 something that says at the top Intake Form

15:46:40 5 Assignment of Benefits and that's dated --

15:46:46 6 what's the date on that?

15:46:47 7     A.  Twelve -- it looks like

15:46:49 8 12/07/05.

15:46:50 9     Q.  Is that your signature,

15:46:52 10 patient's signature?

15:46:52 11     A.  It is.

15:46:53 12     Q.  And here at the top it says

15:46:53 13 Today's Date.  Do you see it more clearly

15:46:58 14 up here?

15:46:59 15     A.  Yes, sir.

15:46:59 16     Q.  And that's also 12/7/05?

15:47:03 17     A.  Correct.

15:47:03 18     Q.  And this is with Dr. Morrison;

15:47:16 19 is that right?  Well, it says you've been

15:47:16 20 referred by Dr. Lambert, correct?

15:47:16 21     A.  Referred by Dr. Lambert, yes.

15:47:18 22 So it must be Dr. Morris' office.  Is there

15:47:20 23 something else attached to that?  Let me

60

15:47:23 1 see.

15:47:33 2     Q.  And at the top of this document

15:47:34 3 it says Southeast Cancer Network, PC.  Is

15:47:38 4 that where you were seeing Dr. Morrison?

15:47:42 5     A.  It must be.  I thought it was

15:47:45 6 the Baptist on Montgomery on the Boulevard.

15:47:47 7     Q.  Well --

15:47:49 8     A.  Maybe that's the name of the

15:47:50 9 business.

15:47:50 10     Q.  The practice could have a name

15:47:52 11 different from the hospital.

15:47:53 12     A.  Sure, probably.

15:47:54 13     Q.  All right.  And, then, let me

15:47:59 14 find --

15:48:08 15     MR. BRYANT:  It's right here.

15:48:08 16     Q.  Just give me that one.  Let me

15:48:09 17 show you another document, and this

15:48:19 18 document has got a date of November 17th,

15:48:22 19 2005 on it.

15:48:25 20     A.  I think these are just lab

15:48:27 21 requests when I started going to the

15:48:29 22 doctor.  This is just lab work, and that's

15:48:32 23 from Dr. Lambert's office, I'm sure.

15  (Pages 57 to 60)

## FREEDOM COURT REPORTING

61

15:48:34 1    Q. All right. And you were already
15:48:36 2  in Dr. Lambert's office for your diabetes
15:48:38 3  treatment anyway?
15:48:39 4    A. Correct. It was during that
15:48:40 5  process or during those visits, one of
15:48:43 6  those visits that he discovered that and he
15:48:45 7  sent me over to Dr. Morrison.
15:48:47 8    Q. All right. And I think you said
15:48:49 9  a minute ago that you thought December 2nd
15:48:51 10  might be the date where Dr. Lambert
15:48:55 11  informed you --
15:48:56 12    A. It could be.
15:48:57 13    Q. Okay. But we do agree that
15:49:01 14  December 7th is when you went to see Dr.
15:49:06 15  Morrison?
15:49:07 16    A. Correct.
15:49:16 17    Q. On that same date, December 7th,
15:49:17 18  didn't you also inform John Tampa about
15:49:20 19  your condition?
15:49:21 20    A. I did.
15:49:22 21    Q. Okay. Let me show you what I'm
15:49:30 22  going to mark as Defendant's Exhibit 1,
15:49:43 23  which is -- it purports to be an affidavit

62

15:49:46 1  by you. Have you seen this document
15:49:48 2  before?
15:49:57 3    A. Okay. Yes, I have.
15:49:57 4
15:49:57 5    (Whereupon, Defendant's Exhibit 1 was
15:49:57 6    marked for identification and same
15:49:57 7    is attached hereto.)
15:50:46 8
15:50:46 9    Q. And is this -- well, did you
15:50:49 10  draft this document?
15:51:18 11    A. I sent memos regarding this
15:51:21 12  document. I didn't personally draft this
15:51:23 13  document, but I drafted some things in this
15:51:25 14  document.
15:51:25 15    Q. That's all right.
15:51:26 16    A. Okay.
15:51:26 17    Q. Whether you drafted it or not,
15:51:28 18  first let's go back to the last page. Is
15:51:30 19  that your signature on the last page?
15:51:32 20    A. It is.
15:51:32 21    Q. Before you signed it, did you
15:51:34 22  read the whole document?
15:51:35 23    A. I did.

63

15:51:36 1    Q. And in signing it, were you
15:51:40 2  confirming that it was truthful?
15:51:43 3    A. Yes, sir.
15:51:55 4    Q. On the first page, paragraph
15:51:55 5  three, the first sentence starts: "In
15:51:56 6  early December 2005, I was tentatively
15:51:59 7  diagnosed with leukemia." What do you mean
15:52:05 8  by tentatively diagnosed?
15:52:05 9    A. Because when I say early
15:52:07 10  December, when Dr. Lambert said that there
15:52:10 11  was some irregularities with my blood, he
15:52:12 12  thought this was what it was, but he wanted
15:52:15 13  to send me to a specialist to confirm.
15:52:17 14    Q. Okay. And the specialist was
15:52:19 15  Dr. Morrison?
15:52:20 16    A. Correct.
15:52:23 17    Q. And you saw him on December 7th?
15:52:25 18    A. Yes, sir.
15:52:28 19    Q. And that's when you did some
15:52:30 20  testing and he said -- he didn't confirm,
15:52:34 21  necessarily, the conclusion of Dr. Lambert,
15:52:36 22  but he was going to send the tests out to
15:52:39 23  wait for the results?

64

15:52:40 1    A. He looked at Dr. Lambert's, I
15:52:44 2  guess, lab work that he sent over with me,
15:52:48 3  but then he wanted to draw his own
15:52:52 4  conclusion, so he drew some of my blood to
15:52:55 5  his lab, I guess, or maybe he ordered
15:53:01 6  something different. But nevertheless, at
15:53:01 7  which point he said that we would revisit
15:53:02 8  again on the 22nd to -- that's when the lab
15:53:07 9  results would come back.
15:53:07 10    Q. Okay. The next paragraph number
15:53:11 11  four, why don't you just read that for me
15:53:13 12  so I don't --
15:53:13 13    A. "On December 7, 2005, I informed
15:53:15 14  John Tampa of my tentative diagnosis and
15:53:18 15  told him about the necessity of additional
15:53:21 16  tests. I further stated that if I was in a
15:53:27 17  late stage of the disease, I would possibly
15:53:31 18  want to return to Texas for treatment. I
15:53:34 19  was very clear that no action would be
15:53:35 20  taken prior to the additional tests."
15:53:37 21    Q. Okay. Did you tell John Tampa
15:53:42 22  that in person or on the phone?
15:53:43 23    A. By phone, from the parking lot,

16 (Pages 61 to 64)

# FREEDOM COURT REPORTING

65

15:53:46 1 after I got out of the doctor's office.

15:53:48 2    Q.   Okay.  So you called him on your

15:53:50 3 cell phone?

15:53:51 4    A.   I did.

15:54:00 5    Q.   Did you tell him anything else

15:54:00 6 about the nature of your condition?

