IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

MARIO MENDIOLA,                    )
                                   )
        Plaintiff,                 )
                                   )        CASE NO.  2:07-CV-469-MEF
v.                                 )
                                   )           (WO–Publish)
VISION HOSPITALITY, *et al.*,      )
                                   )
        Defendants.                )


## MEMORANDUM OPINION AND ORDER

### I.  INTRODUCTION

Plaintiff Mario Mendiola is an adult who has been diagnosed with leukemia.  He filed this claim against I.T. Montgomery, the owner of a hotel Mendiola once managed, J.T. Hotels, a successor in interest to I.T. Montgomery, and Vision Hospitality, a member of the same family of companies.  John Tampa, who is the managing member of these companies, was also named as a defendant.  Mendiola claims Tampa fired him because he was diagnosed with leukemia, in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA").  This Case is presently before the Court on Defendants' Motion for Summary Judgment (Doc. # 23) and Defendants' Renewed Motion for Summary Judgment (Doc. # 40). The Court has carefully considered the undisputed evidence and the applicable law and has determined that the Renewed Motion for Summary Judgment is due to be DENIED for the reasons set forth in this Memorandum Opinion and Order.  The original Motion for Summary Judgment is due to be DENIED as moot.  The Court has construed a portion of each party's

brief as a Motion to Strike.  Both of these Motions are also due to be DENIED.

## II. JURISDICTION AND VENUE

This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims are pursuant to 42 U.S.C. § 12101 *et seq.*  The parties do not contest venue and personal jurisdiction, and the Court finds a sufficient basis for each.

## III. STANDARD OF REVIEW

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "An issue of fact is 'genuine' if the record as a whole could lead a reasonable trier of fact to find for the nonmoving party.   An issue is 'material' if it might affect the outcome of the case under the governing law." *Redwing Carriers, Inc. v. Saraland Apartments*, 94 F.3d 1489, 1496 (11th Cir. 1996) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323.  The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the nonmoving party has failed

to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  *Id.* at 322-23.  Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  *Id.* at 324.  To avoid summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  On the other hand, a court ruling on a motion for summary judgment must believe the evidence of the nonmovant and must draw all justifiable inferences from the evidence in the nonmoving party's favor.  *Anderson*, 477 U.S. at 255.  After the nonmoving party has responded to the motion for summary judgment, the Court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed.  R. Civ.  P. 56(c).

## IV. FACTS

The Court has carefully considered all deposition excerpts and documents submitted in support of and in opposition to the Motion.  The submissions of the parties, viewed in the light most favorable to the nonmoving party, establish the following relevant facts:

John Tampa ("Tampa") owns and operates several hotels in Alabama and elsewhere, all through corporations and limited liability companies.  Though Tampa was initially named as a defendant, all claims against him were dismissed by stipulation of the parties.  (Doc. #

14.)  Tampa is the managing member of Defendant J.T. Hotels, LLC ("J.T. Hotels") which operates the Quality Inn & Suites Governor's House in Montgomery, Alabama.  J.T. Hotels is a successor in interest to Defendant I.T. Montgomery, LLC ("I.T. Montgomery") and exists as a result of a settlement agreement under which Tampa was to transfer all assets of I.T. Montgomery to J.T. Hotels.  J.T. Hotels was added as a Rule 19 defendant subsequent to the filing of this litigation.  The relationship between Defendant Vision Hospitality, LLC ("Vision Hospitality") and the other defendants is not clear.

Tampa met Plaintiff Mario Mendiola ("Mendiola") in San Antonio in April, 2005 and offered him a position as general manager of the Quality Inn & Suites in Montgomery. Mendiola memorialized the terms of the offer in a letter to Tampa on April 27, 2005 and relocated to Montgomery the next month.  His girlfriend, Roxanne Luker ("Luker"), moved with him, and they lived together in a suite on the premises of the Quality Inn & Suites. Mendiola was an employee of I.T. Montgomery while he worked as the general manager of the hotel.