15:54:03 7    A.   I told him that the doctor had

15:54:07 8 viewed the doctor's results and that he

15:54:11 9 wanted to run his own conclusion of the

15:54:13 10 results, so he ran some further tests.  In

15:54:16 11 addition to that, I also stated to him that

15:54:19 12 Dr. Morrison had stated to me that based on

15:54:23 13 the conclusion of his results and if it was

15:54:30 14 true about the leukemia, then further

15:54:32 15 testing would be needed to find out what

15:54:34 16 stage the leukemia would be at, at which

15:54:37 17 point they would want to do a bone marrow

15:54:40 18 biopsy.  That was my conversation with him.

15:54:42 19    Q.   Was this all the same

15:54:44 20 conversation or was that a different

15:54:45 21 conversation?

15:54:45 22    A.   Same conversation.

15:54:46 23    Q.   Other than that conversation,

66

15:54:47 1 did you have any other conversation with

15:54:48 2 Mr. Tampa about the nature of your

15:54:51 3 condition?

15:54:53 4    A.   I don't understand the question.

15:54:54 5 I just thought I answered it.

15:54:56 6    Q.   No.  You answered it in terms of

15:54:58 7 what you told him during that conversation.

15:55:00 8    A.   Okay.

15:55:01 9    Q.   I'm asking did you have any

15:55:02 10 other conversation like that?  Was there

15:55:05 11 another time when you spoke to him about

15:55:07 12 that?

15:55:08 13    A.   No, not that I can recall.  I

15:55:15 14 told him I would keep him posted.

15:55:17 15    Q.   And that's really what I'm

15:55:18 16 getting at.  Was there any posting?  Was

15:55:20 17 there any follow-up?  Did you tell him

15:55:22 18 anything else?

15:55:22 19    A.   There was nothing to report

15:55:23 20 until the 22nd until the results came back.

15:55:31 21    Q.   So is it fair to say that you

15:55:33 22 did not tell him anything about how your

15:55:36 23 condition might affect your ability to

67

15:55:37 1 work?

15:55:38 2    A.   Oh, absolutely not.  In fact, if

15:55:54 3 I may say, after we finished our

15:55:55 4 conversation -- I want to say this because

15:55:57 5 this is what transpired, you know -- he

15:56:01 6 suggested to me that, you know, he said,

15:56:04 7 this is his own words, you can beat this,

15:56:06 8 man.  And he said, I want to help you.  I

15:56:15 9 want to assist you with that.  And he said

15:56:15 10 he was going to assist me by assisting me

15:56:15 11 with two thousand dollars up front to help

15:56:15 12 me with the medical expenses.  That never

15:56:19 13 happened, and that was the last kind of

15:56:21 14 positive conversation I had with him.

15:56:31 15    Q.   In paragraph five of this

15:56:35 16 affidavit you say you never spoke to

15:56:37 17 Beverly Woods about your condition.  Is

15:56:39 18 that a true statement?

15:56:47 19    A.   Yes, it is.

15:57:07 20    Q.   And that you never spoke to her

15:57:07 21 about returning to Texas?

15:57:07 22    A.   Never.

15:57:07 23    Q.   Paragraph six, you say you never

68

15:57:07 1 discussed returning to Texas with Mr.

15:57:09 2 Banks, Timothy Banks.  Is that a true

15:57:15 3 statement?

15:57:15 4    A.   The statement is as it reads.  I

15:57:18 5 told Mr. Banks that I was diagnosed with

15:57:20 6 leukemia, but I never told him I was going

15:57:23 7 to Texas for treatment.  No one knew what

15:57:25 8 the final diagnosis was.

15:57:29 9    Q.   Had you planned to go back to

15:57:31 10 Texas if the diagnosis was that you would

15:57:34 11 need substantial treatment?

15:57:37 12    A.   I was considering that, yes.

15:57:38 13    Q.   And did you discuss the fact

15:57:40 14 that you were considering that with anybody

15:57:41 15 at the hotel?

15:57:42 16    A.   No.  Other than Mr. Tampa, no.

15:57:45 17    Q.   And in terms of your discussion

15:57:47 18 with Mr. Tampa, is it any different than

15:57:49 19 what you just told me a minute ago?

15:57:53 20    A.   Help me understand the question.

15:57:55 21 I don't understand.

15:57:59 22    Q.   Well, did you tell Mr. Tampa

15:58:01 23 that you might be returning to Texas?

17  (Pages 65 to 68)

# FREEDOM COURT REPORTING

69

```
15:58:03  1      A.  Based on the severity of the
15:58:05  2   diagnostic, yes.
15:58:09  3      Q.  And why was it that you would
15:58:11  4   want to return to Texas?
15:58:13  5      A.  Simply because my brothers and
15:58:16  6   sisters are all in Texas, and San Antonio
15:58:19  7   and Houston or San Antonio have very good
15:58:23  8   cancer facilities.  Not that Montgomery
15:58:25  9   didn't.  I just didn't know, but I did know
15:58:28  10  about the Houston and San Antonio area.
15:58:30  11     Q.  Was there any thought that you
15:58:32  12  might be able to obtain free or reduced
15:58:35  13  health -- I mean reduced cost health care
15:58:38  14  in Texas that you couldn't get in Alabama?
15:58:40  15     A.  That never crossed my mind.  In
15:58:43  16  fact, you can probably get reduced
15:58:44  17  assistance in any city or any metropolitan
15:58:47  18  city.  That's just a fact.
15:58:59  19     Q.  Did you discuss with Ms. Luker
15:58:59  20  the concept of moving back to Texas?
15:59:00  21     A.  No.
15:59:02  22     Q.  Y'all never had a -- let me
15:59:05  23  start again.  Ms. Luker came with you from
```

70

```
15:59:08  1   Texas to Montgomery?
15:59:10  2      A.  Correct.
15:59:11  3      Q.  As your girlfriend and to be an
15:59:13  4   employee?
15:59:14  5      A.  Correct.
15:59:16  6      Q.  And you were considering that if
15:59:20  7   the diagnosis was such that you needed
15:59:25  8   treatment, going back to Texas; is that
15:59:28  9   correct?
15:59:28  10     A.  If it was severe enough, I would
15:59:30  11  consider it, yes.
15:59:31  12     Q.  But you didn't discuss that with
15:59:33  13  her?
15:59:34  14     A.  No.
16:00:01  15     Q.  And when you did leave, she did
16:00:01  16  go with you?
16:00:01  17     A.  Yes.
16:00:01  18     Q.  Did she go with you to some of
16:00:01  19  your doctor's appointments in Montgomery?
16:00:01  20     A.  She did.
16:00:01  21     Q.  Would she go with you to one of
16:00:03  22  the appointments where you were -- was she
16:00:05  23  with you when you went to see Mr. Lambert
```

71

```
16:00:07  1   and he informed you -- Dr. Lambert and he
16:00:10  2   informed that you may have leukemia?
16:00:12  3      A.  No, she did not.
16:00:13  4      Q.  Did she go with you when you
16:00:15  5   went to see Dr. Morrison the first time?
16:00:17  6      A.  Yes, she did.
16:00:19  7      Q.  You were here during Ms. Woods'
16:00:30  8   deposition today?
16:00:31  9      A.  I was.
16:00:31  10     Q.  Do you remember Ms. Woods
16:00:33  11  testifying that Ms. Luker talked to her
16:00:38  12  about one of your visits to the doctor?
16:00:41  13     A.  I recall that, yes.
16:00:46  14     Q.  And Ms. Woods testified that Ms.
16:00:48  15  Luker told her that y'all would be going
16:00:51  16  back to Texas.  Did you hear that?
16:00:52  17     A.  I heard her say that, yes.
16:00:54  18     Q.  Do you have any reason to
16:00:57  19  believe that was not truthful testimony?
16:00:59  20     A.  That was not a truthful
16:01:02  21  testimony.
16:01:02  22     Q.  And why do you say that?
16:01:04  23     A.  Because I would never discuss
```