Mendiola was tentatively diagnosed with leukemia in early December, 2005.  He was under the treatment of a physician for diabetes at the time of the diagnosis, and an irregular blood count indicated he may have the disease.  Additional testing was necessary to confirm the diagnosis, and a bone marrow biopsy was needed to determine how advanced the leukemia was.  Mendiola visited a specialist for the additional testing on December 7, 2005 and called Tampa the same day to tell him of the tentative diagnosis.  What happened during

4

this phone call is a matter of dispute.

In his deposition, Mendiola stated:

I informed John Tampa of my tentative diagnosis and told him about the necessity of additional tests. I further stated that if I was in a late stage of the disease, I would possibly want to return to Texas for treatment. I was very clear that no action would be taken prior to the additional tests.

(Mendiola Dep. Doc. # 41-5 Ex. 7 64-65.)  Mendiola further claims that Tampa offered encouraging words and a two-thousand dollar advance to help cover medical expenses. This, according to Mendiola, was the last positive conversation he had with Tampa.

Tampa remembers the conversation differently.  In his deposition, Tampa characterized the substance of their conversation as follows:

Mr. Mendiola came to me—actually, he called me and said he got a—I don't know all the word—issue is good.  But he told me, hey, I have problem or issue with health. I think I've got to go back to Texas. . . . He told me, I've got to go back to Texas.  I cannot manage the property no more.  And my understanding was, I'm going to leave in condition from the company due to my health issue.

(Tampa Dep. Doc. # 41-2 Ex. 4 43.)[1]  Tampa understood Mendiola to be tendering his

---

[1]Tampa also testified that

when [Mendiola] first—we made the first conversation and he told me his plans to leave for Texas to be with his family, I said, no problem, you can hang around over here for a few weeks, see what's going on with you, because he did not know what his sickness is.  He did not know.  He told me he got a problem with sugar and he needs to do more tests, and Montgomery did not have the proper, either doctors or something.  He was trying to find somebody to do the tests.  I don't know exactly, you know.

(Tampa Dep. Doc. # 41-2 Ex.  4 65)

resignation during this phone call.

On December 12, 2005, five days after the phone conversation, Tampa sent a fax to Mendiola informing him that Tampa had hired Mendiola's replacement who would start on December 20, 2005. Mendiola called Tampa numerous times after he received this fax, but Tampa neither answered nor returned the calls. As a result, Mendiola faxed a letter to Tampa on December 14, 2005. He made clear in the letter that he had not resigned, but Tampa claims he never received the letter. Mendiola subsequently approached Tampa in the parking lot of the hotel. He describes the encounter this way:

> I said: Why haven't you answered my phone calls? I sent you a memo regarding the memo you sent me that I'm being replaced. He said: Well, you told me you were leaving. I said: I never told you I was leaving. He had every opportunity at that time to say it was miscommunicated, I'm sorry, make it right, but he didn't. And I said: John, you know, I think you're in violation of the Americans with Disabilities Act. And he raised his hand, walked away, got in his car, and drove away.

(Mendiola Dep. Doc. # 41-5 Ex. 7 78.) For his part, Tampa admits he spoke with Mendiola at some point during the week of December 12, 2007, but claims that Mendiola did not try to explain that he did not resign. In fact, Tampa claims Mendiola was fine with leaving for Texas on December 20, 2007.

Mendiola and Tampa never discussed how the leukemia might affect Mendiola's ability to work. However, when asked about whether "Mendiola's illness affected his job performance," Tampa replied "In the last few weeks, yes. . . . [T]he last few weeks he was on the properties, after he found out he got an issue with his blood sugar, he was not too

6

much on the property.  Most of the time he ran around checking the doctor.  He was just not at work."[2] (Tampa Dep. Doc. # 41-2 Ex. 4 45-46.)  Here again the accounts differ.  Mendiola claims he "never missed work" because we went to the doctor's office only during lunchtime. (Mendiola Dep. Doc. # 41-5 Ex. 7 82.)