72

```
16:01:05  1   that with Roxanna about going back to San
16:01:08  2   Antonio.
16:01:08  3      Q.  You would have never discussed
16:01:09  4   with your girlfriend, who came with you
16:01:11  5   from San Antonio, that you might be going
16:01:13  6   back to San Antonio?
16:01:14  7      A.  I would at some point, but I
16:01:16  8   didn't at that time.
16:01:16  9      Q.  When were you going to tell her?
16:01:18  10     A.  The decision wasn't made.  I
16:01:20  11  didn't have a diagnosis back.  Don't tell
16:01:24  12  the girlfriend everything.
16:01:29  13     Q.  You say in your statement that
16:01:55  14  you told Timothy Banks about your tentative
16:01:57  15  diagnosis of leukemia.  In telling him that
16:02:04  16  -- strike that.  Tell me, what did you tell
16:02:06  17  Timothy Banks?
16:02:09  18     A.  What day, what -- regarding the
16:02:13  19  illness?
16:02:14  20     Q.  Yeah.
16:02:14  21     A.  That I had tentatively been
16:02:17  22  diagnosed with leukemia, and I was awaiting
16:02:21  23  on further tests.  I mean, the entire
```

18  (Pages 69 to 72)

## 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

73

16:02:23  1   property knew that I was diagnosed with it
16:02:25  2   after I made mention to them, all my
16:02:28  3   department managers. Not at a group or a
16:02:31  4   department head meeting, but as I went
16:02:33  5   around, you know, I'm ill. I'm waiting on
16:02:36  6   further testing. There's going to be
16:02:37  7   further testing done to see what stage I'm
16:02:39  8   at. That's basically it.
16:02:41  9       Q.  If you didn't tell your
16:02:42 10   girlfriend -- well, strike that. Why did
16:02:44 11   you want to tell everybody at the property
16:02:46 12   that?
16:02:48 13       A.  No particular reason.
16:02:51 14       Q.  It wasn't because you were
16:02:52 15   planning on leaving and going back to
16:02:53 16   Texas?
16:02:54 17       A.  Absolutely not. I had no
16:02:56 18   intentions of going back to Texas until I
16:02:57 19   found out what the diagnosis was. And even
16:03:00 20   then, maybe the choice would have been
16:03:03 21   different.
16:03:16 22       Q.  Did you hear the testimony
16:03:16 23   earlier today about a conference call where

74

16:03:17  1   the managers were in the office and Mr.
16:03:19  2   Tampa was on the phone? Do you remember
16:03:21  3   that?
16:03:21  4       A.  I do, yes, sir.
16:03:32  5       Q.  And do you remember that event
16:03:32  6   happening?
16:03:32  7       A.  I do.
16:03:32  8       Q.  Is it correct that Mr. Tampa
16:03:32  9   informed everybody during that call that
16:03:34 10   you were going to be going back to Texas?
16:03:38 11       A.  Yes.
16:03:55 12       Q.  When did that call take place?
16:03:59 13       A.  I don't recall. I don't recall
16:04:02 14   when the call took place, but I know it
16:04:06 15   took place.
16:04:10 16       Q.  Do you claim in this case -- I
16:04:21 17   think that you do, that you were terminated
16:04:23 18   from Quality Inn & Suites?
16:04:25 19       A.  Do I claim that I was terminated
16:04:27 20   from my position?
16:04:28 21       Q.  Uh-huh (positive response).
16:04:30 22       A.  I do.
16:04:31 23       Q.  Who told you you were

75

16:04:33  1   terminated?
16:04:35  2       A.  It was in that document that was
16:04:37  3   sent to me saying that I was being replaced
16:04:44  4   by another candidate and the document that
16:04:48  5   Mr. Tampa sent to me.
16:04:51  6       MR. BRYANT:  Number 4.
16:05:01  7       MR. SMITH:  They got out of
16:05:01  8   order. There it is.
16:05:01  9       Q.  Let me show you Plaintiff's
16:05:01 10   Exhibit 4, a document that was marked
16:05:02 11   earlier today. Is that the document that
16:05:04 12   you're referring to?
16:05:05 13       A.  That is the document I'm
16:05:06 14   referring -- you are referring to.
16:05:07 15       Q.  Where in that document does it
16:05:11 16   say you're being terminated?
16:05:13 17       A.  It doesn't say.
16:05:16 18       Q.  Other than this document, is
16:05:31 19   there any other document which you rely on
16:05:32 20   to say that you were terminated?
16:05:36 21       A.  There's no other document that
16:05:38 22   I'm aware of or have seen.
16:05:40 23       Q.  Did Mr. Tampa ever tell you you

76

16:05:43  1   were being terminated?
16:05:44  2       A.  He did not.
16:05:46  3       Q.  Or fired?
16:05:47  4       A.  No, sir.
16:05:48  5       Q.  Or words to that effect?
16:05:50  6       A.  No, sir.
16:05:54  7       Q.  I'm sorry. You may have just
16:06:03  8   said this, but how did you receive this?
16:06:07  9       A.  I was called by Brenda Gwin,
16:06:11 10   asked me to go downstairs and wait by the
16:06:14 11   fax machine, that there was an important
16:06:17 12   document coming to me. This is the
16:06:19 13   document that she was referring to.
16:06:20 14       Q.  It came by fax?
16:06:21 15       A.  Yes, sir.
16:06:22 16       Q.  Was it on December 12th, as it
16:06:26 17   says on the document?
16:06:27 18       A.  I don't recall. It could have
16:06:29 19   been the 13th. It could have been the
16:06:30 20   14th, but I received the document.
16:06:33 21       Q.  The meeting we talked about a
16:06:49 22   second ago with Mr. Tampa on the intercom?
16:06:52 23       A.  Uh-huh (positive response).

19 (Pages 73 to 76)

# FREEDOM COURT REPORTING

77

16:06:53 1    Q. Did that happen before or after
16:06:55 2  you got that fax?
16:06:57 3    A. I don't recall when it happened.
16:07:00 4    Q. At that meeting where Mr. Tampa
16:07:25 5  was on the phone or after that meeting, did
16:07:31 6  you tell Timothy Banks, no, I'm not leaving
16:07:37 7  to go back to Texas?
16:07:39 8    A. I stated to him that I didn't
16:07:42 9  resign, and I didn't quit.
16:07:45 10    Q. When did you tell him that?
16:07:46 11    A. I told him as he was heading
16:07:48 12  back towards the Super 8 that was under
16:07:50 13  renovation. I told him this was wrong, and
16:07:58 14  that I felt he had done it simply because
16:08:00 15  of my illness and I didn't do anything
16:08:02 16  wrong. And Mr. Tampa had already made the
16:08:05 17  decision to replace me. I mean, it doesn't
16:08:07 18  say in this document I'm being terminated,
16:08:16 19  but he's saying that he's already got
16:08:16 20  somebody to make my place. How do you
16:08:16 21  interpret that? I interpret it as being
16:08:16 22  terminated. I tried to call him several
16:08:17 23  times and he never answered his cell phone.