Mendiola also testified to a marked difference in Tampa's demeanor following the tentative diagnosis:

> [I]t's very evident that as soon as I started reporting my illness to Mr.  Tampa, his conversation with me almost went from calling me five times a day to zero . . . . So once I reported to him or advised him, as a courtesy, this was going on with my health . . . our conversation almost went from, like I said, five phone calls a day to zero.  And so there's no other explanation for me as far as his perception of me not being able to comply with, I guess, his needs for me to operate the hotel, and he was totally wrong. . . . First I told him about the diabetes and then, after that, it was determined that leukemia was in play. That's when it really, really got silent, and then I start getting these memos and all of a sudden, you know, he's talking about that I mentioned to him that I was going back.

(Mendiola Dep. Doc.  # 41-5 Ex 7 96-97.)  As Mendiola's statement here shows, there were memos exchanged during this period relating to Tampa's dissatisfaction with Mendiola's performance as manager.

Portions of Tampa's version of events are corroborated by the testimony of two other deponents.  Beverly Woods ("Woods"), the director of sales, and Timothy Banks ("Banks"), the assistant manager, claim Mendiola told them that he had been diagnosed with leukemia

---

[2]While Tampa refers to Mendiola finding out about an "issue with his blood sugar," it is clear from the totality of the deposition testimony that he is referring to the tentative leukemia diagnosis.

and was relocating to Texas for treatment.  Woods' testimony is somewhat inconsistent, however, because she later claims Mendiola did not say he certainly was leaving, but only said that he could get free treatment in Texas.  Both Woods and Banks note that Mendiola did not say he was resigning.  They both claim that in December of 2005, the management of the hotel, including Woods, Banks and Mendiola, participated in a conference call with Tampa.  According to their testimony, during this call Tampa announced that Mendiola was leaving the company and moving back to Texas.  Banks claims Mendiola did not say anything during that call.  Whether this call happened before or after Tampa informed Mendiola that he hired a replacement is not clear.  Woods also testified that Luker, Tampa's girlfriend, told her that she would be returning to Texas with Mendiola.

Mendiola disputes all of this testimony.  He claims he informed hotel personnel of his tentative diagnosis and the need for further testing "[n]ot at a group or a department head meeting, but as I went around." (Mendiola Dep. Doc. # 41-5 Ex. 7 73.)  After the phone call, Mendiola claims he told Banks that he had not resigned, that in fact he had been terminated because of his illness, and that Tampa had already made the decision to terminate him.  He claims he never spoke with Banks about his treatment plan or returning to Texas.  He also claims he never spoke to Woods about his condition or returning to Texas.  Mendiola thinks Banks and Woods testified falsely out of fear of reprisal from Tampa.  Mendiola further claims that he did not discuss with Luker whether he planned to relocate to Texas prior to his final diagnosis, saying that he would "never discuss that" with her because he did not think

it prudent to "tell the girlfriend everything." (Mendiola Dep. Doc. # 41-5 Ex. 7 72.)

On December 22, 2005, Mendiola received confirmation that he had leukemia. However, the disease was in remission, which meant that he would not need medical treatment.

Mendiola then filed for unemployment benefits with the State of Alabama Department of Industrial Relations Unemployment Compensation Agency. The Agency found he was fired without cause and granted his request for benefits. Mendiola then filed a charge of discrimination with the Equal Opportunity Employment Commission ("EEOC") against I.T. Montgomery. The EEOC found there was probable cause to believe I.T. Montgomery violated the ADA. Mendiola received a right to sue letter from the EEOC, and on May 24, 2007, he filed this action.

Defendants moved for summary judgment on March 14, 2008. (Doc. # 23.) Because of some discovery difficulties, however, that motion was not supported by deposition testimony. Mendiola moved to continue the summary judgment deadline so the parties could conduct more discovery. (Doc. # 27.) The Court granted that motion on May 12, 2008. (Doc. # 33.) Depositions were taken and, by leave of this Court (Doc. # 37), J.T. Hotels was added as a Rule 19 defendant (Doc. # 36). Defendants then moved for summary judgment a second time. (Doc. # 40.) The Renewed Motion is substantively similar to the original, but is accompanied by deposition testimony. That Motion is now under submission and ripe for disposition.