78

16:08:20 1    I approached him in the parking
16:08:21 2  lot. When he said earlier in his testimony
16:08:23 3  about him being on the property, he never
16:08:26 4  came to my office. I approached him. I
16:08:29 5  found him in the parking lot and approached
16:08:31 6  him. And I said: Why haven't you answered
16:08:33 7  my phone calls? I sent you a memo
16:08:36 8  regarding the memo you sent me that I'm
16:08:37 9  being replaced. He said: Well, you told
16:08:40 10  me you were leaving. I said: I never told
16:08:42 11  you I was leaving.
16:08:43 12    He had every opportunity at that
16:08:44 13  time to say it was miscommunicated, I'm
16:08:46 14  sorry, whatever, make it right, but he
16:08:48 15  didn't. And I said: John, you know, I
16:08:52 16  think you're in violation of the American
16:08:53 17  Disability Act. And he raised his hand,
16:08:56 18  walked away, got in his car, and drove
16:08:59 19  away.
16:08:59 20    Q. So your testimony is you told
16:09:01 21  him in the parking lot that I think you're
16:09:03 22  in violation of the Americans with
16:09:05 23  Disabilities Act?

79

16:09:06 1    A. I did.
16:09:09 2    Q. Had you talked to a lawyer at
16:09:11 3  that point?
16:09:11 4    A. Absolutely not.
16:09:12 5    Q. You said in your conversation
16:09:18 6  with him, you mentioned that you had sent
16:09:20 7  him a memo. Let's look at Exhibit 5. Is
16:09:30 8  that the memo you're referring to?
16:09:35 9    A. Well, I sent him a lot of memos,
16:09:37 10  but I don't know what you're referring to.
16:09:38 11  But I did send this memo, yes.
16:09:40 12    Q. Okay. How did you -- I don't
16:09:43 13  want to know about other memos right now.
16:09:45 14  I just want to talk about that one, Exhibit
16:09:47 15  5.
16:09:47 16    A. I faxed it.
16:09:49 17    Q. All right. It's got a date on
16:09:51 18  it of December 14th.
16:09:52 19    A. Okay.
16:09:53 20    Q. What day did you fax it?
16:09:54 21    A. I have no idea, but I faxed it.
16:09:57 22  It was either on that day or the day after,
16:09:59 23  but I faxed it.

80

16:10:00 1    Q. And who did you fax it to?
16:10:02 2    A. I faxed it to Dalton. That's
16:10:04 3  where I sent all my faxes to. I sent no
16:10:06 4  faxes to no other number except the
16:10:10 5  corporate office in Dalton, Georgia.
16:10:10 6    Q. And do you have an understanding
16:10:13 7  as to who receives those faxes?
16:10:18 8    A. There was only one person that
16:10:20 9  works in that office, and that's Brenda.
16:10:22 10    Q. All right. So on December 14th
16:10:24 11  or the day after, you sent that to Dalton
16:10:27 12  where Brenda is?
16:10:28 13    A. Uh-huh (positive response).
16:10:29 14    Q. I'm sorry. Is that a yes? You
16:10:31 15  said uh-huh. Was that a yes?
16:10:33 16    A. I'm sorry. Ask the question
16:10:35 17  again.
16:10:35 18    MR. SMITH: What did I ask? I'm
16:10:35 19  sorry.
16:10:35 20
16:10:35 21    (Whereupon, record read.)
16:10:49 22
16:10:49 23    A. That's correct.

20 (Pages 77 to 80)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

81

16:10:49 1    Q.  Let me show you a document that
16:12:03 2  was marked earlier as Plaintiff's Exhibit
16:12:05 3  2.  Take a second and look at that and tell
16:12:09 4  me if you recognize that document.
16:12:12 5    A.  Yes, I do.
16:12:17 6    Q.  Is that a memo from John Tampa
16:12:21 7  to you, dated December 6th, 2005?
16:12:25 8    A.  It is.
16:12:29 9    Q.  Do you recall receiving this?
16:12:32 10    A.  I do.
16:12:34 11    Q.  Do you recall whether you
16:12:35 12  received it on December 6th?
16:12:37 13    A.  I don't recall.
16:12:40 14    Q.  Prior to -- strike that.  Well,
16:13:06 15  let's go back to Defendant's Exhibit 1,
16:13:09 16  your affidavit.  In paragraph four you say
16:13:16 17  that on December 7, 2005, you informed John
16:13:19 18  Tampa of your tentative diagnosis.
16:13:21 19    A.  Uh-huh (positive response).
16:13:22 20    Q.  And I think you've confirmed
16:13:23 21  that that's the date you told him; is that
16:13:25 22  right?
16:13:25 23    A.  Uh-huh (positive response).

82

16:13:26 1    Q.  Say that out loud.
16:13:28 2    A.  Yes, sir, I'm sorry.
16:13:29 3    Q.  If this memo was sent as dated,
16:13:37 4  on December 6th, 2005, that would have been
16:13:40 5  before you told John Tampa about your
16:13:43 6  diagnosis of leukemia, correct?
16:13:44 7    A.  That's correct.
16:13:54 8    Q.  Had you been out of work some
16:13:54 9  prior to this because of your treatment for
16:13:55 10  diabetes?
16:13:59 11    A.  While employed with --
16:14:02 12    Q.  Yes.
16:14:03 13    A.  No, I never missed work.
16:14:05 14    Q.  You never missed any work for
16:14:06 15  the treatment for your diabetes?
16:14:08 16    A.  No.
16:14:09 17    Q.  When did you get your treatment?
16:14:12 18    A.  Go to the doctor's office during
16:14:14 19  lunch and come back.
16:14:16 20    Q.  You always went during lunch?
16:14:18 21    A.  During lunch, after hours.
16:14:21 22    Q.  Did your diagnosis and treatment
16:14:25 23  for diabetes cause you to miss any time

83

16:14:28 1  from work?
16:14:29 2    A.  No.
16:14:39 3    Q.  Did Mr. Tampa know about that;
16:14:39 4  that is, that you had been --
16:14:39 5    A.  Diabetes?
16:14:40 6    Q.  Yeah.
16:14:41 7    A.  Sure.  I don't know if he's
16:14:43 8  referring to this, the leukemia or the
16:14:47 9  diabetes, but -- you know.
16:14:48 10    Q.  Is it fair to say where it says,
16:14:52 11  "I understand you were sick," he could have
16:14:53 12  been referring to the diabetes?
16:14:55 13    MR. BRYANT:  Object to the form.
16:14:57 14    A.  I don't know.
16:15:00 15    Q.  Back to Plaintiff's Exhibit 5,
16:15:26 16  the memo.  On December 14th, you say you
16:15:29 17  faxed that.  Where would you have faxed
16:15:31 18  that from?
16:15:32 19    A.  From the executive office on the
16:15:34 20  first level, which would be the sales
16:15:35 21  office.
16:15:39 22    Q.  Do you have a copy of that
16:15:41 23  somewhere that's got the fax --