# V. DISCUSSION

Mendiola claims he was terminated in violation of the ADA.  The ADA prohibits an employer from discriminating against "a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). A claim under the ADA is analyzed under the same burden-shifting analysis applicable to Title VII claims. *Earl v. Mervyns, Inc.*, 207 F.3d 1361, 1365 (11th Cir. 2000). To establish a prima facie case of ADA discrimination, a plaintiff "must demonstrate that [he] (1) is disabled, (2) is a qualified individual, and (3) was subjected to unlawful discrimination because of [his] disability." *Greenberg v. BellSouth Telecomms., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (internal quotations omitted).  There is no dispute that Mendiola is qualified, and Defendants do not, at this stage, challenge Mendiola's proof on the third element—that Tampa discriminated against him because of his disability.  The Court therefore considers only whether Mendiola has a disability for purposes of the ADA.  Defendants also seek dismissal of all claims against Vision Hospitality, and parties on both sides challenge portions of the other's evidence.  The Court will dispose of these preliminary matters before turning to the dispute over Mendiola's disability.

## A.  Defendant Vision Hospitality

Mendiola asserts a claim of disability discrimination against Vision Hospitality under

the theory that he was employed by both I.T. Montgomery and Vision Hospitality during the relevant period.  Defendants seek summary judgment on the claim against Vision Hospitality.  They argue that the claim should be dismissed because ADA claims provide only employer liability and Vision Hospitality was not Mendiola's employer.  *See Mason v. Stallings*, 82 F.3d 1007, 1009 (11th Cir. 1996); *Doe v. Dekalb County School District*, 145 F.3d 1441, 1447 (11th Cir. 1998).  Mendiola acknowledges in his Response to Defendants' Renewed Motion for Summary Judgment that there is no evidence in the record that he was employed by Vision Hospitality.  The Court has likewise not found evidence that would allow a reasonable fact finder to conclude that Mendiola was employed by Vision Hospitality.  Therefore, all claims against Vision Hospitality are due to be dismissed.

## B.  Plaintiff's Motion to Strike

Mendiola's response to Defendants' Renewed Motion for Summary Judgment contains "Plaintiff's objections to Defendants' summary judgment evidence."  The Court construes this part of Mendiola's response as a Motion to Strike.

Mendiola argues that three sentences, one sentence each from the affidavits of Tampa, Woods, and Banks, should be stricken because they are conclusory, contain incompetent legal opinions, or are hearsay.[3]  These arguments have no merit.

---

[3]Mendiola points out that it is not clear whether the affidavits are part of the summary judgment submission.  The Court agrees, but since the Defendants cite the affidavits throughout their brief, because the affidavits were submitted with the prior Motion for Summary Judgment, and because their contents are materially identical to the deposition testimony of the three affiants, the Court both considers them as evidence and will rule on this Motion to Strike.

The three sentences Mendiola asks the Court to strike all pertain to the impression Tampa, Woods, and Banks had when Mendiola told each of them he had been diagnosed with leukemia. They all three state (both in their affidavits and in deposition testimony) that they understood Mendiola to be resigning from his employment. While the Court expresses no opinion on the ultimate admissibility of this testimony, these statements of how the three understood their conversations with Mendiola are not opinions, they do not concern matters of law, and they are not hearsay. They are testimony by persons with first hand knowledge (indeed, the only persons who could have first hand knowledge) of what they took from their respective conversations with Mendiola. As such, Plaintiff's Motion to Strike is due to be denied.

### C.  Defendants' Motion to Strike

In their reply brief, Defendants argue that a record from the Alabama Department of Industrial Relations, which Mendiola submitted with his opposition to Defendants' Motion, should be stricken because it is hearsay within hearsay and should not be considered.[4]  The Court construes this argument as a Motion to Strike.

Defendants correctly point out that the Eleventh Circuit has held that inadmissible

---

[4]The record states:

This agency has received information from IT Montgomery LLC concerning your most recent separation from work due to informing the employer that you had medical problems and wanted to go home to Texas for treatment. You were told that after your recovery you would be considered for rehire.