84

16:15:43 1    A.  I do not.
16:15:45 2    Q.  -- stuff at the top?
16:15:46 3    A.  I looked for it, but I did not.
16:15:58 4    Q.  There were a few other memos
16:15:59 5  marked this morning.  There was -- let me
16:16:03 6  show you Exhibit 6 and Exhibit 7 and
16:16:18 7  Exhibit 8.
16:16:20 8    A.  Okay.
16:16:21 9    Q.  Before you look through them
16:16:22 10  closely -- you can look through them as
16:16:24 11  closely as you want.  But my basic question
16:16:26 12  is:  Do you have any other memos, other
16:16:29 13  than the ones that we're looking at here,
16:16:31 14  related to your employment at Quality Inn &
16:16:36 15  Suites?
16:16:36 16    A.  In my possession?
16:16:37 17    Q.  Yeah.
16:16:39 18    A.  I may or may not have.  I don't
16:16:48 19  know.  I found some documents late, as I
16:16:48 20  was trying to get prepared for the
16:16:48 21  deposition, as I was going through other
16:16:49 22  folders and discovered these and forwarded
16:16:52 23  them to my attorney.  But I think I've

## 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

85

16:16:55  1  exhausted all that.
16:16:56  2     Q.  Okay.  But you've done a
16:17:00  3  thorough search of whatever you have?
16:17:02  4     A.  Yes, sir.
16:17:02  5     Q.  And you've produced whatever you
16:17:04  6  have to your attorney?
16:17:05  7     A.  I have.
16:17:15  8     Q.  And earlier today, during your
16:17:15  9  deposition, we made copies of some medical
16:17:16  10 records you had in your bag, correct?
16:17:18  11    A.  Correct.
16:17:18  12    Q.  Do you have any other medical
16:17:21  13 records related to any treatment you would
16:17:24  14 have been receiving at the end of 2005 into
16:17:28  15 2006?
16:17:30  16    A.  No.  I requested these from both
16:17:34  17 doctors and to have available for both
16:17:40  18 sides.  I've not -- and I think I mentioned
16:17:44  19 earlier, I think up until March or April, I
16:17:46  20 don't know what's the last one that's dated
16:17:49  21 there.
16:17:50  22    Q.  Do you have any documents that
16:17:52  23 you think are related in any way to your

86

16:17:54  1  case that you haven't produced to your
16:17:56  2  lawyer?
16:17:56  3     A.  No, sir.
16:18:08  4     Q.  You continued as the general
16:18:44  5  manager at the Quality Inn through December
16:18:49  6  20th?
16:18:50  7     A.  Correct.
16:18:53  8     Q.  And, then, on the 21st, you
16:18:57  9  vacated the apartment?
16:18:59  10    A.  Correct.
16:19:09  11    Q.  Where did you go?
16:19:09  12    A.  Down the road.
16:19:12  13    Q.  What do you mean by down the
16:19:14  14 road?
16:19:14  15    A.  Down the road.
16:19:16  16    Q.  Going where?
16:19:17  17    A.  I went to Dr. Morrison's office,
16:19:24  18 which is down the road, and to get my
16:19:29  19 results from the testing that we talked
16:19:31  20 about earlier, at which time he confirmed
16:19:33  21 that, yes, we definitely have leukemia.
16:19:37  22 Now we have to go further.  I want to
16:19:39  23 schedule you for a bone marrow biopsy.  I

87

16:19:43  1  said:  Doctor, I've been released from my
16:19:45  2  position.  I've got my U-haul packed.  I'm
16:19:49  3  on my way back to San Antonio.  I'll try to
16:19:52  4  make arrangements to get that taken care of
16:19:54  5  when I'm in San Antonio, which I did.
16:19:55  6     Q.  Did he refer you to a physician
16:19:57  7  in San Antonio?
16:19:57  8     A.  He did.  And, unfortunately, I
16:20:00  9  couldn't see him, because I have no
16:20:01  10 coverage, so I had to go through hoops to
16:20:04  11 get some assistance until -- it took me
16:20:07  12 about almost the better part of two months
16:20:11  13 to try to get assistance to get checked
16:20:14  14 out.  I can't tell you how much stress I
16:20:16  15 was under, because I didn't know what stage
16:20:18  16 I was at.  I could have been at the worst
16:20:20  17 stage possible.  I didn't know.  Until I
16:20:23  18 could get assistance, I would never know.
16:20:24  19 And, finally, we went through that process
16:20:27  20 and got some assistance and went through
16:20:30  21 the process.
16:20:31  22    Q.  And what was the diagnosis once
16:20:35  23 you got a diagnosis?

88

16:20:36  1     A.  Once the bone marrow biopsy was
16:20:39  2  done, it came back that -- it confirmed
16:20:42  3  again that I do have a disease, but in
16:20:44  4  remission.  And there's a document
16:20:53  5  somewhere in here that says that, you know,
16:20:53  6  I was never not able -- I was never not
16:20:53  7  able to perform my duties, you know, based
16:20:55  8  on that evaluation.
16:20:57  9     Q.  And the leukemia has remained in
16:21:01  10 remission until today?
16:21:02  11    A.  And I hope it continues to
16:21:04  12 remain in remission forever.
16:21:05  13    Q.  Sure.  Where did you move to in
16:21:21  14 San Antonio?
16:21:22  15    A.  I moved to an eighteen wheeler
16:21:27  16 truck yard, which a personal friend of mine
16:21:29  17 owns, and lived in a travel trailer that I
16:21:31  18 borrowed from a friend for ninety days.
16:21:35  19    Q.  Did Roxanna live there with you?
16:21:38  20    A.  Yes, sir, along with four dogs.
16:21:41  21    Q.  Had those dogs been with you in
16:21:43  22 Montgomery?
16:21:44  23    A.  They were in Mississippi.

22 (Pages 85 to 88)

# FREEDOM COURT REPORTING

89

16:21:48 1    Q.  While you were working in
16:21:49 2  Montgomery they were kenneled in
16:21:51 3  Mississippi?
16:21:51 4    A.  Roxanna's mother and her parents
16:21:54 5  lived in Mississippi.  Her farm.
16:22:04 6    Q.  Y'all picked them up on the way
16:22:04 7  back to San Antonio?
16:22:05 8    A.  Yes, sir.
16:22:31 9    Q.  After you left on the 21st or
16:22:31 10  22nd, did you have any additional
16:22:34 11  communication with John Tampa?
16:22:36 12    A.  No, sir.
16:22:38 13    Q.  Did you have any additional
16:22:39 14  communication with anybody at the Quality
16:22:42 15  Inn?
16:22:42 16    A.  No, sir.
16:22:43 17    Q.  Did you have any additional
16:22:44 18  communication with Brenda Gwin?
16:22:47 19    A.  No, sir.
16:22:59 20    Q.  Fair to say, you don't want to
16:23:07 21  go back and work for the Quality Inn?
16:23:09 22    A.  That's not fair to say.
16:23:10 23    Q.  You do want to go back to work

90

16:23:12 1  for the Quality Inn?
16:23:13 2    A.  That's not fair to say.  I don't
16:23:16 3  know.  You're probably right.
16:23:18 4    Q.  I mean, seriously.  Do you have
16:23:20 5  any desire to go back and work for the
16:23:21 6  Quality Inn?
16:23:22 7    A.  No, absolutely not.
16:23:34 8    Q.  If John Tampa offered you a job
16:23:34 9  tomorrow to go work at the Quality Inn?
16:23:35 10    A.  I wouldn't accept the position.
16:23:45 11    Q.  After the conclusion of your
16:23:50 12  employment, do you recall making a claim
16:23:52 13  for or a claim with the Texas Work Force
16:23:57 14  Commission for wages?
16:23:59 15    A.  Wages owed?
16:24:01 16    Q.  Yeah.  Wages owed by IT
16:24:05 17  Montgomery or Quality Inn Suites?
16:24:07 18    A.  I may have filed a claim against
16:24:10 19  the company for stop payment on a check.
16:24:23 20    Q.  Did you get any explanation
16:24:23 21  through that proceeding as to why the stop
16:24:25 22  payment had happened?
16:24:26 23    A.  That thing never went anywhere,