(Doc. # 47-6 Ex. 5.)

hearsay generally cannot be considered on a motion for summary judgment. *Macuba v. Deboer*, 193 F.3d 1316, 1322-23 (11th Cir. 1999). It is not clear, however, that this report would be excluded. The problems Defendants point to are remedied by one exception to the hearsay rule and one exemption from the definition of hearsay. *See* Fed. R. Evid. 805. The exception for public records and reports excepts the first layer of hearsay, Fed. R. Evid. 803(8), and the second layer is not hearsay because it is an admission by a party-opponent, Fed. R. Evid. 801(d)(2). While the Court expresses no opinion on the ultimate admissibility of the report, it will consider the material in ruling on this Motion. Therefore, Defendants' Motion to Strike is due to be denied.

### D. Disability

To establish a prima facie case of ADA discrimination, a plaintiff "must demonstrate that [he] (1) is disabled, (2) is a qualified individual, and (3) was subjected to unlawful discrimination because of [his] disability." *Greenberg v. BellSouth Telecomms., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (internal quotations omitted). Defendants argue in their Motion that Mendiola has not met his burden of production on the issue of disability. The ADA defines "disability," as (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2)(A)-(C). Mendiola claims that he is disabled for purposes of the ADA because Tampa regarded him as being substantially limited in the performance of a major life activity under subsection (C).

There are two ways an employer may regard one as having a disability: "(1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities." *Sutton v. United Air Lines, Inc.*, 527 U.S. 417, 489 (1999). Mendiola claims Tampa committed the second mistake.[5]

"Major life activities" encompass "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R § 1630.2(I); *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1327 n.1 (11th Cir.1998). The major life activity Mendiola relies upon is "working."

The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working. *Id.* "When individuals claim that they are substantially limited in the major life activity of 'working,' their condition 'must significantly restrict [their] ability to perform either a class of jobs or a broad range of jobs in various classes.'" *Stewart v. Happy Herman's Cheshire Bridge*, 117 F.3d 1278, 1285 (11th Cir.

---

[5]Leukemia is clearly a physical impairment. The EEOC regulations on the subject define physical impairment as:

> Any physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculosketal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, endocrine. . . .

29 C.F.R. § 1630.2(h)(1). Leukemia affects at least the hemic and lymphatic systems.

1997) (citing 29 C.F.R. § 1360.2(j)(3)(I)). A "class of jobs" is defined as:

> The job from which the individual has been disqualified because of an impairment, and the number and types of jobs utilizing similar training, knowledge, skills of abilities, within that geographical area, from which the individual is also disqualified because of the impairment.

29 C.F.R. § 1630.2(j)(3)(ii)(B); *see also Witter v. Delta Airlines*, 138 F.3d 1366, 1370 (11th Cir. 1998). A "broad range of jobs in various classes" is defined as:

> The job from which the individual has been disqualified because of an impairment, and the number and types of other jobs *not* utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment.

29 C.F.R. § 1630.2(j)(3)(ii)(C); *see also Whitter*, 138 F.3d at 1370.   Therefore, it is not enough for Mendiola to show that his employer was aware of his physical illnesses. He also must point to evidence from which it can be inferred that Tampa perceived, considered or treated Mendiola's leukemia or other health problems as substantially limiting his ability to perform a class of jobs or a broad range of jobs. *See Roberts v. Rayonier, Inc.*, 135 Fed. Appx. 351, 356 (11th Cir. 2005).

Defendants argue that Tampa could not have regarded Mendiola as disabled because Mendiola did not tell Tampa anything about how the leukemia diagnosis would affect his ability to work. They rely on *Carruthers v. BSA Advertising, Inc.*, 357 F.3d 1213, 1216-17 (11th Cir. 2004), in which the Eleventh Circuit held the district court should have granted judgment as a matter of law where the employer's knowledge of the plaintiff's condition was limited to a physician's diagnosis of a bilateral hand strain/sprain and work restrictions.