91

16:24:30 1  because I filed it in Texas and it needed
16:24:33 2  to be filed in Alabama, and I never filed
16:24:35 3  it in Alabama.
16:24:36 4    Q.  The Texas Commission concluded
16:24:38 5  that they didn't have jurisdiction over
16:24:40 6  your claim?
16:24:40 7    A.  That's correct.
16:24:43 8    Q.  But what you were making the
16:24:45 9  claim over was the stop payment on your
16:24:48 10  last check?
16:24:48 11    A.  Yes, and a bonus that was owed
16:24:51 12  that was never paid.
16:24:52 13    Q.  What bonus was owed?
16:24:53 14    A.  It was based on our contractual
16:24:56 15  agreement on exceeding revenues.
16:25:00 16    Q.  Your claim was that you did
16:25:11 17  exceed revenues in some period and were
16:25:11 18  entitled to a bonus?
16:25:11 19    A.  Correct.
16:25:11 20    Q.  Had you addressed that issue
16:25:11 21  with Mr. Tampa?
16:25:11 22    A.  I did.
16:25:12 23    Q.  And what was his response?

92

16:25:14 1    A.  He didn't respond to anything.
16:25:16 2  I responded.  There's a memo here we
16:25:18 3  created to that.  It says final check and
16:25:22 4  bonus owed.  They sent the check, but he
16:25:27 5  didn't send the bonus.  So he acknowledged
16:25:29 6  that he got the memo.  He sent the check.
16:25:31 7    Q.  Plaintiff's Exhibit 8, is that
16:25:33 8  what you're referring to?
16:25:42 9    A.  That's correct.
16:25:51 10    Q.  And you referenced the
16:25:54 11  October -- the bonus from October in this
16:25:57 12  memo?
16:25:57 13    A.  Correct.
16:25:58 14    Q.  And this memo is sent in
16:25:59 15  December.  Had you talked to Mr. Tampa
16:26:01 16  about the bonus before sending the memo?
16:26:03 17    A.  Oh, absolutely.
16:26:04 18    Q.  Had he given you any indication
16:26:07 19  as to whether you would get it or wouldn't
16:26:20 20  get it?
16:26:08 21    A.  He did not.
16:26:29 22    Q.  At any time did anyone express
16:26:30 23  to you concern that you may have kept a

## 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

93

16:26:32  1   five hundred dollar cash deposit that you
16:26:34  2   shouldn't have kept?
16:26:35  3       A.  Absolutely not.
16:26:45  4       Q.  Did the hotel sometimes get cash
16:26:46  5   deposits for various events?
16:26:51  6       A.  I'm sure they did.
16:26:54  7       Q.  Would you have been a person who
16:26:58  8   would have gotten one of those?
16:27:00  9       A.  Absolutely not.
16:27:01  10      Q.  Who would have been the person
16:27:02  11  to get those?
16:27:03  12      A.  The proper procedure for any
16:27:04  13  event, number one, is first of all, not try
16:27:07  14  to accept cash.  But if it is accepted,
16:27:10  15  then we immediately walk that cash deposit
16:27:12  16  to the front office where it's posted as a
16:27:15  17  deposit and dropped into the safe during
16:27:17  18  that shift.
16:27:41  19      Q.  Let me ask you about -- you
16:27:45  20  applied for unemployment benefits for the
16:27:48  21  State of Alabama?
16:27:49  22      A.  That is correct.
16:27:50  23      Q.  And you did that from Texas?

94

16:27:53  1   Does that sound right?  You didn't do it
16:27:55  2   while you were still in Alabama?
16:27:57  3       A.  Correct.
16:28:01  4       Q.  Did you ever have any
16:28:04  5   administrative hearing on your request for
16:28:06  6   unemployment benefits or did you just
16:28:08  7   receive them?
16:28:12  8       A.  There was no administrative
16:28:14  9   hearing.
16:28:14  10      Q.  You applied?
16:28:15  11      A.  They applied.  They sent me --
16:28:20  12  they applied and never denied, but then
16:28:22  13  they just sent a letter requesting
16:28:25  14  additional information, which I provided,
16:28:27  15  and that was the end of it.  Then I started
16:28:29  16  receiving benefits.
16:28:30  17      Q.  Okay.  Is there -- you haven't
16:28:54  18  filed a claim of employment discrimination,
16:28:57  19  correct?
16:28:57  20      A.  Correct.
16:28:58  21      Q.  Is there any employment action
16:29:00  22  you're complaining of other than your
16:29:01  23  termination?  And by that, I mean, are you

95

16:29:04  1   complaining that you were discriminated
16:29:05  2   against with regard to promotion, pay,
16:29:09  3   demotion, discipline, anything other than
16:29:12  4   the termination of your employment?
16:29:14  5       A.  No.
16:29:25  6       Q.  And why do you say you were
16:29:25  7   terminated because of a disability?
16:29:29  8       A.  Well, to me, it's very evident
16:29:40  9   that as soon as I started reporting my
16:29:41  10  illnesses to Mr. Tampa, his conversation
16:29:42  11  with me almost went from calling me five
16:29:46  12  times a day every day to zero, because
16:29:50  13  that's the way he operates.  He'll call you
16:29:53  14  five, six times a day and ask you the same
16:29:56  15  question.
16:29:56  16      So once I reported to him or
16:29:57  17  advised him or suggested to him, as a
16:30:00  18  courtesy, this was going on with my health,
16:30:04  19  and just want you to be aware of these
16:30:07  20  things, our conversation almost went from,
16:30:09  21  like I said, from five phone calls a day to
16:30:12  22  zero.  And so there's no other explanation
16:30:17  23  for me as far as his perception of me not

96

16:30:22  1   being able to comply with, I guess, his
16:30:25  2   needs for me to operate the hotel, and he
16:30:29  3   was totally wrong.
16:30:30  4       You know, I never once quit
16:30:32  5   work.  I never once missed work.  If I took
16:30:36  6   an hour, an hour and a half or two to go to
16:30:40  7   the doctor -- living on property, you're
16:30:41  8   basically on call 24/7.  You know, I'm
16:30:44  9   walking property at midnight or 10:00 at
16:30:47  10  night.  So, I mean, I'm always working.
16:30:49  11  I'm on the job.  So he can't say I ever
16:30:54  12  once, I guess, moved away from my
16:31:00  13  responsibilities.
16:31:00  14      You know, I tried to communicate
16:31:02  15  with him.  He wouldn't answer his phone.
16:31:05  16  So I come to the conclusion that when I
16:31:10  17  told him the -- first I told him about the
16:31:16  18  diabetes and then, after that, it was
16:31:18  19  determined that leukemia was in play.
16:31:20  20  That's when it really, really got silent,
16:31:23  21  and then I start getting these memos and
16:31:25  22  all of a sudden, you know, he's talking
16:31:27  23  about that I mentioned to him that I was

24  (Pages 93 to 96)