Mendiola argues that Tampa's stark change in behavior is evidence that Tampa regarded Mendiola as unable to perform his job and a broad range of jobs.  Mendiola also claims that, given his initial unambiguous statement that he might return to Texas and his repeated attempts to reiterate this message after he became aware Tampa hired a replacement, the only reason Tampa would have ignored Mendiola and summarily terminated him was the Leukemia diagnosis.  Mendiola also points to Tampa's statement to the Alabama Department of Industrial Relations Unemployment Compensation Agency and during his deposition that Tampa would consider Mendiola for rehire once he "recovered" from Leukemia.  Finally, Mendiola points to Tampa's statements that Mendiola's illness affected his job performance and memos expressing the same sentiment as evidence that Tampa regarded Mendiola as unable to work.

At the outset, the Court notes that a disability claim based upon a "regarded as" theory requires a determination about the subjective state of mind of the employer.  Such questions are not easily proven through deposition transcripts and affidavits, and are therefore generally more appropriate for the jury than for the judge.  *See Ross v. Campbell Soup Co.*, 237 F.3d 701, 709 (6th Cir. 2001).  Additionally, because the inquiry involves a determination about the defendant's state of mind, evidence that would be offered to show discriminatory intent may be relevant to the question of whether the defendant regarded the employee as disabled. *McElroy v. Phillips Medical Sys. of North America, Inc.*, 127 Fed.  Appx. 161, 168 (6th Cir. 2005).

Mendiola points to two sets of statements made by Tampa to support the proposition that Tampa regarded Mendiola as unable to perform a class of jobs or a broad range of jobs. *See Rodriguez v. ConAgra Grocery Products Co.*, 436 F.3d 468, 476 (5th Cir. 2006) (focusing in a regarded as case on the statements of the employer that the plaintiff was not qualified for any positions at defendant-employer's plant); *Muller v. Hotsy Corp.*, 917 F. Supp. 1389, 1411-12 (N.D. Iowa 1996) (holding that statement by employer that it was "hard to believe that [plaintiff] could ever recover from such a severe injury" created triable issue on regarded as claim). The first statements are clearest and most direct. In his deposition, Tampa responded affirmatively when asked if Mendiola's illness affected his job performance. If Tampa believed Mendiola's leukemia interfered with his performance as manager in a way not related to his particular job as hotel general manager, these statements give rise to a permissible inference that Tampa thought Mendiola's illness would interfere with a broad range of jobs or all management jobs. This reasoning is buttressed by analogous inferences from memos sent by Tampa to Mendiola during the same time period expressing newfound dissatisfaction with how Mendiola was performing as general manager.

There is a second set of statements that could support an inference that Tampa thought Mendiola was unable to perform a broad class of jobs. Mendiola points out that Tampa told the Alabama Department of Industrial Relations that he could consider Mendiola for rehire once he recovered from his illness. Additionally, in his deposition, Mendiola was asked whether he ever told anyone that when Mendiola recovered from his illness he could come

17

back to work for Tampa.  He responded that "if somebody asks me, yes." (Tampa Dep. Doc. # 41-2 Ex. 4 99.)  These statements to the effect that Mendiola would be considered for rehire or could come back and work with Tampa when he recovered from his illness obviously admit of two interpretations.  One, offered by Tampa, is that Tampa would consider rehiring Mendiola when he completed his course of treatment and was free to leave Texas.  The other, urged by Mendiola, is that Tampa would consider rehiring Mendiola when he was able to work again.  Because the Court must construe this fact in the light most favorable to Mendiola, the nonmovant, it must, for purposes of this Motion, treat this as an admission by Tampa that he would consider re-hiring Mendiola when he was again able to work.[6]

There is, moreover, circumstantial evidence of discriminatory intent, which is relevant to Tampa's state of mind. *McElroy*, 127 Fed. Appx. at 168.  The temporal proximity (5 days or less) between Mendiola's disclosure of his diagnosis and Tampa's decision to find a replacement, together with (under Mendiola's version of the events) the absence of an alternative nondiscriminatory explanation, is evidence of a discriminatory motive.  *See Puckett v. Shinbaum*, 2008 WL 906569, at *19 n.9, No. 2:06-cv-1148-ID (M.D. Ala. March

---

[6]Mendiola's interpretation indicates that Tampa may have thought Mendiola's impairment was temporary, in which case Tampa would not have regarded Mendiola as having a disability within the terms of the ADA.  Additionally, the Court is aware that Tampa also said that if Mendiola had not resigned, that he could stay and work.  This obviously cuts against Mendiola's argument that Tampa regarded him as unable to work a broad range of jobs.