# FREEDOM COURT REPORTING

|  | 97 |
|---|---|
| 16:31:28 1 | going back to -- I never mentioned that I |
| 16:31:30 2 | was resigning or quitting. I said I would |
| 16:31:33 3 | like to consider that, and at that point he |
| 16:31:35 4 | said, I'll work with you. But he never |
| 16:31:37 5 | worked with me. |
| 16:31:38 6 | The next thing I know he said, I |
| 16:31:40 7 | found a candidate and they want to start on |
| 16:31:42 8 | the 20th. So I interpret that as being |
| 16:31:45 9 | terminated and for no other reason other |
| 16:31:47 10 | than because of my illness. I don't -- |
| 16:31:49 11 | that's just my position. I don't have any |
| 16:31:52 12 | other position to take. You know, I tried |
| 16:31:54 13 | to discuss it with him intelligently. He |
| 16:31:56 14 | wouldn't have it. He wouldn't sit down and |
| 16:31:58 15 | visit with me. He didn't ask for a |
| 16:32:00 16 | resignation letter. There's no resignation |
| 16:32:02 17 | letter on the table. |
| 16:32:04 18 | Every property that I've been |
| 16:32:05 19 | and resigned my position, I've always given |
| 16:32:07 20 | a thirty-day professional notice as a |
| 16:32:10 21 | general manager. If they elect to accept |
| 16:32:12 22 | my thirty-day resignation letter, fine. If |
| 16:32:18 23 | they don't, they can tell me to go. But at |

|  | 98 |
|---|---|
| 16:32:18 1 | least as a courtesy, I would give them |
| 16:32:19 2 | thirty days in writing. They don't have |
| 16:32:21 3 | that document. I never once resigned from |
| 16:32:24 4 | him. I never told him I was going to quit. |
| 16:32:26 5 | Q. In other circumstances when you |
| 16:32:27 6 | resigned from other jobs, you hadn't just |
| 16:32:29 7 | found out that you might be suffering from |
| 16:32:30 8 | a serious illness; is that true? |
| 16:32:34 9 | A. Like quitting from another job, |
| 16:32:37 10 | no. I resigned because I take other |
| 16:32:39 11 | opportunities and move on to higher |
| 16:32:41 12 | mountains, if you will. |
| 16:33:09 13 | Q. I think we may have already |
| 16:33:09 14 | established this, but, ultimately, you |
| 16:33:12 15 | determined, through your consultation with |
| 16:33:15 16 | your physicians, that you did not have an |
| 16:33:16 17 | impairment that would prevent you from |
| 16:33:18 18 | working? |
| 16:33:18 19 | A. That is correct. |
| 16:33:20 20 | Q. And whatever Mr. Tampa knew |
| 16:33:24 21 | about your condition he learned from you? |
| 16:33:27 22 | A. That is correct. |
| 16:33:29 23 | MR. BRYANT: Objection to the |

|  | 99 |
|---|---|
| 16:33:30 1 | form. Go ahead. |
| 16:33:32 2 | Q. And whatever you told Mr. Tampa |
| 16:33:34 3 | about your condition, you've testified to |
| 16:33:36 4 | today? |
| 16:33:36 5 | A. Yes. |
| 16:33:46 6 | Q. Do you claim that you suffered |
| 16:34:06 7 | emotional distress, mental anguish in |
| 16:34:09 8 | conjunction with your termination from |
| 16:34:11 9 | Quality Inn? |
| 16:34:11 10 | A. Absolutely. |
| 16:34:14 11 | Q. Did that mental anguish, |
| 16:34:17 12 | distress, cause you to suffer any physical |
| 16:34:21 13 | symptoms? |
| 16:34:30 14 | A. To some degree, yes. |
| 16:34:30 15 | Q. What physical symptoms? |
| 16:34:30 16 | A. Like I felt very depressed, very |
| 16:34:35 17 | down, unable to find gainful employment |
| 16:34:39 18 | immediately. The fact where I was living, |
| 16:34:44 19 | having to, I guess, degrade myself down to |
| 16:34:46 20 | that kind of living standards. It was just |
| 16:34:48 21 | very stressful from the beginning, not to |
| 16:34:51 22 | mention the fact that we were asked to |
| 16:34:53 23 | leave or at least I was asked to leave and, |

|  | 100 |
|---|---|
| 16:34:55 1 | you know, five days before Christmas. I |
| 16:35:01 2 | mean, that's -- I mean, how cold can you |
| 16:35:03 3 | get? I mean, and then New Year's being in |
| 16:35:09 4 | place. He knew we didn't have a job to go |
| 16:35:11 5 | to. I had never been looking for a job. I |
| 16:35:14 6 | never once alluded to I was looking for |
| 16:35:16 7 | other work. I didn't have work. Not |
| 16:35:18 8 | having an income, not having a way to pay |
| 16:35:21 9 | for whatever medical treatments I needed in |
| 16:35:25 10 | an immediate basis, however I could pay |
| 16:35:27 11 | them. |
| 16:35:31 12 | Q. And I'm understanding everything |
| 16:35:32 13 | you're saying, but my original question |
| 16:35:36 14 | was: Did you suffer any physical symptoms? |
| 16:35:38 15 | And by that, I might mean -- well, I don't |
| 16:35:41 16 | want to give you examples, but did you |
| 16:35:43 17 | suffer any physical -- you've described to |
| 16:35:45 18 | me what happened. Did you suffer any |
| 16:35:46 19 | physical -- |
| 16:35:47 20 | A. Physical means -- you know, I |
| 16:35:48 21 | don't know whether it's physical, but, you |
| 16:35:50 22 | know, I felt internally always upset, you |
| 16:35:54 23 | know, stomach aches, vomiting, just not |

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

|  | 101 |
|---|---|
| 16:36:00 1 | myself, not -- depressed, not wanting to |
| 16:36:06 2 | talk to anybody. I think those are all |
| 16:36:06 3 | physical things. |
| 16:36:06 4 | Q. During what period of time did |
| 16:36:08 5 | you suffer those things? |
| 16:36:08 6 | A. For six months and I think |
| 16:36:10 7 | you'll find that in my documents. |
| 16:36:12 8 | Q. Could some of that, especially |
| 16:36:14 9 | during the months when you were waiting for |
| 16:36:15 10 | your diagnosis, could that have been caused |
| 16:36:17 11 | by the stress associated with not knowing |
| 16:36:19 12 | the outcome of your diagnosis? |
| 16:36:20 13 | A. I'm sure that it did. |
| 16:36:22 14 | Q. Did you seek any treatment for |
| 16:36:25 15 | the things you've just been describing to |
| 16:36:27 16 | me, medical treatment? |
| 16:36:28 17 | A. I did not. |
| 16:36:29 18 | Q. Or psychological? |
| 16:36:30 19 | A. No, I did not. |
| 16:36:46 20 | Q. Other than the folks who |
| 16:37:00 21 | testified in depositions today, are you |
| 16:37:02 22 | aware of anybody who might have facts |
| 16:37:06 23 | relevant to your case? |