18

31, 2008) (DeMent, J.).  If Mendiola's version of Tampa's actions following the diagnosis are to be believed—particularly his stubborn refusal to acknowledge Mendiola did not resign—they give rise to a permissible inference that Tampa thought Mendiola unable to perform his job or a broad class of jobs.

Plaintiff also urges the Court to consider the EEOC probable cause determination in ruling on the Motion.  Defendant argues the EEOC's determination in this case is based on Plaintiff's evidence alone and is therefore untrustworthy.   While the Eleventh Circuit generally considers EEOC determinations "highly probative," the Circuit has eschewed a per se rule of admissibility of probable cause determinations at trial in recognition of the varying quality of such determinations.  *Barfield v.  Orange County*, 911 F.2d 644, 650 (1990).  The rule allows a trial judge in a jury trial the discretion to admit or exclude probable cause determinations upon consideration of both the probative value and the potential for prejudice. *Id*.  This Court does not at present make a determination about the ultimate admissibility of the EEOC determination in this case, but does note it as an additional reason that this case should be allowed to continue to trial.

As a final note, *Carruthers v.  BSA Advertising, Inc.*, 357 F.3d 1213 (11th Cir. 2004), is not determinative of this case.  First, *Carruthers* involved a hand sprain, whereas this case involves leukemia.   While a simple difference in diagnosis is not a meaningful point of distinction, it is generally known that cancer is at best debilitating and at worst deadly.  *See Heyman v.  Queens Village Comm.*, 198 F.3d 68, 73 (2d Cir. 1999) (holding that employer

19

regarded employee as disabled where employee was diagnosed with lymphoma and where facts showed employer expected employee to miss work as a result of his lymphoma). On the other hand, a hand sprain is at best a minor and transient inconvenience, and only in severe cases would a hand sprain be debilitating. Given these differences, one expects a different set of assumptions to arise from these very different diagnoses. Moreover, the Eleventh Circuit in *Carruthers* recognized the transitory nature of hand sprain when it held that the diagnosis did not carry the "permanent or long term impact" necessary to a finding of disability under the ADA. It is widely known, however, that a cancer diagnosis is lifelong.

Second, the only other evidence in *Carruthers* was that the employer (1) told the plaintiff she must maintain a full time schedule, and (2) advertised for her replacement after it learned she would not be able to perform the basic tasks of her position. This case involves statements by Tampa that the Court must construe to mean the he thought Mendiola was unable to work generally. Moreover, by Mendiola's account, Tampa engaged in an inexplicable refusal to acknowledge that Mendiola did not resign, and sought his replacement shortly after Tampa learned of the diagnosis. All of these facts, together with the difference in permanence and severity of the diagnoses distinguish this case from *Carruthers*.

## VI. Conclusion

Like all plaintiffs pursuing regarded as claims under the ADA, Mendiola faces a formidable challenge at trial. Nevertheless, in light of the conflicting facts on the issue of disability in the record, the two parallel but mutually exclusive accounts of events presented

20

by Mendiola and Tampa, and the difficulty in determining subjective state of mind as a matter of law, the Court finds that the evidence is sufficient to create a triable issue on whether Tampa regarded Mendiola as being unable to work a broad range of jobs in various classes or a class of jobs.  Therefore, it is hereby ORDERED:

(1) that Plaintiff's Motion to Strike is DENIED;

(2) that Defendants' Motion to Strike is DENIED;

(3) that Defendants' Renewed Motion for Summary Judgment (Doc. # 40) is DENIED; and

(4) that Defendants' Motion for Summary Judgment (Doc. # 23) is DENIED as moot.


Done this the 8th day of December, 2008

_____/s/ Mark E. Fuller_____
CHIEF UNITED STATES DISTRICT JUDGE