|  | 103 |
|---|---|
| 16:38:06 1 | Q. When is the last time you talked |
| 16:38:07 2 | to him? |
| 16:38:07 3 | A. I talked to him probably two |
| 16:38:11 4 | weeks ago. |
| 16:38:12 5 | Q. What did you talk to him about |
| 16:38:13 6 | two weeks ago? |
| 16:38:14 7 | A. Just his job. He's working with |
| 16:38:16 8 | Hyundai as a supervisor. He's really happy |
| 16:38:21 9 | there, and Kedrick is a real go-getter. |
| 16:38:23 10 | He'll do well there. |
| 16:38:24 11 | Q. Did you talk about your case? |
| 16:38:25 12 | A. I told him that there was a |
| 16:38:27 13 | pending case. |
| 16:38:27 14 | Q. Did you tell him what it was |
| 16:38:29 15 | about? |
| 16:38:29 16 | A. I did tell him that I had filed |
| 16:38:32 17 | an Americans with Disability Act claim with |
| 16:38:35 18 | them. |
| 16:38:35 19 | Q. What did he say about that? |
| 16:38:36 20 | A. He didn't say anything, just -- |
| 16:38:40 21 | he just didn't say anything. He didn't say |
| 16:38:43 22 | go for it, or anything of that nature. He |
| 16:38:46 23 | just said, see how it goes. That's all he |

|  | 102 |
|---|---|
| 16:37:16 1 | A. I think there is one gentleman |
| 16:37:16 2 | here that was pointed out. He was the |
| 16:37:16 3 | restaurant manager, Kedrick, whatever his |
| 16:37:19 4 | last name was. I forget that. |
| 16:37:21 5 | Q. What do you think Kedrick might |
| 16:37:23 6 | know about your case? |
| 16:37:23 7 | A. I don't know that he would know |
| 16:37:25 8 | anything other than the fact that what |
| 16:37:30 9 | could have been said behind -- you know, I |
| 16:37:34 10 | guess, in my absence, if you will. Kedrick |
| 16:37:39 11 | was a very straightforward, you know, non- |
| 16:37:42 12 | biased individual. You know, he is what he |
| 16:37:45 13 | is, and he sees what he sees, and that's |
| 16:37:47 14 | the only person that I could really say, |
| 16:37:49 15 | you know, if he heard anything or said -- |
| 16:37:52 16 | or whether it be negative or positive or |
| 16:37:54 17 | indifferent, he would say it. And whatever |
| 16:37:56 18 | he would say, that's fine. I wouldn't hold |
| 16:37:58 19 | it against him. That's just the way he is. |
| 16:38:00 20 | Q. Have you talked to him since you |
| 16:38:01 21 | left Quality Inn? |
| 16:38:02 22 | A. I talked to him probably half a |
| 16:38:05 23 | dozen times. |

|  | 104 |
|---|---|
| 16:38:49 1 | said, you know. |
| 16:38:50 2 | Q. Anybody else that you can think |
| 16:38:51 3 | of that might be a witness or that would -- |
| 16:38:55 4 | forget about whether they would be a |
| 16:38:57 5 | witness or not. Anybody else that you can |
| 16:38:58 6 | think of that might have facts relevant to |
| 16:39:01 7 | your case? |
| 16:39:03 8 | A. Well, Mr. Montgomery, which is |
| 16:39:06 9 | executive chef, I think he's still employed |
| 16:39:08 10 | there, but I don't know that he would say |
| 16:39:14 11 | anything, you know, for either side. He's been |
| 16:39:18 12 | pretty much Mr. Montgomery. He's been |
| 16:39:18 13 | at the Governor's House probably since the |
| 16:39:21 14 | Governor's House was built. So he's gone |
| 16:39:24 15 | through a lot of owners, gone through a lot |
| 16:39:27 16 | of GMs. |
| 16:39:28 17 | Q. You said that you think Kedrick |
| 16:39:30 18 | would be straightforward, and whatever he |
| 16:39:32 19 | said, you would take it at face value or |
| 16:39:34 20 | words to that effect? |
| 16:39:35 21 | A. Uh-huh (positive response). |
| 16:39:36 22 | Q. Do you think other folks that |
| 16:39:38 23 | work at Quality Inn wouldn't be truthful if |

26 (Pages 101 to 104)

# FREEDOM COURT REPORTING

105

16:39:43 1 they testified?

16:39:44 2     A.  Absolutely, I do think that.

16:39:46 3     Q.  Who do you think wouldn't be

16:39:48 4 truthful?

16:39:49 5     A.  I know Ms. Woods and Mr. Banks,

16:39:53 6 I felt they would not be truthful or --

16:39:55 7     Q.  You don't think they are

16:39:57 8 truthful people?

16:39:59 9     A.  I think they are truthful in

16:40:01 10 some regard and not in some other regard,

16:40:03 11 in other respects.

16:40:04 12     Q.  Do you think they would be

16:40:06 13 willing to swear to tell the whole truth

16:40:09 14 and nothing but the truth, but then lie

16:40:11 15 about it?

16:40:11 16     A.  I would say that's a fair

16:40:15 17 statement.

16:40:15 18     Q.  Anything they ever did to you to

16:40:17 19 make you think that?

16:40:18 20     A.  No.  I just, I feel that they

16:40:21 21 value their job and they know where they

16:40:24 22 work and they know where their bread is

16:40:26 23 buttered, and I don't think they're going

106

16:40:27 1 to say anything to contradict what the

16:40:30 2 defendant wants them to say.

16:40:44 3     Q.  Have you talked to Roxanna about

16:40:44 4 maybe being a witness for you in this case?

16:40:45 5     A.  I have not.

16:40:54 6     Q.  If you asked her to come be a

16:40:55 7 witness for you in this case, do you think

16:40:55 8 she would?

16:40:55 9     A.  I would think so.

16:40:58 10     Q.  I'm sorry.  You would or you

16:40:59 11 wouldn't?

16:40:59 12     A.  I think she would.

16:41:13 13     MR. SMITH:  Let's take a quick

16:41:14 14 break.

16:41:14 15

16:41:14 16     (Whereupon, a brief recess was

16:49:19 17     taken.)

16:49:19 18

16:49:20 19     Q.  During this time, December of

16:49:29 20 '05, did you keep any kind of diary,

16:49:34 21 calendar?

16:49:36 22     A.  No.

16:49:38 23     Q.  Did you keep a -- did you have

107

16:49:41 1 any way of keeping up with dates and what

16:49:44 2 you had going on on a particular day?

16:49:46 3     A.  No.

16:49:49 4     Q.  In one of the witness lists I

16:50:08 5 got in this case, I think your wife may

16:50:10 6 have been listed.  Do you think your wife

16:50:12 7 would have any knowledge about anything

16:50:13 8 related to this case?

16:50:14 9     A.  No.

16:50:23 10     MR. SMITH:  I don't have

16:50:23 11 anything else.

16:50:23 12     MR. BRYANT:  Okay.  We'll

16:50:23 13 reserve ours for the time of trial.

14

15     FURTHER DEPONENT SAITH NOT

16

17

18

19

20

21

22

23

108

1     C E R T I F I C A T E

2

3 STATE OF ALABAMA )

4 JEFFERSON COUNTY )

5

6     I HEREBY CERTIFY that the

7 above and foregoing transcript was taken

8 down by me in stenotype, and the questions

9 and answers thereto were transcribed by

10 means of computer-aided transcription, and

11 that the foregoing represents a true and

12 correct transcript of the testimony given

13 by said witness.

14     I FURTHER CERTIFY that I am

15 neither of counsel, nor of any relation to

16 the parties to the action, nor am I anywise

17 interested in the result of said cause.

18

19

20

21 TANYA D. CORNELIUS

22 CCR No. 378

23

27 (Pages 105 to 108)